**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA and STATE OF TEXAS, ex rel. SHATISH PATEL, M.D., HEMALATHA VIJAYAN, M.D., and WOLLEY OLADUT, M.D.,** | § § § § § § § § § | **FILED <u>IN CAMERA</u> AND <u>UNDER SEAL</u> PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| *Plaintiffs,* | § | |
| **vs.** | § § | |
| **CATHOLIC HEALTH INITIATIVES, ST. LUKE'S HEALTH SYSTEM CORPORATION, ST. LUKE'S COMMUNITY DEVELOPMENT CORPORATION – SUGAR LAND, DAVID FINE, DAVID KOONTZ, and STEPHEN PICKETT,** | § § § § § § § § § § § § | **CIVIL ACTION NO. _____** |
| *Defendants.* | § | **JURY TRIAL DEMANDED** |

<u>**RELATORS' ORIGINAL COMPLAINT**</u>

Shatish Patel, M.D., Hemalatha Vijayan, M.D., and Wolley Oladut, M.D. (collectively,

"Relators") hereby file Relators' Original Complaint against Catholic Health Initiatives,

St. Luke's Health System Corporation, St. Luke's Community Development Corporation –

Sugar Land, David Fine, David Koontz, and Stephen Pickett (collectively, "Defendants"),

asserting claims on behalf of the United States of America and the State of Texas pursuant to the

Federal False Claims Act, 31 U.S.C. §§ 3729, *et. seq.*, and the Texas Medicaid Fraud Prevention

Act, Tex. Hum. Res. Code §§ 36.001, *et. seq.*

## Table of Contents

Table of Contents ...................................................................................................2

I.    The Parties ...............................................................................................4

II.   Selected Abbreviations, Designations, and Defined Terms .....................................5

III.  Jurisdiction and Venue...............................................................................6

IV.   Facts ......................................................................................................7

       The System Plans Suburban Expansion with Physician-Owned Hospitals .........................7

       Formation of the Partnership, Public Offerings, and Building the Hospital...................... 8

       New Restrictions on Physician-Owned Hospitals Alter the System's Plans....................12

       The System Moves to Eliminate its Physician Partners .........................................14

       The System Picks Statutory Rescission as Its Weapon of Choice .....................................18

       The System Won't Take "No" for an Answer .................................................. 22

       The Aftermath of the Rescission Transactions .................................................. 29

       The System Advances a New Legal Theory and Digs a Deeper Hole..............................31

       Because Mootness is Jurisdictional, the System Forced the Appellate Court to
             Decide that Ownership of the Hospital Had Not Transferred to
             SLCDC-SL....................................................................................34

       Relators Discover that the System Had Known All Along that its Position about
             the Hospital's Ownership was Frivolous.....................................................35

       The System Knowingly, Intentionally, and Repeatedly Used Misrepresentations
             to Ultimately Convince the Government to Recognize a Change of
             Ownership of the Hospital ........................................................................39

       SLCDC-SL Never Had the Right to Receive a Single Medicare or Medicaid
             Dollar for Otherwise Covered Services Rendered at the Hospital ........... 44

       CHI Acquires the System and Doubles Down on the System's Misconduct....................45

V.    Claims / Causes of Action................................................................................ 47

       Count 1:       Violation of 31 U.S.C. § 3729(a)(1)(A) (Against All Defendants)
                      (Rescission Transactions) (Anti-Kickback / Stark)...................................47

|          |                                                                                      |      |
|----------|--------------------------------------------------------------------------------------|------|
| Count 2: | Violation of 31 U.S.C. § 3729(a)(1)(B) (Against All Defendants) (Rescission Transactions) (Anti-Kickback / Stark) | 55 |
| Count 3: | Violation of 31 U.S.C. § 3729(a)(1)(A) (Against All Defendants) (Hospital Change of Ownership) | 59 |
| Count 4: | Violation of 31 U.S.C. § 3729(a)(1)(B) (Against All Defendants) (Hospital Change of Ownership) | 62 |
| Count 5: | Violation of Tex. Hum. Res. Code § 36.002(1) (Against All Defendants) (Hospital Change of Ownership) | 68 |
| Count 6: | Violation of Tex. Hum. Res. Code § 36.002(2) (Against Defendants SLCDC-SL, the System, and CHI) (Hospital Change of Ownership) | 73 |

**VI.**   **Conditions Precedent / No Public Disclosure Bar** ............................................... 75

**VII.**   **Jury Trial Demand** ........................................................................ 76

**Prayer for Relief** .............................................................................. 76

## I.    The Parties

1.      Relator Shatish Patel, M.D. is a resident of Fort Bend County, Texas. Dr. Patel is a physician licensed to practice medicine in the State of Texas.

2.      Relator Hemalatha Vijayan, M.D. is a resident of Fort Bend County, Texas. Dr. Vijayan is a physician licensed to practice medicine in the State of Texas.

3.      Relator Wolley Oladut, M.D. is a resident of Fort Bend County, Texas. Dr. Oladut is a physician licensed to practice medicine in the State of Texas.

4.      Defendant St. Luke's Health System Corporation d/b/a CHI St. Luke's Health is a Texas nonprofit corporation that may be served through its registered agent for service of process in Texas: C T Corporation System, 1999 Bryan St., Suite 900, Dallas, TX 75201.

5.      Defendant Catholic Health Initiatives is a Colorado nonprofit corporation with its principal place of business located at 198 Inverness Dr. W., Englewood, CO 80112-3637. Catholic Health Initiatives may be served through its registered agent for service of process in Texas: C T Corporation System, 1999 Bryan St., Suite 900, Dallas, TX 75201. On May 31, 2013, Defendant Catholic Health Initiatives became the sole member of Defendant St. Luke's Health System Corporation d/b/a CHI St. Luke's Health.

6.      Defendant St. Luke's Community Development Corporation – Sugar Land is a Texas nonprofit corporation that may be served through its registered agent for service of process in Texas: C T Corporation System, 1999 Bryan St., Suite 900, Dallas, TX 75201. Defendant St. Luke's Health System Corporation d/b/a CHI St. Luke's Health is the sole member of Defendant St. Luke's Community Development Corporation – Sugar Land.

7.      Defendant David Fine is an individual resident of Colorado and a former resident of Texas. Defendant Fine currently serves as President and CEO of the CHI Institute for

Research and Innovation, and he may be served at his primary place of work, 198 Inverness Dr. W., Englewood, CO 80112-3637, or wherever he may be found.

8.      Defendant Stephen Pickett is an individual resident of Alabama and a former resident of Texas. Defendant Pickett currently serves as a healthcare consultant for Warbird Consulting, and he may be served at his primary place of work, 600 Galleria Pkwy SE, Suite 1400, Atlanta, GA 30339, or wherever he may be found.

9.      Defendant David Koontz is an individual resident of Georgia and a former resident of Texas. Defendant Koontz currently serves as CEO of St. Francis Hospital in Columbus, Georgia, and he may be served at his primary place of work, 2122 Manchester Expressway, Columbus, GA 31904, or wherever he may be found.

## II.    Selected Abbreviations, Designations, and Defined Terms

10.     All natural persons shall be identified by their surname or by their full name if necessary to avoid confusion.

11.     Defendant Catholic Health Initiatives is hereafter referred to as "CHI."

12.     Defendant St. Luke's Health System Corporation is hereafter referred to as the "System."

13.     Nonparty St. Luke's Community Development Corporation is hereafter referred to as "SLCDC."

14.     Defendant St. Luke's Community Development Corporation – Sugar Land is hereafter referred to as "SLCDC-SL."

15.     SLCDC-SL and the System are hereafter referred to collectively as the "St. Luke's Defendants."

16.     Nonparty SLEHS Holdings, Inc. is hereafter referred to as "Holdings."

17.     The "Hospital" refers to the St. Luke's Sugar Land Hospital a/k/a CHI St. Luke's Health—Sugar Land Hospital, located at 1317 Lake Point Parkway, Sugar Land, TX 77478.

18.     Nonparty St. Luke's Sugar Land Partnership, L.L.P. is hereafter referred to as the "Partnership."

19.     Nonparties John Vanderzyl, M.D., Nilesh Bavishi, M.D., and Dipti Bavishi, M.D. are hereafter referred to collectively as the "Initial Partners."

20.     Nonparty Healthcare Appraisers, Inc. is hereafter referred to as "HCAI."

21.     The Federal False Claims Act, 31 U.S.C. §§ 3729, *et. seq.* is hereafter referred to as the "FCA."

22.     The Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§ 36.001, *et. seq.*, is hereafter referred to as the "TMFPA."

23.     The pending Texas state court case styled *Patel, et. al. v. St. Luke's Sugar Land Partnership, L.L.P., et. al.*, Cause No. 2011-24016, in the 152nd Judicial District Court of Harris County, Texas shall be referred to herein as the "State Court Lawsuit."

### III.     Jurisdiction and Venue

24.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action asserts claims that arise under the laws of the United States. The Court also has subject matter jurisdiction under 31 U.S.C. § 3732(a), which expressly confers jurisdiction on this Court for the specific claims asserted herein for violations of 31 U.S.C. § 3729. *See also* 31 U.S.C. § 3730(b).

25.     Pursuant to 28 U.S.C. § 1367, this Court also has supplemental jurisdiction over the claims asserted herein under the Texas Medicaid Fraud Prevention Act, as those claims are

so related to claims within the Court's federal question jurisdiction that they form part of the same case or controversy. Moreover, under 31 U.S.C. § 3732(b), this Court has subject matter jurisdiction over the claims asserted herein under the Texas Medicaid Fraud Prevention Act because those claims seek recovery of funds paid by the State of Texas relating to the same transactions or occurrences at issue in the claims asserted herein under the Federal False Claims Act.

26.    Under 28 U.S.C. § 1391(b)(2), venue is proper in the Southern District of Texas because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in the Southern District of Texas. Moreover, venue is proper in the Southern District of Texas under 31 U.S.C. § 3732(a) because at least one defendant can be found, resides, or transacts business in the Southern District of Texas and because the claims asserted herein arise from acts proscribed by 31 U.S.C. § 3729 that occurred within the Southern District of Texas.

## IV.    <u>Facts</u>

**The System Plans Suburban Expansion with Physician-Owned Hospitals**

27.    In the first half of the last decade, the System, under the leadership of its then-CEO Fine, determined that it had to expand into the suburban and surrounding areas of Houston, Texas to stay competitive with Memorial Hermann and Methodist hospital systems – the System's chief rivals the Houston-area market.

28.    By 2005, both Memorial Hermann and Methodist had established regional hospitals in key suburban markets in the Houston area.

29.    Because the System was already behind Memorial Hermann and Methodist in expanding to suburban markets, the System and Fine concluded that the System would be best served by partnering with physicians who practiced primarily in the suburban markets targeted by

the System. Accordingly, the System actively sought to establish joint-venture hospitals where local physicians would have some ownership interest, and would therefore have additional incentive to refer patients and services to the St. Luke's-affiliated regional hospital in lieu of the competing hospitals, including suburban hospitals already established or planned by Memorial Hermann or Methodist or both.

30.     The System's purpose in establishing physician-owned hospitals was to induce regional physicians to refer more patients and services to the St. Luke's-affiliated hospital. But the System believed that if the physician-owned hospital were structured to comply with the requirements of the "Whole Hospital Exception" safe harbor established as part of the federal healthcare statutory and regulatory framework, then such a physician-owned hospital would not violate federal or state healthcare laws or the statutes and regulations governing financial relationships between hospitals and physician referral sources.

31.     The Houston suburb of Sugar Land, Texas was one key market the System targeted for expansion as part of the System's suburban expansion strategy.

**Formation of the Partnership, Public Offerings, and Building the Hospital**

32.     On February 14, 2006, the System's for-profit subsidiary Holdings and the Initial Partners formed the Partnership for the purpose of owning and operating an acute care hospital located in Sugar Land, Texas.  The Partnership was formed as a general partnership registered as a limited liability partnership under the laws of the State of Texas.  The Partnership's governing documents permitted the Partnership to transact lawful business, enter into lawful arrangements for sharing of profits and losses, and to buy, sell, or lease any property, amongst other purposes.

33.     In February 2006, the Initial Partners and Holdings prepared and issued a Confidential Private Placement Memorandum (the "PPM") to a number of potential physician

investors.  Through this public offering (the "First Offering"), under the conditions set forth in

the PPM, the Partnership intended to and did raise funding needed to build and operate the

Hospital.

34.     The PPM and the Partnership's original partnership agreement specified that the

ownership of the Partnership would be split between two classes of partners – Class A and Class

B.  Class A would comprise of physician investors, including Relators, and would always own 49%

of the Partnership, irrespective of how many actual Class A Units had been issued.  Class B

would comprise solely of the Class B Partner – a System subsidiary or affiliate – and would always

own 51% of the Partnership, irrespective of the number of Class B Units issued.  Prior to the

acceptance of new partners through the PPM, the Initial Partners collectively owned 14 Class A

Units, and Holdings owned 204 Class B Units.  Despite the disparity in numbers of Units held,

Class A collectively owned 49% of the Partnership, and Class B owned 51% of the Partnership.

35.     Just prior to the issuance of the PPM, the Initial Partners had not paid any cash or

other consideration in exchange for the 14 Class A Units collectively held by the Initial Partners.

Prior to the closing of the First Offering, the System and the Initial Partners agreed that the

Initial Partners would pay $20,000 per Class A Unit, even though Class A Units were being sold

to other physician investors at the price of $40,000 per Class A Unit. The System and the Initial

Partners later agreed to list the Initial Partners as having paid $40,000 per Class A Unit in

Partnership records created to identify the physician partners, the numbers of Class A Units held

by each physician partner, and the total investment by each physician partner. After the closing of

the First Offering, the System and the Initial Partners realized that crediting the Initial Partners

for having invested $40,000 per Class Unit when they had, in fact, not paid more than $20,000

per Class A Unit would not comply with healthcare laws and regulations governing the financial relationship between hospitals and physicians, in part, because the System would be causing the Partnership to give the Initial Partners more equity interest than the Initial Partners had actually paid for.

36.     But instead of the Initial Partners simply paying an additional $20,000 per Class A Unit they held, the System and the Initial Partners agreed to create false records purporting to list a number of additional development services purportedly provided by the Initial Partners during the startup phase of the Partnership and during the First Offering. The Initial Partners did not actually provide any such additional services, and both the System and the Initial Partners knew that they were simply creating false records to make it appears as if the Initial Partners had received a discount on the sales price of Class A Units in exchange for having actually provided services that could be fairly valued at $20,000 per Class A Unit. Neither the System nor the Initial Partners disclosed this sham to the other new incoming physician investors.

37.     In the First Offering, Relators Shatish Patel and Vijayan each purchased 4 Class A Units pursuant to the PPM and joined the Partnership as general partners.  In the First Offering, Relator Oladut purchased 2 Class A Units pursuant to the PPM and joined the Partnership as a general partner.  In the First Offering, Relators' co-party in the State Court Lawsuit Subodh Sonwalkar, M.D. purchased 1 Class A Unit pursuant to the PPM and joined the Partnership as a general partner. In 2007, pursuant to a second public offering (the "Second Offering"), Sonwalkar purchased 1 additional Class A Unit. Each Class A Unit was sold for $40,000. Therefore, Relators Patel and Vijayan each invested $160,000 in the Partnership, Relator Oladut invested $80,000 in the Partnership, and Sonwalkar invested $80,000 in the Partnership.

38.     On or about July 31, 2007, the Partnership amended its original partnership agreement and adopted an amended and restated partnership agreement (hereinafter, the "Amended Partnership Agreement").  In conjunction with the adoption of the Amended Partnership Agreement, Holdings transferred its Class B Units to SLCDC-SL, which then became the Class B Partner.

39.     The Amended Partnership Agreement also altered the ownership rights of Class A and Class B.  Prior to the amendment, the number of units issued in each class had no bearing on the proportionate ownership of the classes.  But the Amended Partnership Agreement altered the methodology behind setting the proportionate ownership between Class A and Class B by using a method whereby each class's percentage ownership of the Partnership would be determined by the number of units issued to that class divided by the total number of units issued to both classes.

40.     When the Amended Partnership Agreement was adopted, a total of 142 Class A Units were held.  Had the Class B Partner kept all of the 204 Class B Units it was originally given in early 2006, then Class A's ownership percentage would have dropped to 41% using the new method adopted in the Amended Partnership Agreement.  But the parties chose to preserve the 49%/51% Class A/Class B ownership split, and so, the parties agreed to reduce the Class B Partner's Class B Units to 147.79592 units – exactly 51% of the Partnership based on the total units held on July 31, 2007.

41.     Irrespective of the Class A/Class B ownership split, the Class A representatives on the Governing Board of the Partnership collectively held the right to 49% of the Voting Interest on the Governing Board under the terms of the Amended Partnership Agreement.

42.     At the close of the Second Offering, a total of 196 Class A Units had been issued to 96 Class A Partners – all physicians.

43.     Using the funds raised by the public offerings and other sources of financing, the Hospital was built and officially commenced operations in October 2008. The Hospital also became a Medicare provider in October 2008.

**New Restrictions on Physician-Owned Hospitals Alter the System's Plans**

44.     Less than 18 months after the Hospital opened, new legislation went into effect that restricted expansion of physician-owned hospitals. *See* 42 U.S.C. § 1395nn(i)(1)(B). Because the Hospital was physician-owned, it could not increase the number of beds, procedure rooms, and operating rooms beyond that for which the Hospital was licensed on March 23, 2010, unless the Hospital could obtain approval from the federal government, with such approval subject to several restrictions. *See* 42 C.F.R. § 411.362(c).

45.     At the time, the Hospital had been constructed and licensed as a 100-bed acute care facility. But the System had always planned to eventually expand the Hospital to a 200-bed facility. The footprint of the Hospital's campus had been designed so that a second tower could be built. On June 1, 2006 – before the closing of the First Offering, a key System finance employee Penny Tillman stated in an email to other System employees that "it's difficult to make money with only 100 beds." Plans to expand the Hospital had, by August 2009, progressed to the point that the System's counsel Ann Thielke exchanged emails on August 11, 2009 with Pickett and Koontz about taking steps toward a third public offering to raise additional funds. As documented in an August 13, 2009 email from Thielke, Pickett wanted to sell new units in the Partnership at a price of $45,000 per unit.

46.     But the new restrictions on physician-owned hospitals fundamentally altered the System's assessment of the value of having physician owners for its suburban hospitals. In 2005, the System and Fine had concluded that joint-ventures with physician owners would help the System catch up to Memorial Hermann and Methodist in the greater Houston area. But that strategy had been predicated on the assumption that physician-owned hospitals could expand over time based on market conditions.

47.     On or about October or November 2010, however, the System had determined that its interests related to the Hospital would be best served if the Hospital were no longer subject to restrictions on expansion. In a November 24, 2010 email to John Beard of the law firm Baker Donelson, Koontz referenced his prior discussions with Beard about the challenges facing the Hospital and then presented Beard with several questions exploring the possibility of buying out the Partnership's Class A physician partners or using some other means to eliminate the physician owners' interest in the Partnership and the Hospital. By November 29, 2010, Baker Donelson had prepared a detailed agenda for a discussion with Koontz and Thielke about available options to eliminate the physician partners from the Partnership.

48.     In late November 2010, a short-term crisis for the Hospital regarding its number of operating rooms accelerated the System's plans to eliminate the Partnership's physician partners. The Hospital had initially been constructed with eight operating rooms. Due to insufficient demand during the first several months after the Hospital's opening, only four operating rooms were being used. But in May 2010, demand had increased, and so the Hospital began scheduling surgeries in the fifth operating room. On November 24, 2010, CMS released its final interpretation of the new statutory restrictions on physician-owned hospitals, concluding

that such hospitals could not increase the number of operating rooms that existed and were operational on March 23, 2010.

49.     Based on the language of CMS's interpretation, the Hospital stopped using its fifth operating room. On December 16, 2010, Koontz emailed Baker Donelson stating that having to stop using the fifth operating room "is killing us." On December 29, 2010, Koontz expressed in an email to the System's counsel Ann Thielke and to Baker Donelson that having to stop using the fifth operating room was causing an "operational obstruction … on a day to day basis." On January 6, 2011, Koontz stated in an email to John Beard of Baker Donelson and to Thielke that "[s]hutting down this fifth OR is killing us as we are struggling to grow our reputation and business." Because of the impact on the Hospital of shutting down its fifth operating room, Koontz directed Baker Donelson to prepare a request for an advisory opinion to CMS on behalf of the Partnership, since the Hospital had eight fully constructed operating rooms on March 23, 2010. The request for an advisory opinion on this issue was sent to CMS on February 15, 2011.

**The System Moves to Eliminate its Physician Partners**

50.     On November 19, 2010, Thielke sent an email to Beard of Baker Donelson requesting a phone call to discuss how to value the Class A Units held by the physician partners in the Partnership for the purpose of buying out the Class A physician partners. On November 20, 2010, Koontz and Beard spoke on the phone as per Thielke's request.

51.     On November 20, 2010, Beard sent an email to Richard Cowart of Baker Donelson summarizing the key points of his conversation with Koontz. According to Beard, Koontz stated that approximately 30 of the 96 physician partners regularly used the Hospital, that Koontz and Fine had discussed the System's options with each other, that the System had consulted HCAI about valuing Class A Units for the purposes of a redemption, that HCAI had

informed the System that the value of the Class A Units using the methodology set forth in the Amended Partnership Agreement would be zero or close to zero, that Fine favored eliminating the physician partners entirely, that Fine expected that the physician partners would not sell their Class A Units voluntarily at HCAI's stated value, and that Koontz and HCAI had explored whether redemption payments to the Class A Unit holders could substantially exceed HCAI's stated value if those payments were represented to be some sort of settlement payment.

52.     At the direction of Koontz and Thielke, Baker Donelson's Beard prepared a detailed agenda dated November 29, 2010 containing discussion points focused on the System's goal of removing the physician partners.

53.     At the time, Baker Donelson was representing both the System and the Partnership, but this joint representation was not disclosed to the Class A Physician representatives on the Partnership's Governing Board. Neither Baker Donelson nor the System disclosed to the Class A Physician representatives of the Partnership's Governing Board that Baker Donelson had a conflict of interest in representing both the System and the Partnership for the purpose of advising the System on means and methods to eliminate the physician partners from the Partnership. Neither Baker Donelson nor the System disclosed to the Class A Physician representatives on the Partnership's Governing Board that Baker Donelson had prepared a conflict waiver, but that against the advice of independent counsel Winstead, Fine executed Baker Donelson's conflict waiver on behalf of the Partnership, even though Fine served as the System's CEO.

54.     Baker Donelson's November 29, 2010 agenda reiterated that the System believed that 30 out of the 96 physician partners regularly admitted patients and performed services at the Hospital.

55.     Baker Donelson's November 29, 2010 agenda discussed multiple possible options for the System to attempt to eliminate the physician partners from the Partnership, including dissolution of the Partnership and an equity to debt conversion transaction buttressed by a coercive mandatory capital call.

56.     On December 2, 2010, Thielke asked Beard by email to forward a May 2010 memo Baker Donelson had prepared regarding rescission rights. Beard responded to Thielke's request the same day, explaining that the memo was actually prepared in May 2007 and that Baker Donelson had prepared other memos regarding rescission rights related to the physician partners in the Partnership.

57.     Baker Donelson's first memo to the System regarding rescission rights was dated September 22, 2006, just months after the close of the First Offering. Baker Donelson also prepared memos regarding rescission rights dated October 8, 2006, December 20, 2006, and May 1, 2007. Neither the System nor Baker Donelson ever disclosed to the Class A Physician representatives on the Partnership's Governing Board that Baker Donelson had been advising the System on how to rescind the physician partner investments in the Partnership since September 2006. The Second Offering documents contained no disclosure that the System had already sought legal advice on how to eliminate the physician partners.

58.     The System continued to actively consider different options to eliminate the physician owners in the months after Thielke's December 2, 2010 request to Beard to receive a

copy of one of Baker Donelson's prior memos about rescission. During this time, the System through Koontz and Fine disclosed the System's plans to eliminate the physician partners to two of the seven Class A Physician representatives on the Partnership's Governing Board: David Korfin, M.D. and Vanderzyl.

59. Korfin and Vanderzyl started working in concert with the System to help the System achieve its goal to eliminate the physician partners. On February 1, 2010, Korfin sent an email to Koontz offering suggestions on how to manipulate HCAI's opinion that for the purposes of redemption, the Class A Units had little value. Korfin told Koontz that the System had to "come up with an $8M value" for the Class A Units and to do so, the System and HCAI needed "to be creative." Korfin also suggested that Koontz direct HCAI to apply a control premium in its valuation to artificially increase HCAI's assessment. On February 7, 2011, Beard sent HCAI an email stating that Koontz wanted HCAI to consider applying a control premium.

60. On February 15, 2011, HCAI responded by informing Beard that a control premium was not warranted under the circumstances, in HCAI's view. HCAI also rejected a suggestion floated by Korfin to value the Class A Units without consideration of Partnership debt.

61. On March 8, 2011, Thielke informed Beard by email that Fine was "now very interested in the idea of entertaining a 'friendly' lawsuit from the physicians" that could be used as a pretext for returning to the physicians their initial investment amounts. At the time, no physician partner had presented any demand, claim, or notice of intent to sue the Partnership or the System.

62.     On March 9, 2011, Cowart of Baker Donelson asked Beard by email to research where a "friendly" suit had worked under similar circumstances. Beard responded by email the same day, stating that Baker Donelson had noted the existence of commercially reasonable settlements of potential physician claims, where a legitimate claim existed and the settlement was reached by arms-length negotiations. Beard confirmed that he spoke with Thielke to discourage the System from pursuing Fine's "friendly" lawsuit approach and to instead recommend that the System use the rescission process set forth under the Texas Securities Act "as long as it is completed within the 5-year statute of limitations."

**The System Picks Statutory Rescission as Its Weapon of Choice**

63.     On March 10, 2011, Thielke confirmed in an email to Pickett that she would recommend that the System pursue the rescission process outlined by Baker Donelson.

64.     On March 10, 2011, Beard sent an internal email to Cowart stating that the System had a very short time window to use the statutory rescission process in light of the statute of limitations applicable to claims asserted under the Texas Securities Act.

65.     The relevance of the statute of limitations for Texas Securities Act claims was clearly expressed in an April 7, 2011 email by Baker Donelson's Jonell Beeler to Beard. Beeler stated that for the Partnership to offer rescission to the physician investors, it would follow that the Partnership had identified colorable claims that it was trying to mitigate. Without any colorable claims, there should not be a rescission offer. Put differently, for the statutory rescission process under the Texas Securities Act to allow the System to refund the physician partners their entire original investment amounts despite HCAI's assessment of the redemption value of those investments, there must be some known or identified colorable claim that could be asserted under the Texas Securities Act.

66.     Beard in an April 7, 2011 email to Beeler had already confirmed that no formal or informal claims of any kind had been made by any of the physician investors in the Partnership. But even if possible claims existed, those claims would be extinguished upon the expiration of the statute of limitations set forth in the Texas Securities Act.

67.     Thus, a statutory rescission payment to a physician partner after the expiration of the Texas Securities Act's limitations period would essentially be a payment from a hospital to a physician in exchange for a release of claims that had already been extinguished, if those claims had even existed at all. And in the case of the Partnership's public offerings, the System had no basis to think that any of the physician partners was even contemplating a lawsuit asserting a Texas Securities Act claim related to the Partnership's public offerings. (Ironically, it was the means employed by the System's to force the Partnership to proceed with statutory rescission offers supposedly mitigating a non-existent risk of lawsuits from the physician partners that ultimately led to Relator Shatish Patel initiating the State Court Lawsuit, which was initially filed in large part to ensure that the System was providing the physician partners with full and complete disclosure of what the System's plans really were.)

68.     At the direction of the System, Baker Donelson asked HCAI to provide additional support for the theory that colorable claims under the Texas Securities Act did exist, resulting in an April 8, 2011 report from HCAI that purported to analyze the financial projections for the Hospital included with the PPMs. HCAI's April 8, 2011 report concluded that the original financial projections for the Hospital shared with prospective physician investors overestimated revenues and underestimated salary expenses. As a result, HCAI stated that "there is some basis for the position that the assumptions underlying the original Projections were unreasonable."

69.     HCAI's April 8, 2011 report was created at the direction of the System and through Baker Donelson as an intermediary. HCAI stamped its report "Privileged Attorney-Client Communication" and "Attorney Work Product." No physician partner, individually or on behalf of the Class A physician partners as a group, had retained Baker Donelson or HCAI to assess whether the physician partners had any basis for a claim against the System or the Partnership under the Texas Securities Act based on the errors in the financial projections discussed in HCAI's April 8, 2011 report. The HCAI report served as nothing more than an attempt by the System to artificially create support for the rescission offers it planned to use to eliminate the physician partners from the Partnership.

70.     On April 12, 2011, Baker Donelson issued a report to the Governing Board of the Partnership detailing its analysis of a rescission offer under the Texas Securities Act. At the outset, Baker Donelson claimed that the Partnership "is evaluating the risk that investors in Sugar Land may assert claims that certain information" in the PPMs "were misleading." But the Partnership had not independently sought such an evaluation. It was the System that had already been actively considering multiple options to eliminate the physician partners, of which one option was rescission under the Texas Securities Act. It was the System's decision to engage Baker Donelson to evaluate the possibility of statutory rescission, not the Partnership's.

71.     Baker Donelson's April 12, 2011 report claimed that HCAI had been engaged to evaluate the reasonableness of the assumptions used in the financial projections presented to potential physician investors because "certain investors have raised questions to Sugar Land administration, in part, because the financial performance of Sugar Land had been significantly different from the original projections." But this was false, as the HCAI's engagement had

nothing to do with any claims of securities fraud or questions from physicians about finances. Some physician partners had asked questions about the financial performance of the Partnership, just like equity owners of any other type business regularly do. But no physician partner had ever indicated, prior to HCAI's April 8, 2011 report, that there was any intent to sue the Partnership based on the financial projections in the PPMs or for any other reason. Instead, HCAI had been engaged simply to fabricate support for the System's plan to rescind the physician partners investments.

72.     Baker Donelson's April 12, 2011 report further claimed that the difference in the statutory rescission payment to the physician investors and HCAI's limited appraisal of $5,000 for each Class A Unit "may give rise to healthcare compliance scrutiny." Thereafter, Baker Donelson admits that HCAI's April 8, 2011 report be expressly relied upon in connection with any rescission offers as a means to mitigate healthcare compliance risk. But of course, there was no reason for the HCAI April 8, 2011 report other than to provide false justification for the System's plan to rescind the physician partners' investments.

73.     Baker Donelson's April 12, 2011 report contains multiple references to HCAI's limited appraisal of $5,000 per Class A Unit. However, HCAI's limited appraisal was not actually issued until April 19, 2011 – seven days later. Baker Donelson had already been aware of HCAI's limited appraisal because Baker Donelson had been engaged for several months by the System to provide advice on how the System could eliminate the physician partners, and in the course of that engagement, Baker Donelson had worked directly with HCAI to draft HCAI's April 8, 2011 report and HCAI's April 19, 2011 limited appraisal. HCAI's involvement had nothing to do with real, plausible, or colorable claims that could be asserted under the Texas

Securities Act. Instead, HCAI merely served to further the System's objective of finding a way to eliminate the physician partners.

74.     Baker Donelson continued to analyze how the statute of limitations for Texas Securities Act claims would affect the plausibility of the System's intended position that rescission under Texas Securities Act would comply with healthcare laws regulating financial relationships and transactions between the System, the Hospital, and the physician partners. This analysis was reflected in a number of internal Baker Donelson emails exchanged on May 11, 2011 and May 12, 2011, as well as emails between Beard and Thielke on May 11, 2011 and May 12, 2011. Baker Donelson had ultimately concluded that the limitations period under the Texas Securities Act expired five years after the date of an investment, regardless of when or whether an investor discovers the potential fraud.

75.     Baker Donelson informed the System of its conclusion regarding the five-year limitations period multiple times, including in emails exchanged between Beard and Thielke on May 11, 2011 and May 12, 2011. Thus, the System was aware that even if the System's attempt to fabricate a basis for statutory rescission through the HCAI April 8, 2011 report might be sufficient for compliance with healthcare laws regulating financial relationships between hospitals and physicians, that no viable basis would exist if the five-year limitations period under the Texas Securities Act had expired.

**The System Won't Take "No" for an Answer**

76.     Once the System's statutory rescission plan had been set in motion, the System went to great lengths to ensure its complete takeover of the Hospital and the elimination of all physician partners.

77.     To implement the rescission transactions in compliance with the Texas Securities Act, the Partnership had to be the entity to fund the rescission payments, initially by placing sufficient funds into an escrow account. The Partnership did not have cash on hand to fund the rescission offers. Accordingly, the System's representatives on the Partnership's Governing Board sought the Governing Board's approval of a loan by the Partnership from the System of approximately $10 million. Under Section 8.09(b) of the Amended Partnership Agreement, any loan by the Partnership over $250,000 could only be approved by the affirmative vote of Governing Board members collectively representing at least 75% of the Voting Interest on the Governing Board. On May 23, 2011, the Partnership's Governing Board took a roll call vote to approve the borrowing of the funds necessary for the rescission transactions. The required 75% supermajority of the Voting Interest on the Governing Board was not reached. Nonetheless, Fine, Pickett, and Koontz – who simultaneously served as Governing Board members of the Partnership and as officers or directors of the System and SLCDC-SL – forced the Partnership to assume the loan obligation anyway.

78.     An initial attempt in May 2011 to proceed with the rescission transactions had been blocked by a temporary injunction issued in the State Court Lawsuit. After this temporary injunction was later dissolved, the Partnership, at the direction of the System, issued rescission offer letters to the physician partners on June 10, 2011. The rescission offer letters stated that the physicians had 30 days to decide on the offer, as required by the Texas Securities Act.

79.     The requirement under the Texas Securities Act that a statutory rescission offer be held open for 30 days threatened to expose the sham the System was attempting to perpetrate on the physician partners and on any possible healthcare compliance review. Baker Donelson had

already informed the System that a rescission transaction after the expiration of the five-year Texas Securities Act limitations period could not be justified using HCAI's reports that the System had commissioned to lend plausibility to the System's rescission plans. In a series of emails dated June 8, 2011 and June 9, 2011 between Thielke, Beard, and Kenneth Broughton of Haynes and Boone (additional counsel retained by the System), the System decided to take the position that the five-year limitations period would expire on June 21, 2011 for physicians who had invested in the First Offering. The System's stated rationale focused on when the physician investors' subscription agreements had been accepted by the Partnership, which Thielke, Beard, and Broughton believed to be June 21, 2006. A June 17, 2011 email exchange involving Thielke, Beard, and the Partnership's new counsel Keith Remels further underscored the importance, in the System's view, of determining if the rescission transactions had to be completed by June 21, 2011.

80.     Accordingly, despite the rescission offers expressly stating that they would be held open for 30 days, the System and the Partnership's new counsel Remels started to employ strong-arm tactics to convince those who had not already accepted rescission to do so before June 21, 2011. For example, Remels spoke to one physician investor P.K. Shah, M.D. on June 17, 2011, threatening Shah with the possibility of the Partnership or the System suing Shah if he did not accept the rescission offer immediately. On information and belief, similar conversations took place with other physician investors who had not yet accepted rescission.

81.     The System took the June 21, 2011 deadline seriously because the System knew that the statutory rescission plan it had set in motion was always intended to be a means to eliminate the physician partners while simultaneously building goodwill with those specific

physician partners the System considered to be valuable referral sources. Koontz had even testified under oath during a May 13, 2011 hearing in the State Court Lawsuit that the purpose of the statutory rescission transactions was to maintain the System's goodwill with the physicians in the community. The numerous email exchanges involving Thielke and Baker Donelson described above confirm that the System understood the statutory rescission offers solely as means to pay the physician partners more than what the System deemed to be fair market value for their Class A Units. Those same email exchanges also confirm that the System knew that even the false pretenses the System created to lend bare minimum plausibility for the System's statutory rescission plan would have no value at all after the expiration of the five-year limitations period under the Texas Securities Act.

82.     As it turns out, June 21, 2011 was not the correct date. The Texas Supreme Court had long-since held that under the Texas Securities Act, the limitations period would start to run when an investor became contractually bound to purchase the securities, even if such purchase remained conditional on whether the securities would later be issued. *Dillon v. Lintz*, 582 S.W.2d 394, 394 (Tex. 1979). Each of the physician investors who participated in the First Offering executed subscription agreements that bound the physicians to purchase Class A Units on the condition that the Partnership ultimately accepted the physicians' subscription and issued the Class A Units. From the perspective of the physicians, the subscription agreements were "irrevocable." Thus, because each physician investor became obligated to purchase the Class A Units on the date that the physician investor executed the subscription agreement, the trigger date for the limitations period for each investor was the date of that investor's execution of the

subscription agreement – not the date of the Partnership's ultimate acceptance of the subscription agreement or the date the Class A Units were actually issued.

83.     Accordingly, the limitations period under the Texas Securities Act had already expired as of June 10, 2011 – the date the rescission offers were issued – for the following physician investors: Dr. Amirali Popatia; Dr. Charles Popenay; Dr. Faye Popenay; Dr. Salimah Cumber; Dr. Rajesh Bindal; Dr. Dominic Sreshta; Dr. Sairi Hirana; Dr. James Martin; Dr. Subrata Ghosh; Dr. John Pozzi; Dr. Mike Yuan; Dr. Perry Little; Dr. Simon Gebara; Dr. Pawan Grover; Dr. Gene Yee; Dr. Madhukar Kaw; Dr. Richard Lock; Dr. John Vanderzyl; Dr. Ramon Creixell; Dr. Timothy Detter; Dr. Shelena Lalji; Dr. Nora Cantu; Dr. Leka Gajula; Dr. Ghanshyan Patel; Dr. Henry Mata; Dr. Amin Jamal; Dr. Lakshmi Seshadri; Dr. Sorab Italia; Dr. David Korfin; Dr. Russell Homsten; Dr. Shanaz Ali; Dr. Jie Cheng; Dr. Nilesh Bavishi; Dr. Dipti Bavishi; Dr. Nasrullah Manji; Dr. Arvind Bhandari; Dr. Jay Chavda; Dr. George Miller; Dr. Matti Korhonen; Dr. Vivek Kavadi; Dr. Rajnikant Patel; Dr. Bharat Gandhi; Dr. P.K. Shah; Dr. Marializa Bernardo; Dr. Wesley Nahm; Dr. Eric Berkman; Dr. Inna Shpats; and Dr. Steven Nolan.

84.     The System nonetheless forced the Partnership to consummate the rescission transactions with these physician investors. And because the System directed SLCDC-SL and the Partnership to withhold material information about Baker Donelson's analysis of the statute of limitations and how it might impact healthcare laws governing financial relationships between hospitals and physicians, these physicians – with the exception of those recruited by the System to help implement the System's plans, such as Korfin and Vanderzyl – had been intentionally

misled by the System about the risks associated with accepting the statutory rescission offers after the expiration of the five year limitations period under the Texas Securities Act.

85.     A little less than six years after the consummation of their rescission transactions, the following physicians from the First Offering who could not possibly have had any claims under the Texas Securities Act remain active staff members and referral sources at the Hospital, according to the results of a search for Sugar Land Hospital physicians conducted on June 10, 2017 on the System website at www.chistlukeshealth.org: Dr. Dominic Sreshta; Dr. John Pozzi; Dr. Madhukar Kaw; Dr. John Vanderzyl; Dr. Nora Cantu; Dr. Leka Gajula; Dr. Henry Mata; Dr. Amin Jamal; Dr. David Korfin; Dr. Nasrullah Manji; Dr. Arvind Bhandari; Dr. Matti Korhonen; Dr. Bharat Gandhi; Dr. P.K. Shah; and Dr. Marializa Bernardo.

86.     These rescinded physician investors have continued to refer patients and services – including designated health services – to the Hospital after their rescission transactions had been consummated, resulting in SLCDC-SL submitting claims to and receiving payment from Medicare and Medicaid programs. The System also grew its referral relationship and financial relationship with those select physician partners the System had always favored, including System apologists Korfin and Vanderzyl.

87.     Other rescinded physicians from the First Offering who could not possibly have had any claims under the Texas Securities Act have continued to be referral sources to other System-affiliated facilities according to a master list of physicians with active staff privileges at one or more System-affiliated hospitals or facilities in the Houston area. This master list was obtained on June 10, 2017 on the System website at www.chistlukeshealth.org.

88.     In sum, the System sought to eliminate the physician partners, but wanted to do so in a way that would maintain and grow the System's relationship with those physician partners the System viewed as valuable referral sources. To accomplish these goals, the System first commissioned a limited appraisal by HCAI, one focused on a specific formula in the Amended Partnership Agreement designed to be used for redemption of Class A Units in certain specific circumstances. As a result, HCAI prepared a limited appraisal valuing each Class A Unit at $5,000. Some physician partners accepted HCAI's valuation, and thus, the System could engender goodwill and keep referrals coming from those physicians by invoking the statutory rescission process under the Texas Securities Act. But the rescissions were sham transactions, used as pretexts to justify returning the physician's initial investments despite the System's resolute stand that the Class A Units were only worth $5,000.

89.     But other physicians found the System's lack of transparency troubling, and as a result, expressed reluctance to agree to the rescission process without additional information. Against these physicians, the System used a variety of strong-arm tactics and misrepresentations to coax compliance with the System's overall plan. In doing so, the System wanted to ensure that those physician partners the System viewed as valuable referral sources and who favored the rescission process would have even more incentive to grow their referral volume to the Hospital. Ultimately, the System used strong-arm tactics and coercion against those physicians who were mostly just investors and who had not changed their referral patterns based on their ownership interest in the Partnership. In doing so, the System cemented its favorable standing with those it considered better referral sources, having convinced those referral sources that the System found

just the right loophole to allow those physicians to receive more than $40,000 per Class A Unit despite the HCAI $5,000 valuation.

**The Aftermath of the Rescission Transactions**

90.     All but four of the physician owners of Class A Units accepted the Partnership's rescission offer. The four who refused the offer consist of Relators and their State Court Lawsuit co-party Sonwalkar. Because the remaining four physician partners collectively owned only 12 Class A Units, the System interpreted the Amended Partnership Agreement to allow SLCDC-SL to control the actions of the Partnership's Governing Board. The System took the position that as a result of the rescission offers, SLCDC-SL owned approximately 95.5% of the Partnership, even though the System and SLCDC-SL forced the Partnership to incur debt to fund the statutory rescissions, which were from the outset part of the System's plan to eliminate all physician partners. Based on the System's assumption that SLCDC-SL owned 95.5% of the Partnership, the System also took the position that SLCDC-SL could unilaterally control the Partnership's Governing Board.

91.     On September 2, 2011, the Partnership's Governing Board purportedly initiated a capital call without the participation of any board members appointed by the physician partners. Notice of the capital call was sent to Relators and Sonwalkar. The capital call required a contribution of $487,037 each from Shatish Patel and Vijayan and $243,518.50 each from Sonwalkar and Oladut, based on the number of units owned by each. The notice of capital call stated that the failure to make the capital contribution by September 30, 2011 would amount to a default, allowing the Partnership to terminate the physicians' partnership interests.

92.     Relators and Sonwalkar did not comply with the capital call that the System, through SLCDC-SL, caused the Partnership to purportedly issue. The System then forced the

Partnership to send the four remaining physician partners written notice of their purported default. In response, the physicians' attorneys sent the Partnership a letter asserting that the capital call was an ultra vires act under the terms of the Amended Partnership Agreement. On October 3, 2011, the physicians applied for a temporary injunction. They sought to enjoin the System and SLCDC-SL from taking various actions with respect to the Partnership.

93.     In mid-October, the Partnership sent a notice to the physicians, contending that their partnership interests had been terminated, and a request was later sent for the physician partners to assign their interests to the Partnership.

94.     On November 8, 2011, the trial court presiding over the State Court Lawsuit denied the application for temporary injunction. The trial court's denial of the temporary injunction was appealed to the First District Court of Appeals of Texas.

95.     The physician partners ultimately prevailed in their interlocutory appeal of the trial court's denial of their October 2011 application for a temporary injunction. See *Sonwalkar v. St. Luke's Sugar Land P'ship, L.L.P.*, 394 S.W.3d 186 (Tex. App.—Houston [1st Dist.] 2012, no pet.). The First Court of Appeals concluded that as of the time of the denial of their application for temporary injunction, the physician partners were entitled to enjoin actions intended to effect the termination of their partnership interests. Because the capital call was disallowed under the Amended Partnership Agreement, the physicians' partnership interests could not be terminated for failure to pay. Therefore, absent an injunction, they faced the possibility of irreparable injury of the loss of their management rights. Specifically, the First Court of Appeals determined that Relators and Sonwalkar' Governing Board representatives collectively controlled 49% of the Voting Interest on the Governing Board, allowing Relators and Sonwalkar to block certain actions

of the Governing Board that required a supermajority affirmative vote and approval. The First Court of Appeals remanded for further proceedings in the trial court. Neither the System nor SLCDC-SL filed a petition for review to the Texas Supreme Court challenging the *Sonwalkar* decision.

**The System Advances a New Legal Theory and Digs a Deeper Hole**

96.     On remand, Relators and Sonwalkar renewed their October 2011 application for temporary injunction. A temporary injunction hearing was set for December 21, 2012. Two days before the hearing, the System filed a motion to dismiss the application for temporary injunction on the basis of mootness. Despite having never suggested mootness during the course of the *Sonwalkar* interlocutory appeal, and despite the First Court of Appeals's opinion which explained that the capital call had been ineffective to terminate the physicians' partnership interests, the System argued to the trial court that the request for a temporary injunction was moot because there had been "Changed Circumstances Since the Filing of the Application."

97.     The System argued that during the *Sonwalkar* appeal, the System had proceeded with its plans and had already terminated the physician partners' partnership interests. The System argued that its actions were permissible because during the *Sonwalkar* appeal, neither the appellate court nor the trial court had put an injunction in place during the pendency of the appeal, and thus, the System, SLCDC-SL, and the Partnership were free to act however they wished. According to the System, this meant that the purported termination of the physicians' partnership interests had, in fact and in law, occurred and could not be reversed.

98.     The System took the position that due to the effectiveness of the termination of the physicians' partnership interests, the Partnership had been reduced to just one partner – SLCDC-SL. According to the System, this meant that the Hospital and all other assets held by

the Partnership were immediately inherited by SLCDC-SL, as the last remaining partner, under the System's legal theory.

99.     The System then argued to the trial court that it should apply the mootness doctrine because the changed circumstances also included a series of actions the System and SLCDC-SL took with respect to the Hospital. These supposedly included withdrawing the LLP registration of the Partnership, transferring the "St. Luke's Sugar Land Hospital" business name to SLCDC-SL, filing a final sales tax return for the Partnership, terminating certain agreements to which the Partnership was a party, transferring the Partnership's Medicare provider number, assigning the Partnership's equipment leases, informing several governmental entities and agencies – including Texas Medicaid, the DEA, the Texas Board of Pharmacy, and the Texas Department of Public Safety – that SLCDC-SL or the System were now the registered provider of medical services through the Hospital, and obtaining new accreditation.

100.     The System further claimed that SLCDC-SL had changed its insurance coverage, utilities, supply, and vendor contracts, and equipment and services agreements.

101.     The System also asserted that it was relevant that the real property where the Hospital had operated under a lease to which the Partnership was the lessee had been purchased by a System-affiliated entity.

102.     During the December 21, 2012 hearing, the System offered Koontz as its sole witness. Koontz recounted the history of the Partnership's attempted capital call, including the refusal of the four physician partners to make the capital contribution and the Partnership's subsequent notification to them of the purported termination of their partnership interests. He

repeatedly testified that after the purported termination of the remaining physician partners' interests, the managing partner considered the Partnership to have no other remaining partners.

103.    Koontz then proceeded to describe the course of events upon which the System relied to support its position that the request for a temporary injunction had been rendered moot. In his capacity as Senior Vice President, it was Koontz's job to confirm completion of all action necessary for SLCDC-SL to assume the authority to operate the Hospital. One such action was to "transfer" the Medicare provider number, which was necessary for SLCDC-SL to receive payment from the government for services covered by Medicare and Medicaid, as well as payment from private insurers. Koontz testified that it took "six to nine months" to transfer the provider number for the Hospital from the Partnership to SLCDC-SL. He explained that the "main challenge was the unusual nature of the request" the System was making of CMS because: "When they see a transfer of CMS number from one company to another, they are used to some documents accompanying that. Some – you know, some codifying documents. And one of the things that they suggested would be a Bill of Sale. Instead we had to produce other documents. I think those related to the rescission and so on to show that there was only one partner."

104.    On cross-examination, Koontz also testified that it was his "understanding" that the Hospital "is currently owned" by SLCDC-SL. However, Koontz agreed that there was no bill of sale documenting the transfer of Hospital assets from the Partnership to SLCDC-SL, and no asset purchase agreement or other document memorializing the transfer of the Hospital. Notably, the Partnership's attorney objected to the cross-examination insofar as Koontz was asked about the purported "transfer" of the Hospital. The Partnership's counsel argued to the trial court: "I think 'transfer' is misleading and inappropriate. There is no evidence there was a

transfer. Once you get down to one person—I believe the law is a partnership no longer exists if there is only one partner. So, there is no transfer document necessary."

105.    The trial court ultimately denied the physician partners' renewed temporary injunction application on the grounds of mootness despite the *Sonwalkar* opinion. The physician partners once again appealed to the First Court of Appeals.

**Because Mootness is Jurisdictional, the System Forced the Appellate Court to Decide that Ownership of the Hospital Had Not Transferred to SLCDC-SL**

106.    And once again, the First Court of Appeals reversed the trial court's denial of the physician partners' application for a temporary injunction. *See Patel v. St. Luke's Sugar Land Partnership, L.L.P.*, 445 S.W.3d 413 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). The First Court of Appeals rejected the System's position that the physicians' partnership interests had been terminated and that the Hospital had automatically transferred to SLCDC-SL as a result. The First Court of Appeals reached its decision presuming that the System and SLCDC-SL had taken various actions "based on a mistaken belief that the Partnership no longer existed" and that "SLCDC-SL somehow became the owner" of the Hospital. The First Court of Appeals further explained that its decision would not change even if it were the case that SLCDC-SL, "laboring under its misimpression that the physicians had been squeezed out of the Partnership, actually took actions to the effect" that the Hospital "was actually transferred away from the Partnership."

107.    The System did ask the Texas Supreme Court to review the *Patel* decision, but after asking both sides to fully brief the issues, the Texas Supreme Court denied the System's petition for review.

108.     Because mootness presents a question of subject matter jurisdiction, the First Court of Appeals in *Patel* was forced to decide whether the ownership of the Hospital had actually been transferred under Texas law to SLCDC-SL as part of the appellate court's interlocutory review of the trial court's denial of the temporary injunction previously mandated by the *Sonwalkar* decision. When the Texas Supreme Court denied the System's petition for review, the *Patel* holding became the law of the case, leaving no room for the System and SLCDC-SL to even claim that the Hospital's ownership remained in dispute. After the First Court of Appeals issued its mandate in the *Patel* interlocutory appeal, the System and SLCDC-SL had no plausible basis to maintain that SLCDC-SL owned the Hospital and to continue to represent in the Hospital's required annual costs reports that SLCDC-SL owned the Hospital.

**Relators Discover that the System Had Known All Along that its Position about the Hospital's Ownership was Frivolous**

109.     But as it turned out, the System had withheld from discovery the truth behind the legal positions it had taken all along – positions that the First Court of Appeals had to describe as "a mistaken belief" and a "misimpression" because the System's discovery abuse had prevented Relators and Sonwalkar to offer evidence at the December 21, 2012 temporary injunction hearing to show that the System was knowingly and intentionally presenting a frivolous argument that had already been debunked by the System's own counsel.

110.     After it became clear that the four physician partners who had refused the rescission offers intended to maintain their rights to remain partners in the Partnership – thus potentially frustrating Fine and Koontz's original objective of achieving 100% System ownership of the Hospital – the System tried to make it so that the physicians would never get the chance to have their day in court on the issue of their continued status as partners in the Partnership. Fine

would later gloat to others in an April 13, 2012 presentation about the Hospital's 2011 year in review that his "[p]unishments" were "complete" – assuming that no possibility of the physician partners vindicating their rights remained.

111.     As Relators later uncovered, punishing the last four physicians as Fine wanted required the System to defraud several third parties and government agencies, and to do so knowingly and intentionally.

112.     In an August 1, 2011 email from System employee Niquole Dunham to System officer David Gruener, Dunham presents a timeline and list of tasks designed to convert the Hospital from the Partnership's ownership to that of nonprofit SLCDC-SL. This email was prepared a month before the System forced the Partnership to issue what was ultimately determined to be an ultra vires capital call designed to terminate the partnership interests of the four remaining physician partners. And according to this email, the System never believed it would be possible for the physician partners to meet the capital call demands, even if they wanted to. The plan from the start was to issue a capital call demand that the System was all but certain to be well-beyond the financial resources of the four remaining physician partners. Dunham also expressly references the need to act quickly to reassign the Hospital's general ledger and get Medicare and Medicaid numbers transferred. Put differently, the System had already created a detailed plan to use the capital call as a means to justify a transfer of the Hospital to SLCDC-SL no matter what. The System and SLCDC-SL did not act to transfer the Medicare provider number due to some sort of mistake about the legality of the capital call or the rights of the physician partners during the pendency of the *Sonwalkar* appeal.

113.     In an August 15, 2011 email to Thielke, Dunham also lays out specific steps for legal review and analysis related to the System's plan to transfer the Hospital. Again, this planning considered such a transfer to be inevitable, even as it would be weeks before the System would force the Partnership to issue the ultra vires capital call.

114.     On August 18, 2011, Koontz asked the Hospital's then-CEO Bryan Hargis to confirm that Sonwalkar and Vijayan had active staff privileges at the Hospital. Koontz made this request because the System wanted to determine if it could seek to terminate Sonwalkar and Vijayan as partners in the Partnership on some basis related to their staff privileges. In response to his request, Koontz was told that Sonwalkar and Vijayan did have active staff privileges.

115.     On August 24, 2011, the Partnership's counsel Remels, acting at the direction of the System, Fine, Pickett, and Koontz instead of disinterested members of the Partnership's Governing Board, sent Oladut a notice of default letter alleging that Remels had tried to deliver a July 29, 2011 letter notifying Oladut that he could no longer be a partner in the Partnership because Oladut had intentionally resigned his medical privileges at the Hospital. But Oladut had not, in fact, resigned his medical privileges. Remels's claim that Oladut had resigned was a complete falsehood, and the supposed inability to deliver the July 29, 2011 letter to Oladut was also a fabrication. The System and the Partnership had never had any difficulty delivering notices to Oladut before, including, for example, the June 10, 2011 rescission offer letter to Oladut. After Oladut was forced to retain personal legal counsel to respond to Remels's August 24, 2011 letter, the System directed the Partnership's counsel Remels to abandon the position that Oladut had defaulted as a partner in the Partnership due to a staff privileges related deficiency.

116.    On September 23, 2011, Dunham sent an email to several System employees and outside advisors attaching a detailed checklist of tasks related to the plan to convert the Hospital from being owned and operated by the Partnership to being owned and operated by SLCDC-SL. Dunham's email reflects that the System had already decided that the Hospital would continue to use the same Medicare provider number, but with a new tax ID number, which had already been obtained. But September 23, 2011 was before the physician partners were even required to respond to the capital call, again showing that the System intended to convert the Hospital no matter what the physician partners did.

117.    After the deadline for compliance stated in the ultra vires capital call had passed, the System's in-house legal counsel Asha Geire sent an email dated October 24, 2011 to Beeler of Baker Donelson pitching the System's theory that due to the termination of the physician partners from the Partnership, the Hospital automatically transferred to SLCDC-SL. Geire wanted to inform Beeler if it would be appropriate based on the System's legal theory to resume using the fifth operating room on the basis that the Hospital was no longer subject to the restrictions on physician-owned hospitals.

118.    On October 26, 2011, the System's most senior in-house counsel Thielke responded to both Geire and Beeler in an email Thielke also copied to Beard, Cowart, and Koontz that the Partnership was still in existence and in the winding up phase – directly contradicting the self-serving System theory that the Hospital had automatically transferred to SLCDC-SL. Thielke's email having been copied to Koontz also shows that Koontz's testimony during the December 21, 2012 temporary injunction hearing was false in that Koontz was clearly

informed by the senior counsel of the System that the Hospital had not just automatically transferred to SLCDC-SL.

119.     Also on October 26, 2011, Thielke separately emailed Geire, Dunham, Koontz, and the System's advisor Melinda Grady that the idea they had concocted of the Hospital automatically transferring to SLCDC-SL was not correct. In this separate email, Thielke included the relevant statutes governing the winding up and termination of partnerships under Texas law, even highlighting the key provisions that debunked the System's theory. Thielke informed them all that the System was "just beginning the winding up" and that "there is no 'automatic' action whereby the p-ship ceases to exist or the business is 'transferred' without performing the winding up procedures." Thielke's email further contradicts Koontz's testimony during the December 21, 2012 hearing and directly guts the notion that the System had simply made a mistake about the effect of terminating the physician partners from the Partnership.

**The System Knowingly, Intentionally, and Repeatedly Used Misrepresentations to Ultimately Convince the Government to Recognize a Change of Ownership of the Hospital**

120.     Despite having received legal advice and supporting statutes from Thielke debunking the theory that the Partnership ceased to exist when the physician partners were purportedly terminated and that the Hospital automatically transferred by operation of law to SLCDC-SL when the physician partners were purportedly terminated, the System directed the Hospital's CEO Hargis to inform CMS through Trailblazer Health Enterprises in a December 1, 2011 letter to take notice of a change of ownership of the Hospital on the basis that since SLCDC-SL "is the sole partner, all of the assets and liabilities of the Partnership vested automatically with" SLCDC-SL.

121.     Despite having received legal advice and supporting statutes from Thielke debunking the theory that the Partnership ceased to exist when the physician partners were purportedly terminated and that the Hospital automatically transferred by operation of law to SLCDC-SL when the physician partners were purportedly terminated, on December 2, 2011, the System submitted to CMS (through Trailblazer) Medicare enrollment applications indicating a change of ownership of the Hospital – Form 855A. As stated clearly in the form, CMS requires the submission of a bill of sale documenting the transfer of a hospital under the change of ownership basis submitted by the System. Anticipating problems because no such bill of sale for the Hospital existed, the System, in the cover letter dated December 2, 2011, intentionally misrepresented that "all assets and liabilities of the [Partnership] are vested automatically with" SLCDC-SL.

122.     In a memo dated December 5, 2011, the System's then-outside counsel Haynes and Boone also confirmed for the System that the Hospital would not simply be inherited by SLCDC-SL. Instead, the Partnership's winding up and termination process would have to follow certain termination and liquidation steps described in the Amended Partnership Agreement. Haynes and Boone advised the System that Partnership assets and contracts could be formally transferred or assigned to the System or a System-affiliated entity, but Haynes and Boone provided no support for the notion that the Hospital would automatically transfer to SLCDC-SL without any formal winding up or documentation of such a transfer. Haynes and Boone also reminded the System that fraudulent transfer principles might be applicable to any transfers of assets from the Partnership.

123.     The System did not revise or correct the December 1, 2011 and the December 2, 2011 misrepresentations to CMS (sent through Trailblazer) despite receiving confirmation from Haynes and Boone that Thielke's analysis was correct and that there was no plausible basis to suggest that the Hospital had automatically transferred to SLCDC-SL. The System intended to continue deceiving CMS about the nature and basis of the supposed change of ownership of the Hospital.

124.     In an email to Vyki Robbins of the Texas Department of State Health Services ("TDSHS") dated February 10, 2012, System employee Claire Lauzon-Vallone attached a December 19, 2011 resolution purportedly approved by the Partnership's Governing Board as evidence of a sale of the Hospital from the Partnership to SLCDC-SL. But the attached resolution did not reflect any attempt to document a sale of assets. Yet Lauzon-Vallone stated that the System's "attorneys state this document represents the evidence of the 'sale' of the" Hospital. Lauzon-Vallone also told Robbins that the System's attorneys "were part of the court hearing and judgment to make this legal." Lauzon-Vallone's statements constitute intentional misrepresentations by the System to TDSHS regarding the purported transfer of the Hospital to SLCDC-SL. The attached resolution was never intended to and did not actually represent evidence of a sale, no court hearing had taken place to determine that a sale had happened, and no judgment made any of the System's actions and representations "legal."

125.     On March 1, 2012, Thielke sent TDSHS attorney Lisa Nieman a bill of sale documenting the sale of the real property where the Hospital was located, asking if that would be sufficient to meet the necessary change of ownership requirements. The Partnership has leased the real property, and the bill of sale Thielke sent to Nieman was clearly an agreement between

Medistar Sugar Land Medical Center, Ltd. and St. Luke's Sugar Land Properties Corporation –
not the Partnership and SLCDC-SL. Thielke was fully aware that this bill of sale did not
document a transfer and sale of the Hospital to SLCDC-SL, but the System directed Thielke to
attempt to pass off this bill of sale in the hopes of getting the change of ownership approved.

126.    On March 14, 2012, Lauzon-Vallone sent an email to Lisa Vallejo of TDSHS
attaching the same unrelated bill of sale Thielke sent to Nieman on March 1, 2012. However,
Lauzon-Vallone told Vallejo that Nieman had already "concurred with" Thielke that "the
documents met the requirements" for the change of ownership regarding the Hospital. This
statement was an intentional misrepresentation to TDSHS, as Thielke understood the bill of sale
regarding the real property had nothing to do with the purported transfer of the Hospital.

127.    Despite having received legal advice and supporting statutes from Thielke and
Haynes and Boone debunking the theory that the Partnership ceased to exist when the physician
partners were purportedly terminated and that the Hospital automatically transferred by
operation of law to SLCDC-SL when the physician partners were purportedly terminated, the
System intentionally misrepresented and misled Texas Medicaid & Healthcare Partnership in a
March 22, 2012 letter in which the System asserted that no formal or written bill of sale would
exist to document the transfer of the Hospital to SLCDC-SL and that when SLCDC-SL
purportedly became the sole partner, "all of the assets and liabilities of the Partnership vested
automatically with" SLCDC-SL.

128.    Ultimately, CMS approved the change of ownership of the Hospital on May 24,
2011. In an internal email dated May 24, 2011 from System employee Kenneth Zieren to Lauzon-

Vallone, Thielke, and Koontz, Zieren concluded that either CMS understood the situation or that the System "just wore them down!"

129.    At no point did the System disclose to CMS or TDSHS that Thielke and Haynes and Boone had already advised the System that its position regarding the transfer of the Hospital assets had no basis.

130.    Prior to the December 21, 2012 temporary injunction hearing, the System and SLCDC-SL had concealed all the evidence regarding the System's numerous misrepresentations to CMS and TDSHS regarding the purported transfer of the Hospital from the four physician partners – despite discovery requests directly on point. As a result, when Koontz testified on December 21, 2012 at the temporary injunction hearing following the *Sonwalkar* appeal, the physicians did not have the ability to create a record filled with documentary evidence contradicting Koontz's false claim that the System honestly believed that the Hospital automatically transferred to SLCDC-SL upon the purported termination of the physician partners in the Partnership. In turn, the First Court of Appeals in the *Patel* appeal issued its opinion under the presumption that the System was merely mistaken about the effect of the purported termination of the physician partners and had merely taken steps to obtain CMS's change of ownership approval under a "misimpression" about what had happened. The System's suppression of evidence from discovery was yet another fraud perpetrated by the System – a fraud committed in the hopes of receiving a favorable result in the *Patel* appeal given the lack of hard evidence to contradict Koontz's false testimony.

131.    But the First Court of Appeals did ultimately reject the System's position even without having full knowledge of the System's misrepresentations to CMS and TDSHS. And the

Texas Supreme Court denied the System's petition for review. As a result, after the First Court of Appeals opinion in *Patel* became final, the System had a duty to correct its prior statements to CMS and TDSHS about the purported transfer of the Hospital, even if the System had not previously engaged in a pattern of fraud. However, the System has refused to take any steps to inform CMS and TDSHS of the now final resolution by the Texas state courts that the Partnership remains to this day the entity that owns the Hospital.

**SLCDC-SL Never Had the Right to Receive a Single Medicare or Medicaid Dollar for Otherwise Covered Services Rendered at the Hospital**

132. The System and SLCDC-SL have materially misrepresented facts about the correct owner of the Hospital – the Partnership – in the change of ownership Form 855A submitted in 2011 as well as in every annual Medicare cost report for the Hospital that the System and SLCDC-SL have submitted to Medicare for the years 2012, 2013, 2014, 2015, and 2016. As a condition of being entitled to receive payment from Medicare and Medicaid, providers must file change of ownership forms and annual Medicare cost reports without any material misrepresentations. The System and SLCDC-SL have not done so with respect to the Hospital, and thus, SLCDC-SL has not been entitled to receive any payment from Medicare or Medicaid for services rendered at the Hospital starting from 2012 to the present. Every such document and filing presented by SLCDC-SL contains a certification as to the truth of the representations contained therein and an express notice that the right to receive payment from federally funded healthcare programs is conditioned upon compliance with healthcare laws and regulations and on the truth of the representations contained therein.

133. The System and SLCDC-SL have also made false certifications in the documents completed and submitted to CMS for the purpose of enrolling the Hospital to submit claims

electronically through CMS's electronic data interchange. Such enrollment documents required the System and SLCDC-SL to acknowledge that all claims later submitted electronically met all of CMS's requirements, including compliance with applicable healthcare laws and regulations. Further electronic batch claims may only be submitted with an express acknowledgment that payments under federally funded healthcare programs were conditioned on a certification that the information on such claims – including the identification of the correct entity that owned the Hospital – was true and correct, and that submitting such electronic batch claims with any false information or misrepresentations would constitute false claims for which the government would not have an obligation to pay.

134.   SLCDC-SL has in fact submitted claims for payment to Medicare and Medicaid in the years 2012 to the present, and these claims for payment have been documented in the annual Medicare cost reports submitted by SLCDC-SL. These claims for payment as well as the actual payments from Medicare and Medicaid are documented in monthly and annual financial statements SLCDC-SL prepares for review by SLCDC-SL's directors and by the System's finance personnel. These claims for payment as well as the actual payments from Medicare and Medicaid are documented in the System's accounting software and are shared with the System's external auditors each year in connection with a consolidated audit of the System and its affiliated entities.

**CHI Acquires the System and Doubles Down on the System's Misconduct**

135.   In 2013, CHI completed an approximately $2 billion transaction to acquire complete control of the System from the Episcopal Diocese of Texas. Unlike the Diocese, CHI is in the business of operating hospital systems and other medical facilities across the nation.

136.     Although CHI's acquisition of the System occurred well after the misconduct by the System, Fine, Pickett, and Koontz, as described above, CHI was made aware of the issues, disputes, and risks associated with the System's actions related to the Partnership and the Hospital.

137.     CHI's acquisition of complete control of the System did close prior to the issuance of the *Patel* opinion from the First Court of Appeals. Despite the Texas Supreme Court denying the System's petition for review of the *Patel* decision, CHI has decided to continue the System's ongoing misrepresentations to CMS and TDSHS about the ownership of the Hospital. Specifically, CHI took a more direct role in managing the various System-affiliated entities with respect to their finances and regulatory compliance. For example, CHI caused the System and its affiliated entities to shift their fiscal years to match CHI's fiscal year.

138.     CHI directly reviewed and controlled SLCDC-SL's Medicare cost reports submitted for 2014, 2015, and 2016. Even though the *Patel* decision now leaves no doubt that the Hospital is owned by the Partnership, CHI has caused SLCDC-SL and the System to continue perpetuating their prior fraudulent misrepresentations instead of working towards correcting the false information previously submitted to CMS. Not only has CHI caused the System and SLCDC-SL to continue along the same fraudulent path they started in 2011, but CHI has further caused the System and SLCDC-SL to refuse complying with other federal laws when compliance would reveal the System and SLCDC-SL's fraudulent misrepresentations about the ownership of the Hospital.

139.     Most recently, Relators and Sonwalkar – now having had their ongoing status as partners confirmed and accepted by the System and SLCDC-SL – demanded that the System and

SLCDC-SL perform their contractual and statutory duties to file tax returns for the Partnership for the years 2012 to the present. The System and SLCDC-SL had previously refused to do so based on the System's position that the Partnership ceased to exist after the purported termination of the physician partners based on the 2011 capital call. Federal law demands that the Partnership's tax returns be filed now, but the process of doing so would necessarily require recognition that the financial activity from the Hospital for the years 2012 to the present belongs to the Partnership, not SLCDC-SL, thus potentially exposing that SLCDC-SL has been receiving government payments that it had no right to receive from 2012 to the present.

140.    For this reason, CHI has directed the System and SLCDC-SL to refuse complying with their duties to ensure that the Partnership's past-due tax returns are promptly filed. In doing so, CHI has now directly contributed to SLCDC-SL's on-going practice of submitted claims for Medicare and Medicaid payment for which SLCDC-SL has no right to receive.

### V.    Claims / Causes of Action

**Count 1:**    **Violation of 31 U.S.C. § 3729(a)(1)(A) (Against All Defendants) (Rescission Transactions) (Anti-Kickback / Stark)**

141.    Relators repeat, reallege, and hereby incorporate by reference Paragraphs 1 – 140, above, as if fully set forth herein.

142.    A person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" is liable under the FCA. 31 U.S.C. § 3729(a)(1)(A).

143.    A claim for payment is false or fraudulent under the FCA if the claim requests payment for services rendered in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b. *See* 42 U.S.C. § 1320a-7b(g) ("a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of

Title 31"). A violation of the Anti-Kickback Statute occurs when, among other things, a person "knowingly and willfully offers or pays remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person" to "refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program…." 42 U.S.C. § 1320a-7b(b)(2)(A). To violate the Anti-Kickback Statute, a person need not have actual knowledge of the Anti-Kickback Statute or a specific intent to violate the Anti-Kickback Statute. 42 U.S.C. § 1320a-7b(h). An offer to pay or a payment of remuneration violates the Anti-Kickback Statute if one purpose of the offer or payment was to induce referrals.

144.    SLCDC-SL, since 2012, has regularly and consistently presented claims for payment to the government for services rendered at the Hospital and referred by physicians who invested in the Partnership through the First Offering and who had their investments rescinded after the expiration of the five-year limitations period under the Texas Securities Act in violation of the Anti-Kickback Statute. Such rescission transactions violated the Anti-Kickback Statute because the System and SLCDC-SL knowingly and willfully forced the Partnership to offer statutory rescission to, among other things, induce the physician partners to continue referring services for which a Federal healthcare program may make payment in whole or in part. SLCDC-SL knew that such claims for payment were for services rendered in violation of the Anti-Kickback Statute at the time SLCDC-SL presented such claims to the government for payment.

145.    The System has had direct control over SLCDC-SL's actions at all times relevant. The System caused SLCDC-SL, since 2012, to regularly and consistently present claims for payment to the government for services rendered at the Hospital and referred by physicians who

invested in the Partnership through the First Offering and who had their investments rescinded after the expiration of the five-year limitations period under the Texas Securities Act in violation of the Anti-Kickback Statute. Such rescission transactions violated the Anti-Kickback Statute because the System and SLCDC-SL knowingly and willfully forced the Partnership to offer statutory rescission to, among other things, induce the physician partners to continue referring services for which a Federal healthcare program may make payment in whole or in part. The System knew that such claims for payment were for services rendered in violation of the Anti-Kickback Statute at the time the System caused SLCDC-SL to present such claims to the government for payment.

146.    During Fine's tenure as CEO and Director of the System and Director of SLCDC-SL, Fine had the power to control SLCDC-SL's actions. Fine caused SLCDC-SL, from 2012 until the date of Fine's resignation as CEO and Director of the System and Director of SLCDC-SL, to regularly and consistently present claims for payment to the government for services rendered at the Hospital and referred by physicians who invested in the Partnership through the First Offering and who had their investments rescinded after the expiration of the five-year limitations period under the Texas Securities Act in violation of the Anti-Kickback Statute. Such rescission transactions violated the Anti-Kickback Statute because the System and SLCDC-SL knowingly and willfully forced the Partnership to offer statutory rescission to, among other things, induce the physician partners to continue referring services for which a Federal healthcare program may make payment in whole or in part. Fine knew that such claims for payment were for services rendered in violation of the Anti-Kickback Statute at the time Fine caused SLCDC-SL to present such claims to the government for payment.

147.     During Pickett's tenure as CFO and Director of the System and Director of SLCDC-SL, Pickett had the power to control SLCDC-SL's actions. Pickett caused SLCDC-SL, from 2012 until the date of Pickett's resignation as CFO and Director of the System and Director of SLCDC-SL, to regularly and consistently present claims for payment to the government for services rendered at the Hospital and referred by physicians who invested in the Partnership through the First Offering and who had their investments rescinded after the expiration of the five-year limitations period under the Texas Securities Act in violation of the Anti-Kickback Statute. Such rescission transactions violated the Anti-Kickback Statute because the System and SLCDC-SL knowingly and willfully forced the Partnership to offer statutory rescission to, among other things, induce the physician partners to continue referring services for which a Federal healthcare program may make payment in whole or in part. Pickett knew that such claims for payment were for services rendered in violation of the Anti-Kickback Statute at the time Pickett caused SLCDC-SL to present such claims to the government for payment.

148.     During Koontz's tenure as an officer and Director of the System and Director of SLCDC-SL, Koontz had the power to control SLCDC-SL's actions. Koontz caused SLCDC-SL, from 2012 until the date of Koontz's resignation as an officer and Director of the System and Director of SLCDC-SL, to regularly and consistently present claims for payment to the government for services rendered at the Hospital and referred by physicians who invested in the Partnership through the First Offering and who had their investments rescinded after the expiration of the five-year limitations period under the Texas Securities Act in violation of the Anti-Kickback Statute. Such rescission transactions violated the Anti-Kickback Statute because the System and SLCDC-SL knowingly and willfully forced the Partnership to offer statutory

rescission to, among other things, induce the physician partners to continue referring services for which a Federal healthcare program may make payment in whole or in part. Koontz knew that such claims for payment were for services rendered in violation of the Anti-Kickback Statute at the time Koontz caused SLCDC-SL to present such claims to the government for payment.

149.    After CHI became the sole member of the System, CHI had the power to control SLCDC-SL's actions. CHI caused SLCDC-SL, since the date CHI became the sole member of the System, to regularly and consistently present claims for payment to the government for services rendered at the Hospital and referred by physicians who invested in the Partnership through the First Offering and who had their investments rescinded after the expiration of the five-year limitations period under the Texas Securities Act in violation of the Anti-Kickback Statute. Such rescission transactions violated the Anti-Kickback Statute because the System and SLCDC-SL knowingly and willfully forced the Partnership to offer statutory rescission to, among other things, induce the physician partners to continue referring services for which a Federal healthcare program may make payment in whole or in part. CHI knew that such claims for payment were for services rendered in violation of the Anti-Kickback Statute at the time CHI caused SLCDC-SL to present such claims to the government for payment.

150.    A claim for payment is false or fraudulent under the FCA if the claim requests payment for services rendered in violation of the Stark Law, 42 U.S.C. § 1395nn, and if the government has conditioned payment on the claimant's certification of compliance with the Stark Law. Physicians with certain types of "financial relationships" with hospitals cannot make referrals for services reimbursable by Medicare, and hospital entities cannot bill Medicare for referrals from those physicians. 42 U.S.C. § 1395nn (a)(1)(A),(B). The types of financial

relationships at issue can be either an "ownership or investment interest" in a hospital or a "compensation arrangement" between the physician and the hospital entity. 42 U.S.C. § 1395nn(a)(2)(A),(B). A "compensation arrangement" is any "arrangement involving any remuneration" between a physician and a hospital entity. 42 U.S.C. § 1395nn(h)(1)(A). And "remuneration" includes "any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1395nn(h)(1)(B). "Isolated transactions" are permitted, but they must – among other things – be "consistent with fair market value." 42 U.S.C. § 13955nn(e)(6)(A); 42 U.S.C. § 1395nn(e)(2)(B).

151.     The rescission transactions between the Partnership and all but four of its physician partners were not consistent with the System's assessment of fair market value based on the HCAI limited appraisal, and thus, the rescission transactions cannot be considered isolated transactions for purposes of the Stark Law. The rescission transactions are compensation arrangements because they involved remuneration between a physician and a hospital entity. Because the rescission transactions are compensation arrangements that do not qualify for any Stark Law exception or safe harbor, claims for payment for services referred by the rescinding physicians to SLCDC-SL on and after 2012 are false or fraudulent under the FCA (A) because those services were rendered in violation of the Stark Law and (B) the government has conditioned payment on SLCDC-SL's certification of compliance with the Stark Law. *See, e.g.,* 42 C.F.R. § 413.24(f)(4)(iv).

152.     SLCDC-SL, since 2012, has regularly and consistently presented claims for payment to the government for services rendered at the Hospital and referred by physicians whose investments in the Partnership were rescinded in 2011. SLCDC-SL knew that such claims

for payment were for services rendered in violation of the Stark Law at the time SLCDC-SL presented such claims to the government for payment.

153.     The System has had direct control over SLCDC-SL's actions at all times relevant. The System caused SLCDC-SL, since 2012, to regularly and consistently present claims for payment to the government for services rendered at the Hospital and referred by physicians whose investments in the Partnership were rescinded in 2011. The System knew that such claims for payment were for services rendered in violation of the Stark Law at the time the System caused SLCDC-SL to present such claims to the government for payment.

154.     During Fine's tenure as CEO and Director of the System and Director of SLCDC-SL, Fine had the power to control SLCDC-SL's actions. Fine caused SLCDC-SL, from 2012 until the date of Fine's resignation as CEO and Director of the System and Director of SLCDC-SL, to regularly and consistently present claims for payment to the government for services rendered at the Hospital and referred by physicians whose investments in the Partnership were rescinded in 2011. Fine knew that such claims for payment were for services rendered in violation of the Stark Law at the time Fine caused SLCDC-SL to present such claims to the government for payment.

155.     During Pickett's tenure as CFO and Director of the System and Director of SLCDC-SL, Pickett had the power to control SLCDC-SL's actions. Pickett caused SLCDC-SL, from 2012 until the date of Pickett's resignation as CFO and Director of the System and Director of SLCDC-SL, to regularly and consistently present claims for payment to the government for services rendered at the Hospital and referred by physicians whose investments in the Partnership were rescinded in 2011. Pickett knew that such claims for payment were for services

rendered in violation of the Stark Law at the time Pickett caused SLCDC-SL to present such claims to the government for payment.

156.     During Koontz's tenure as an officer and Director of the System and Director of SLCDC-SL, Koontz had the power to control SLCDC-SL's actions. Koontz caused SLCDC-SL, from 2012 until the date of Koontz's resignation as an officer and Director of the System and Director of SLCDC-SL, to regularly and consistently present claims for payment to the government for services rendered at the Hospital and referred by physicians whose investments in the Partnership were rescinded in 2011. Koontz knew that such claims for payment were for services rendered in violation of the Stark Law at the time Koontz caused SLCDC-SL to present such claims to the government for payment.

157.     After CHI became the sole member of the System, CHI had the power to control SLCDC-SL's actions. CHI caused SLCDC-SL, since the date CHI became the sole member of the System, to regularly and consistently present claims for payment to the government for services rendered at the Hospital and referred by physicians whose investments in the Partnership were rescinded in 2011. CHI knew that such claims for payment were for services rendered in violation of the Stark Law at the time CHI caused SLCDC-SL to present such claims to the government for payment.

158.     For the aforementioned violations of 31 U.S.C. § 3729(a)(1)(A), Relators seek to recover on behalf of the government civil penalties and treble damages, as set forth in 31 U.S.C. § 3729(a)(1). The government's damages consist of the gross Medicare payments made by the government to SLCDC-SL from 2012 to the present for claims for services rendered at the Hospital and referred by any of the physicians whose investments in the Partnership were

rescinded in 2011, or alternatively, by any of the physicians who invested in the First Offering and whose investments in the Partnership were rescinded in 2011.

159.    To the extent that any particular Defendant meets the conditions of 31 U.S.C. § 3729(a)(2), Relators seek recovery under 31 U.S.C. § 3729(a)(2)(C) against that Defendant.

160.    Relators further seek each and every remedy allowed under 31 U.S.C. § 3730(d) to the maximum amount permitted by law.

**Count 2:     Violation of 31 U.S.C. § 3729(a)(1)(B) (Against All Defendants) (Rescission Transactions) (Anti-Kickback / Stark)**

161.    Relators repeat, reallege, and hereby incorporate by reference Paragraphs 1 – 160, above, as if fully set forth herein.

162.    A person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable under the FCA. 31 U.S.C. § 3729(a)(1)(B). A false record or statement is "material" if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

163.    SLCDC-SL has knowingly made or used false records and statements material to false or fraudulent claims submitted to the government, including, but not limited to, false certifications on Medicare enrollment form 855A about SLCDC-SL's compliance with healthcare laws such as the Anti-Kickback Statute and the Stark Law, false certifications on required annual Medicare cost reports about SLCDC-SL's compliance with healthcare laws such as the Anti-Kickback Statute and the Stark Law, and false certifications required with every single electronic claim submission about SLCDC-SL's compliance with healthcare laws such as the Anti-Kickback Statute and the Stark Law. These false records and statements are material

because payment under federally funded healthcare programs are conditioned upon these certifications.

164.    The System has had direct control over SLCDC-SL's actions at all times relevant. The System caused SLCDC-SL to make or use false records and statements material to false or fraudulent claims submitted to the government, including, but not limited to, false certifications on Medicare enrollment form 855A about SLCDC-SL's compliance with healthcare laws such as the Anti-Kickback Statute and the Stark Law, false certifications on required annual Medicare cost reports about SLCDC-SL's compliance with healthcare laws such as the Anti-Kickback Statute and the Stark Law, and false certifications required with every single electronic claim submission about SLCDC-SL's compliance with healthcare laws such as the Anti-Kickback Statute and the Stark Law. These false records and statements are material because payment under federally funded healthcare programs are conditioned upon these certifications. The System knew that these certifications were false at the time the System caused SLCDC-SL to make or use these false certifications.

165.    During Fine's tenure as CEO and Director of the System and Director of SLCDC-SL, Fine had the power to control SLCDC-SL's actions. Fine caused SLCDC-SL, from 2012 until the date of Fine's resignation as CEO and Director of the System and Director of SLCDC-SL, to make or use false records and statements material to false or fraudulent claims submitted to the government, including, but not limited to, false certifications on Medicare enrollment form 855A about SLCDC-SL's compliance with healthcare laws such as the Anti-Kickback Statute and the Stark Law, false certifications on required annual Medicare cost reports about SLCDC-SL's compliance with healthcare laws such as the Anti-Kickback Statute and the

Stark Law, and false certifications required with every single electronic claim submission about SLCDC-SL's compliance with healthcare laws such as the Anti-Kickback Statute and the Stark Law. These false records and statements are material because payment under federally funded healthcare programs are conditioned upon these certifications. Fine knew that these certifications were false at the time Fine caused SLCDC-SL to make or use these false certifications.

166.    During Pickett's tenure as CFO and Director of the System and Director of SLCDC-SL, Pickett had the power to control SLCDC-SL's actions. Pickett caused SLCDC-SL, from 2012 until the date of Pickett's resignation as CFO and Director of the System and Director of SLCDC-SL, to make or use false records and statements material to false or fraudulent claims submitted to the government, including, but not limited to, false certifications on Medicare enrollment form 855A about SLCDC-SL's compliance with healthcare laws such as the Anti-Kickback Statute and the Stark Law, false certifications on required annual Medicare cost reports about SLCDC-SL's compliance with healthcare laws such as the Anti-Kickback Statute and the Stark Law, and false certifications required with every single electronic claim submission about SLCDC-SL's compliance with healthcare laws such as the Anti-Kickback Statute and the Stark Law. These false records and statements are material because payment under federally funded healthcare programs are conditioned upon these certifications. Pickett knew that these certifications were false at the time Pickett caused SLCDC-SL to make or use these false certifications.

167.    During Koontz's tenure as an officer and Director of the System and Director of SLCDC-SL, Koontz had the power to control SLCDC-SL's actions. Koontz caused SLCDC-SL, from 2012 until the date of Koontz's resignation as an officer and Director of the System and

Director of SLCDC-SL, to make or use false records and statements material to false or fraudulent claims submitted to the government, including, but not limited to, false certifications on Medicare enrollment form 855A about SLCDC-SL's compliance with healthcare laws such as the Anti-Kickback Statute and the Stark Law, false certifications on required annual Medicare cost reports about SLCDC-SL's compliance with healthcare laws such as the Anti-Kickback Statute and the Stark Law, and false certifications required with every single electronic claim submission about SLCDC-SL's compliance with healthcare laws such as the Anti-Kickback Statute and the Stark Law. These false records and statements are material because payment under federally funded healthcare programs are conditioned upon these certifications. Koontz knew that these certifications were false at the time Koontz caused SLCDC-SL to make or use these false certifications.

168.     After CHI became the sole member of the System, CHI had the power to control SLCDC-SL's actions. CHI caused SLCDC-SL, since the date CHI became the sole member of the System, to make or use false records and statements material to false or fraudulent claims submitted to the government, including, but not limited to, false certifications on Medicare enrollment form 855A about SLCDC-SL's compliance with healthcare laws such as the Anti-Kickback Statute and the Stark Law, false certifications on required annual Medicare cost reports about SLCDC-SL's compliance with healthcare laws such as the Anti-Kickback Statute and the Stark Law, and false certifications required with every single electronic claim submission about SLCDC-SL's compliance with healthcare laws such as the Anti-Kickback Statute and the Stark Law. These false records and statements are material because payment under federally funded

healthcare programs are conditioned upon these certifications. CHI knew that these certifications were false at the time CHI caused SLCDC-SL to make or use these false certifications.

169.     For the aforementioned violations of 31 U.S.C. § 3729(a)(1)(B), Relators seek to recover on behalf of the government civil penalties and treble damages, as set forth in 31 U.S.C. § 3729(a)(1). The government's damages consist of the gross Medicare payments made by the government to SLCDC-SL from 2012 to the present for claims for services rendered at the Hospital and referred by any of the physicians whose investments in the Partnership were rescinded in 2011, or alternatively, by any of the physicians who invested in the First Offering and whose investments in the Partnership were rescinded in 2011.

170.     To the extent that any particular Defendant meets the conditions of 31 U.S.C. § 3729(a)(2), Relators seek recovery under 31 U.S.C. § 3729(a)(2)(C) against that Defendant.

171.     Relators further seek each and every remedy allowed under 31 U.S.C. § 3730(d) to the maximum amount permitted by law.

**Count 3:**     **Violation of 31 U.S.C. § 3729(a)(1)(A) (Against All Defendants) (Hospital Change of Ownership)**

172.     Relators repeat, reallege, and hereby incorporate by reference Paragraphs 1 – 171, above, as if fully set forth herein.

173.     A person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" is liable under the FCA. 31 U.S.C. § 3729(a)(1)(A).

174.     Every single claim for payment from a federally funded healthcare program that SLCDC-SL has presented for services rendered at the Hospital constitutes a false or fraudulent claim for payment or approval. SLCDC-SL started submitting such claims in early 2012 and continues to do so. SLCDC-SL knows that such claims are false or fraudulent. In late 2011, both

the System's most senior in-house counsel Thielke and the System's outside counsel Haynes and Boone advised the System and SLCDC-SL that no plausible basis existed under Texas law to believe that the Partnership immediately ceased to exist upon the purported termination of the last four physician partners' interests in the Partnership or that as a result, the Hospital automatically transferred to SLCDC-SL as a matter of law. Nonetheless, SLCDC-SL has continued to present claims for payment for services rendered at the Hospital – a hospital that the Partnership still owns. Moreover, even if SLCDC-SL was simply mistaken about the legal effects of the purported termination of the last four physician partners' interests in the Partnership, the *Patel* case resolved the issue, deciding that the Partnership continues to own the Hospital. The Texas Supreme Court declined a review of the *Patel* opinion. Yet SLCDC-SL has both (A) continued to submit claims for payment for services rendered at the Hospital after the Texas courts rejected SLCDC-SL's claim to ownership and (B) refused to correct its prior misrepresentations and false or fraudulent claims submitted to the government for payment.

175.    The System has had direct control over SLCDC-SL's actions at all times relevant. The System caused SLCDC-SL to present every single claim for payment from a federally funded healthcare program that SLCDC-SL has presented for services rendered at the Hospital. Each one of these claims constitutes a false or fraudulent claim for payment or approval, for the reasons alleged herein. The System knew that these claims for payment were false or fraudulent at the time the System caused SLCDC-SL to present them for payment.

176.    During Fine's tenure as CEO and Director of the System and Director of SLCDC-SL, Fine had the power to control SLCDC-SL's actions. Fine caused SLCDC-SL to present every single claim for payment from a federally funded healthcare program that SLCDC-

SL has presented for services rendered at the Hospital, from 2012 until the date of Fine's resignation as CEO and Director of the System and Director of SLCDC-SL. Each one of these claims constitutes a false or fraudulent claim for payment or approval, for the reasons alleged herein. Fine knew that these claims for payment were false or fraudulent at the time Fine caused SLCDC-SL to present them for payment.

177.    During Pickett's tenure as CFO and Director of the System and Director of SLCDC-SL, Pickett had the power to control SLCDC-SL's actions. Pickett caused SLCDC-SL to present every single claim for payment from a federally funded healthcare program that SLCDC-SL has presented for services rendered at the Hospital, from 2012 until the date of Pickett's resignation as CFO and Director of the System and Director of SLCDC-SL. Each one of these claims constitutes a false or fraudulent claim for payment or approval, for the reasons alleged herein. Pickett knew that these claims for payment were false or fraudulent at the time Pickett caused SLCDC-SL to present them for payment.

178.    During Koontz's tenure as an officer and Director of the System and Director of SLCDC-SL, Koontz had the power to control SLCDC-SL's actions. Koontz caused SLCDC-SL to present every single claim for payment from a federally funded healthcare program that SLCDC-SL has presented for services rendered at the Hospital, from 2012 until the date of Koontz's resignation as an officer and Director of the System and Director of SLCDC-SL. Each one of these claims constitutes a false or fraudulent claim for payment or approval, for the reasons alleged herein. Koontz knew that these claims for payment were false or fraudulent at the time Koontz caused SLCDC-SL to present them for payment.

179.     After CHI became the sole member of the System, CHI had the power to control SLCDC-SL's actions. CHI caused SLCDC-SL to present every single claim for payment from a federally funded healthcare program that SLCDC-SL has presented for services rendered at the Hospital, since the date CHI became the sole member of the System. Each one of these claims constitutes a false or fraudulent claim for payment or approval, for the reasons alleged herein. CHI knew that these claims for payment were false or fraudulent at the time CHI caused SLCDC-SL to present them for payment.

180.     For the aforementioned violations of 31 U.S.C. § 3729(a)(1)(A), Relators seek to recover on behalf of the government civil penalties and treble damages, as set forth in 31 U.S.C. § 3729(a)(1). The government's damages consist of the gross Medicare payments made by the government to SLCDC-SL from 2012 to the present.

181.     To the extent that any particular Defendant meets the conditions of 31 U.S.C. § 3729(a)(2), Relators seek recovery under 31 U.S.C. § 3729(a)(2)(C) against that Defendant.

182.     Relators further seek each and every remedy allowed under 31 U.S.C. § 3730(d) to the maximum amount permitted by law.

**Count 4:     Violation of 31 U.S.C. § 3729(a)(1)(B) (Against All Defendants) (Hospital Change of Ownership)**

183.     Relators repeat, reallege, and hereby incorporate by reference Paragraphs 1 – 182, above, as if fully set forth herein.

184.     A person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable under the FCA. 31 U.S.C. § 3729(a)(1)(B). A false record or statement is "material" if it has "a natural tendency to

influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

185.    SLCDC-SL has knowingly made or used false records and statements material to false or fraudulent claims submitted to the government, including, but not limited to, communications with government officials in which SLCDC-SL made fraudulent misrepresentations about the status of the Partnership, the meaning and application of Texas law governing the ownership and transfer of the Hospital and its associated assets, rulings issued in pending court proceedings regarding the ownership of the Hospital, and the actual content of documents submitted by SLCDC-SL to government regulators about the purported transfer of the Hospital and the underlying bill of sale, or lack thereof, false statements on annual Medicare cost reports about the Hospital's owner and false statements about the Hospital's owner with every single electronic claim submitted by SLCDC-SL for services rendered at the Hospital. These false records and statements are material because these false records and statements succeeded in deceiving the government and ultimately inducing the government to recognize a change in ownership of the Hospital for purposes of payments from federally funded healthcare programs, ultimately resulting in SLCDC-SL receiving government payments it had no right to receive.

186.    The System has knowingly made or used false records and statements material to false or fraudulent claims submitted to the government, including, but not limited to, communications with government officials in which the System made fraudulent misrepresentations about the status of the Partnership, the meaning and application of Texas law governing the ownership and transfer of the Hospital and its associated assets, rulings issued in

pending court proceedings regarding the ownership of the Hospital, the actual content of documents submitted by SLCDC-SL to government regulators about the purported transfer of the Hospital and the underlying bill of sale, or lack thereof, false statements on annual Medicare cost reports about the Hospital's owner and false statements about the Hospital's owner with every single electronic claim submitted by SLCDC-SL for services rendered at the Hospital. These false records and statements are material because these false records and statements succeeded in deceiving the government and ultimately inducing the government to recognize a change in ownership of the Hospital for purposes of payments from federally funded healthcare programs, ultimately resulting in SLCDC-SL receiving government payments it had no right to receive.

187.     The System has had direct control over SLCDC-SL's actions at all times relevant. The System caused SLCDC-SL to make or use false records and statements material to false or fraudulent claims submitted to the government, including, but not limited to, communications with government officials in which SLCDC-SL made fraudulent misrepresentations about the status of the Partnership, the meaning and application of Texas law governing the ownership and transfer of the Hospital and its associated assets, rulings issued in pending court proceedings regarding the ownership of the Hospital, the actual content of documents submitted by SLCDC-SL to government regulators about the purported transfer of the Hospital and the underlying bill of sale, or lack thereof, false statements on annual Medicare cost reports about the Hospital's owner and false statements about the Hospital's owner with every single electronic claim submitted by SLCDC-SL for services rendered at the Hospital. These false records and statements are material because these false records and statements succeeded in deceiving the

government and ultimately inducing the government to recognize a change in ownership of the Hospital for purposes of payments from federally funded healthcare programs, ultimately resulting in SLCDC-SL receiving government payments it had no right to receive. The System knew these records and statements were false at the time the System caused SLCDC-SL to make or use them.

188.    During Fine's tenure as CEO and Director of the System and Director of SLCDC-SL, Fine had the power to control the System and SLCDC-SL's actions. Fine, up until the date of Fine's resignation as CEO and Director of the System and Director of SLCDC-SL, caused the System and SLCDC-SL to make or use false records and statements material to false or fraudulent claims submitted to the government, including, but not limited to, communications with government officials in which the System and SLCDC-SL made fraudulent misrepresentations about the status of the Partnership, the meaning and application of Texas law governing the ownership and transfer of the Hospital and its associated assets, rulings issued in pending court proceedings regarding the ownership of the Hospital, the actual content of documents submitted by SLCDC-SL to government regulators about the purported transfer of the Hospital and the underlying bill of sale, or lack thereof, false statements on annual Medicare cost reports about the Hospital's owner and false statements about the Hospital's owner with every single electronic claim submitted by SLCDC-SL for services rendered at the Hospital. These false records and statements are material because these false records and statements succeeded in deceiving the government and ultimately inducing the government to recognize a change in ownership of the Hospital for purposes of payments from federally funded healthcare programs, ultimately resulting in SLCDC-SL receiving government payments it had no right to

receive. Fine knew these records and statements were false at the time Fine caused the System and SLCDC-SL to make or use them.

189. During Pickett's tenure as CFO and Director of the System and Director of SLCDC-SL, Pickett had the power to control SLCDC-SL's actions. Pickett, up until the date of Pickett's resignation as CFO and Director of the System and Director of SLCDC-SL, caused the System and SLCDC-SL to make or use false records and statements material to false or fraudulent claims submitted to the government, including, but not limited to, communications with government officials in which the System and SLCDC-SL made fraudulent misrepresentations about the status of the Partnership, the meaning and application of Texas law governing the ownership and transfer of the Hospital and its associated assets, rulings issued in pending court proceedings regarding the ownership of the Hospital, the actual content of documents submitted by SLCDC-SL to government regulators about the purported transfer of the Hospital and the underlying bill of sale, or lack thereof, false statements on annual Medicare cost reports about the Hospital's owner and false statements about the Hospital's owner with every single electronic claim submitted by SLCDC-SL for services rendered at the Hospital. These false records and statements are material because these false records and statements succeeded in deceiving the government and ultimately inducing the government to recognize a change in ownership of the Hospital for purposes of payments from federally funded healthcare programs, ultimately resulting in SLCDC-SL receiving government payments it had no right to receive. Pickett knew these records and statements were false at the time Pickett caused the System and SLCDC-SL to make or use them.

190.     During Koontz's tenure as an officer and Director of the System and Director of SLCDC-SL, Koontz had the power to control SLCDC-SL's actions. Koontz, up until the date of Koontz's resignation as an officer and Director of the System and Director of SLCDC-SL, caused the System and SLCDC-SL to make or use false records and statements material to false or fraudulent claims submitted to the government, including, but not limited to, communications with government officials in which the System and SLCDC-SL made fraudulent misrepresentations about the status of the Partnership, the meaning and application of Texas law governing the ownership and transfer of the Hospital and its associated assets, rulings issued in pending court proceedings regarding the ownership of the Hospital, the actual content of documents submitted by SLCDC-SL to government regulators about the purported transfer of the Hospital and the underlying bill of sale, or lack thereof, false statements on annual Medicare cost reports about the Hospital's owner and false statements about the Hospital's owner with every single electronic claim submitted by SLCDC-SL for services rendered at the Hospital. These false records and statements are material because these false records and statements succeeded in deceiving the government and ultimately inducing the government to recognize a change in ownership of the Hospital for purposes of payments from federally funded healthcare programs, ultimately resulting in SLCDC-SL receiving government payments it had no right to receive. Koontz knew these records and statements were false at the time Koontz caused the System and SLCDC-SL to make or use them.

191.     After CHI became the sole member of the System, CHI had the power to control SLCDC-SL's actions. CHI, since the date CHI became the sole member of the System, has caused the System and SLCDC-SL to make or use false records and statements material to false

or fraudulent claims submitted to the government, including, but not limited to, false statements on annual Medicare cost reports about the Hospital's owner and false statements about the Hospital's owner with every single electronic claim submitted by SLCDC-SL for services rendered at the Hospital. These false records and statements are material because they ultimately result in SLCDC-SL receiving government payments it has no right to receive. CHI knew these records and statements were false at the time CHI caused the System and SLCDC-SL to make or use them.

192.     For the aforementioned violations of 31 U.S.C. § 3729(a)(1)(B), Relators seek to recover on behalf of the government civil penalties and treble damages, as set forth in 31 U.S.C. § 3729(a)(1). The government's damages consist of the gross Medicare payments made by the government to SLCDC-SL from 2012 to the present.

193.     To the extent that any particular Defendant meets the conditions of 31 U.S.C. § 3729(a)(2), Relators seek recovery under 31 U.S.C. § 3729(a)(2)(C) against that Defendant.

194.     Relators further seek each and every remedy allowed under 31 U.S.C. § 3730(d) to the maximum amount permitted by law.

**Count 5:     Violation of Tex. Hum. Res. Code § 36.002(1) (Against All Defendants) (Hospital Change of Ownership)**

195.     Relators repeat, reallege, and hereby incorporate by reference Paragraphs 1 – 194, above, as if fully set forth herein.

196.     A person commits an unlawful act if the person "knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized." Tex. Hum. Res. Code § 36.002(1).

197.    A material fact is one "having a natural tendency to influence or to be capable of influencing." Tex. Hum. Res. Code § 36.001(5-a).

198.    SLCDC-SL has knowingly made false statements or misrepresentations of material facts, including, but not limited to, false statements or misrepresentations about the status of the Partnership, the meaning and application of Texas law governing the ownership and transfer of the Hospital and its associated assets, rulings issued in pending court proceedings regarding the ownership of the Hospital, the actual content of documents submitted by SLCDC-SL to government regulators about the purported transfer of the Hospital and the underlying bill of sale, or lack thereof, and false statements about the Hospital's owner with every single electronic claim submitted by SLCDC-SL for services rendered at the Hospital. These false statements or misrepresentations are material because these false statements or misrepresentations have succeeded in deceiving the government, ultimately resulting in SLCDC-SL receiving Medicaid payments it had no right to receive.

199.    The System has knowingly made false statements or misrepresentations of material facts, including, but not limited to, false statements or misrepresentations about the status of the Partnership, the meaning and application of Texas law governing the ownership and transfer of the Hospital and its associated assets, rulings issued in pending court proceedings regarding the ownership of the Hospital, the actual content of documents submitted by SLCDC-SL to government regulators about the purported transfer of the Hospital and the underlying bill of sale, or lack thereof, and false statements about the Hospital's owner with every single electronic claim submitted by SLCDC-SL for services rendered at the Hospital. These false statements or misrepresentations are material because these false statements or

misrepresentations have succeeded in deceiving the government, ultimately resulting in SLCDC-SL receiving Medicaid payments it had no right to receive.

200.     The System has had direct control over SLCDC-SL's actions at all times relevant. The System caused SLCDC-SL to make false statements or misrepresentations of material facts, including, but not limited to, false statements or misrepresentations about the status of the Partnership, the meaning and application of Texas law governing the ownership and transfer of the Hospital and its associated assets, rulings issued in pending court proceedings regarding the ownership of the Hospital, the actual content of documents submitted by SLCDC-SL to government regulators about the purported transfer of the Hospital and the underlying bill of sale, or lack thereof, and false statements about the Hospital's owner with every single electronic claim submitted by SLCDC-SL for services rendered at the Hospital. These false statements or misrepresentations are material because these false statements or misrepresentations have succeeded in deceiving the government, ultimately resulting in SLCDC-SL receiving Medicaid payments it had no right to receive. The System knew these statements or misrepresentations were false at the time the System caused SLCDC-SL to make them.

201.     During Fine's tenure as CEO and Director of the System and Director of SLCDC-SL, Fine had the power to control the System and SLCDC-SL's actions. Fine, up until the date of Fine's resignation as CEO and Director of the System and Director of SLCDC-SL, caused the System and SLCDC-SL to make false statements or misrepresentations of material facts, including, but not limited to, false statements or misrepresentations about the status of the Partnership, the meaning and application of Texas law governing the ownership and transfer of the Hospital and its associated assets, rulings issued in pending court proceedings regarding the

ownership of the Hospital, the actual content of documents submitted by SLCDC-SL to government regulators about the purported transfer of the Hospital and the underlying bill of sale, or lack thereof, and false statements about the Hospital's owner with every single electronic claim submitted by SLCDC-SL for services rendered at the Hospital. These false statements or misrepresentations are material because these false statements or misrepresentations have succeeded in deceiving the government, ultimately resulting in SLCDC-SL receiving Medicaid payments it had no right to receive. Fine knew these statements or misrepresentations were false at the time Fine caused the System and SLCDC-SL to make them.

202.    During Pickett's tenure as CFO and Director of the System and Director of SLCDC-SL, Pickett had the power to control SLCDC-SL's actions. Pickett, up until the date of Pickett's resignation as CFO and Director of the System and Director of SLCDC-SL, caused the System and SLCDC-SL to make false statements or misrepresentations of material facts, including, but not limited to, false statements or misrepresentations about the status of the Partnership, the meaning and application of Texas law governing the ownership and transfer of the Hospital and its associated assets, rulings issued in pending court proceedings regarding the ownership of the Hospital, the actual content of documents submitted by SLCDC-SL to government regulators about the purported transfer of the Hospital and the underlying bill of sale, or lack thereof, and false statements about the Hospital's owner with every single electronic claim submitted by SLCDC-SL for services rendered at the Hospital. These false statements or misrepresentations are material because these false statements or misrepresentations have succeeded in deceiving the government, ultimately resulting in SLCDC-SL receiving Medicaid

payments it had no right to receive. Pickett knew these statements or misrepresentations were false at the time Pickett caused the System and SLCDC-SL to make them.

203.    During Koontz's tenure as an officer and Director of the System and Director of SLCDC-SL, Koontz had the power to control SLCDC-SL's actions. Koontz, up until the date of Koontz's resignation as an officer and Director of the System and Director of SLCDC-SL, caused the System and SLCDC-SL to make false statements or misrepresentations of material facts, including, but not limited to, false statements or misrepresentations about the status of the Partnership, the meaning and application of Texas law governing the ownership and transfer of the Hospital and its associated assets, rulings issued in pending court proceedings regarding the ownership of the Hospital, the actual content of documents submitted by SLCDC-SL to government regulators about the purported transfer of the Hospital and the underlying bill of sale, or lack thereof, and false statements about the Hospital's owner with every single electronic claim submitted by SLCDC-SL for services rendered at the Hospital. These false statements or misrepresentations are material because these false statements or misrepresentations have succeeded in deceiving the government, ultimately resulting in SLCDC-SL receiving Medicaid payments it had no right to receive. Koontz knew these statements or misrepresentations were false at the time Koontz caused the System and SLCDC-SL to make them.

204.    After CHI became the sole member of the System, CHI had the power to control SLCDC-SL's actions. CHI, since the date CHI became the sole member of the System, has caused the System and SLCDC-SL to make false statements or misrepresentations of material facts, including, but not limited to, false statements or misrepresentations about the Hospital's owner with every single electronic claim submitted by SLCDC-SL for services rendered at the

Hospital. These false statements or misrepresentations are material because these false statements or misrepresentations have succeeded in deceiving the government, ultimately resulting in SLCDC-SL receiving Medicaid payments it had no right to receive. CHI knew these statements or misrepresentations were false at the time CHI caused the System and SLCDC-SL to make them.

205.     For the aforementioned violations of Tex. Hum. Res. Code § 36.002(1), Relators seek to recover on behalf of the State of Texas the civil remedies and penalties set forth in Tex. Hum. Res. Code § 36.052.

206.     Relators further seek each and every remedy allowed under Tex. Hum. Res. Code § 36.110.

**Count 6:        Violation of Tex. Hum. Res. Code § 36.002(2) (Against Defendants SLCDC-SL, the System, and CHI) (Hospital Change of Ownership)**

207.     Relators repeat, reallege, and hereby incorporate by reference Paragraphs 1 – 206, above, as if fully set forth herein.

208.     A person commits an unlawful act if the person "knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized." Tex. Hum. Res. Code § 36.002(2).

209.     SLCDC-SL has knowingly concealed or failed to disclose information that has permitted SLCDC-SL to receive benefits or payments under the Medicaid program that it is not authorized to receive. The information SLCDC-SL has knowingly concealed or failed to disclose includes, but is not limited to, information about the status of the Partnership, the meaning and application of Texas law governing the ownership and transfer of the Hospital and its associated

assets, rulings issued in pending court proceedings regarding the ownership of the Hospital, the actual content of documents submitted by SLCDC-SL to government regulators about the purported transfer of the Hospital and the underlying bill of sale, or lack thereof, and about the Hospital's owner with every single electronic claim submitted by SLCDC-SL for services rendered at the Hospital.

210.    The System has knowingly concealed or failed to disclose information that has permitted SLCDC-SL to receive benefits or payments under the Medicaid program that it is not authorized to receive. The information the System has knowingly concealed or failed to disclose includes, but is not limited to, information about the status of the Partnership, the meaning and application of Texas law governing the ownership and transfer of the Hospital and its associated assets, rulings issued in pending court proceedings regarding the ownership of the Hospital, the actual content of documents submitted by SLCDC-SL to government regulators about the purported transfer of the Hospital and the underlying bill of sale, or lack thereof, and about the Hospital's owner with every single electronic claim submitted by SLCDC-SL for services rendered at the Hospital.

211.    After CHI became the sole member of the System, CHI has knowingly concealed or failed to disclose information that has permitted SLCDC-SL to receive benefits or payments under the Medicaid program that it is not authorized to receive. The information CHI has knowingly concealed or failed to disclose includes, but is not limited to, information about the status of the Partnership, the meaning and application of Texas law governing the ownership and transfer of the Hospital and its associated assets, rulings issued in pending court proceedings regarding the ownership of the Hospital, the actual content of documents submitted by SLCDC-

SL to government regulators about the purported transfer of the Hospital and the underlying bill of sale, or lack thereof, and about the Hospital's owner with every single electronic claim submitted by SLCDC-SL for services rendered at the Hospital.

212.     For the aforementioned violations of Tex. Hum. Res. Code § 36.002(1), Relators seek to recover on behalf of the State of Texas the civil remedies and penalties set forth in Tex. Hum. Res. Code § 36.052.

213.     Relators further seek each and every remedy allowed under Tex. Hum. Res. Code § 36.110.

### VI.     Conditions Precedent / No Public Disclosure Bar

214.     All conditions precedent have been performed by Relators or have occurred.

215.     This action brought by Relators is not based on allegations or transactions that are the subject of a civil suit or administrative civil money penalty proceeding in which the government is already a party. *See* 31 U.S.C. § 3730(e)(3).

216.     Substantially the same allegations or transactions as alleged in this action brought by Relators or in the claims alleged herein have not been publicly disclosed (A) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party, (B) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation, or (C) from the news media. *See* 31 U.S.C. § 3730(e)(4)(A).

217.     This action brought by Relators is not based on allegations or transactions that are the subject of a civil suit or an administrative penalty proceeding in which the State of Texas is already a party. *See* Tex. Hum. Res. Code § 36.113(a).

218.     Substantially the same allegations or transactions as alleged in this action brought by Relators or in the claims alleged herein have not been publicly disclosed in a Texas or federal

criminal or civil hearing in which the State of Texas or an agent of the State of Texas is a party, in

a Texas state legislative or administrative report, or other Texas hearing, audit, or investigation,

or from the news media. *See* Tex. Hum. Res. Code § 36.113(b).

### VII.    Jury Trial Demand

219.    Relators hereby demand a jury trial pursuant to FRCP 38.

### Prayer for Relief

WHEREFORE, Relators, on behalf of the United States of American and the State of

Texas, and for themselves, respectfully ask the Court to enter judgment against Defendants,

jointly and severally, in at least the following particulars:

- That Defendants be ordered to cease and desist from violating the Federal False Claims

  Act, 31 U.S.C. § 3729, *et. seq.*;

- That Defendants be ordered to cease and desist from violating the Texas Medicaid Fraud

  Prevention Act, Tex. Hum. Res. Code § 36.001, *et. seq.*;

- That the Court enter judgment against Defendants, jointly and severally, in an amount

  equal to three times the damages sustained by the United States of America because of

  Defendants' actions;

- That the Court impose a civil penalty of not less than $5,500 and not more than $11,000

  for each violation of the Federal False Claims Act, 31 U.S.C. § 3729, *et. seq.*;

- That the Court enter judgment against Defendants, jointly and severally, in an amount

  equal to three times the amount of any payment or the value of any monetary or in-kind

  benefit provided under the Medicaid program, directly or indirectly, as a result of

Defendants' unlawful acts under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code § 36.001, *et. seq.*;

- That the Court impose a civil penalty of not less than $5,500 and not more than $11,000 for each violation of the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code § 36.001, *et. seq.*;

- That the Court award Relators the maximum amount permitted under 31 U.S.C. § 3730(d) as well as attorney's fees, interest, and costs, to the extent permitted by law;

- That the Court award Relators the maximum amount permitted under Tex. Hum. Res. Code § 36.110 as well as attorney's fees, interest, and costs, to the extent permitted by law;

- That the Court award the United States of America and the State of Texas all interest, costs, and attorney's fees to the extent permitted by law; and

- That the Court award all other relief, whether at law or at equity, to which the United States of America, the State of Texas, and Relators are entitled.

Dated: June 11, 2017

Respectfully submitted,

*/s/ Hiren P. Patel*

Hiren P. Patel
Southern District ID No. 608956
Texas Bar No. 24056098
1113 Vine Street, Suite 230
Houston, Texas 77002
Telephone: (713) 579-9700
Facsimile: (832) 460-6530
Email:  hpatel@patelervin.com

**Attorney-in-Charge for Relators**

## CERTIFICATE OF SERVICE

Pursuant to 31 U.S.C. § 3730(b)(2) and FRCP 4(i)(1), I certify that on June 11, 2017, a true and correct copy of this document was served by certified mail, return receipt requested, to the following recipients.

Jeff Sessions                                                                          **Via CMRR**
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Ken Paxton                                                                            **Via CMRR**
Attorney General of the State of Texas
Office of the Attorney General
P.O. Box 12548
Austin, TX 78711-2548

Abe Martinez                                                                          **Via CMRR**
Acting United States Attorney
U.S. Attorney's Office
Southern District of Texas
1000 Louisiana, Suite 2300
Houston, TX 77002

*/s/ Hiren P. Patel*
Hiren P. Patel