## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA and** | § | |
| **STATE OF TEXAS, ex rel. SHATISH** | § | |
| **PATEL, M.D., HEMALATHA** | § | |
| **VIJAYAN, M.D., and WOLLEY** | § | |
| **OLADUT, M.D.,** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. 4:17-CV-01817** |
| | § | |
| **CATHOLIC HEALTH INITIATIVES,** | § | |
| **ST. LUKE'S HEALTH SYSTEM** | § | |
| **CORPORATION, ST. LUKE'S** | § | |
| **COMMUNITY DEVELOPMENT** | § | |
| **CORPORATION – SUGAR LAND,** | § | |
| **DAVID FINE, DAVID KOONTZ, and** | § | |
| **STEPHEN PICKETT,** | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM IN SUPPORT OF
## RELATORS' OPPOSITION TO DEFENDANTS'
## MOTION TO DISMISS RELATORS' ORIGINAL COMPLAINT

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................... i

TABLE OF AUTHORITIES ............................................................................. iii

PRELIMINARY STATEMENT ......................................................................... 1

    I.    Introduction and Summary of Argument. ....................................... 1

    II.   Nature and Stage of the Proceeding. ............................................. 3

    III.  Issues Presented. ............................................................................ 3

ARGUMENT ................................................................................................. 4

    1.    Standard of Review......................................................................... 4

        1.1.   Rule 12(b)(6): Defendants overlook a key portion of the applicable standard. ................................................................ 4

        1.2.   Rule 9(b): Defendants apply the wrong standard. ..................... 5

    2.    The Complaint's FCA claims arising from the 2011 rescission transactions meet the requirements of Rule 12(b)(6) and Rule 9(b). ................. 6

        2.1.   The Complaint plausibly alleges violations of the AKS arising from the 2011 rescission transactions. .............................................. 6

            2.1.1.  The Complaint plausibly alleges that the 2011 rescission transactions constitute illegal kickbacks under the AKS.....................7

            2.1.2.  The Complaint plausibly alleges the required level of intent for the AKS-related allegations. .................................................. 11

            2.1.3.  The Complaint plausibly and with sufficient particularity alleges the existence of referrals for covered services underlying Relators' FCA claims. ....................................................12

        2.2.   The Complaint plausibly alleges violations of the Stark Law arising from Defendants' rescission transactions. ............................... 15

        2.3.   The Complaint sufficiently alleges that Defendants knowingly submitted or caused to be submitted false claims arising from the 2011 rescission transactions. ................................................. 17

3.      The Complaint's FCA claims arising from the purported change of ownership of the Hospital meet the requirements of Rule 12(b)(6) and Rule 9(b). ............................................................................................ 18

    3.1.    The Complaint plausibly alleges the existence of factually false claims. ....... 18

    3.2.    Defendants have no basis to challenge Counts III – VI for failing to allege false certification theories with sufficient particularity. .................... 22

    3.3.    The Complaint plausibly alleges that Defendants knowingly submitted false claims. .............................................................................................. 25

4.      The Complaint's TMFPA claims arising from the purported change of ownership of the Hospital meet the requirements of Rule 12(b)(6) and Rule 9(b). ............................................................................................ 28

    4.1.    The FCA and the TMFPA materially differ in two key respects relevant here. ..................................................................................... 29

    4.2.    The Complaint satisfies Rule 12(b)(6) and Rule 9(b) with respect to the actual elements of the TMFPA claims asserted. ................................. 31

5.      The Complaint sufficiently pleads FCA and TMFPA claims against the individual Defendants Fine, Pickett, and Koontz under Rule 12(b)(6) and Rule 9(b). ............................................................................................ 32

6.      If the Court finds the Complaint insufficient under either Rule 12(b)(6) or Rule 9(b) with respect to one or more claims asserted, the Court should grant leave to amend. ............................................................................ 33

CONCLUSION & PRAYER FOR RELIEF ................................................................. 35

## TABLE OF AUTHORITIES

### CASES

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................... 4, 13

*Bass v. Parkwood Hosp.*, 180 F.3d 234 (5th Cir. 1999).................................32

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)..................................... 4, 8

*Hart v. Bayer Corp.*, 199 F.3d 239 (5th Cir. 2000) .....................................33

*In re United Services Auto. Ass'n*, 307 S.W.3d 299 (Tex. 2010)....................28

*Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999) ..................................4

*LaSalle Bank Nat. Ass'n v. Sleutel*, 289 F.3d 837 (5th Cir. 2002) ...................31

*Lippincott v. Whisenhunt*, 462 S.W.3d 507 (Tex. 2015) .................................30

*Lyn–Lea Travel Corp. v. Am. Airlines*, 283 F.3d 282 (5th Cir. 2002) ..................33

*Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464 (5th Cir. 2004)...................4

*Nazari v. State*, 497 S.W.3d 169 (Tex. App.—Austin 2016, pet. filed) .........................30

*Patel v. St. Luke's Sugar Land Partnership, L.L.P.*, 445 S.W.3d 413 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) .................................. 26

*Texas Dept. of Parks and Wildlife v. Miranda*, 133 S.W.3d 217 (Tex. 2004) .................................28

*United States ex rel. Bennett v. Medtronic*, 747 F.Supp.2d 745 (S.D. Tex. 2010) ...........................18

*United States ex rel. Gage v. Davis S.R. Aviation, L.L.C.*, 623 Fed. Appx. 622 (5th Cir. 2015)...................................................35

*United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009) .............................. passim

*United States ex rel. Hebert v. Dizney*, No. 07-31053, 2008 WL 4538308 (5th Cir. Oct. 10, 2008) .........................................................5

*United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890 (5th Cir. 2013)......................................................14

*United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654 (S.D. Tex. 2013) ...............23

*United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370 (5th Cir. 2004).......... 4, 18, 23

*United States ex rel. Ruscher v. Omnicare*, No. 4:08-cv-3396, 2014 WL 2618158 (S.D. Tex. June 12, 2014) ..................................................................................................5, 10

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899 (5th Cir. 1997) ..............................................................................................................23

*United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375 (5th Cir. 2003) ..............................................................................................................35

*United States ex rel. Williams v. McKesson Corp.*, No. 3:12-CV-371-B, 2014 WL 3353247 (N.D. Tex. Jul. 9, 2014) ................................................................................... 28

*United States v. Caris Life Scis., Inc.*, No. 3:10-CV-02237-P, 2013 WL 11579021 (N.D. Tex. Oct. 23, 2013) ...................................................................................................14

*United States v. Davis*, 132 F.3d 1092 (5th Cir. 1998) ....................................................7

*United States v. Planned Parenthood Gulf Coast, Inc.*, 21 F. Supp. 3d 825 (S.D. Tex. 2014).......... 29

*Waldmann v. Fulp*, ___ F.Supp.3d ___, 2016 WL 9711525 (S.D. Tex. Oct. 12, 2016) ............. passim

*Williams v. WMX Techs., Inc.*, 112 F.3d 175 (5th Cir. 1997) .........................................32

## STATUTES

31 U.S.C. § 3729(a)(1) ....................................................................................... 30

31 U.S.C. § 3729(a)(1)(A) ..............................................................................6, 29

31 U.S.C. § 3729(a)(1)(B) ..........................................................................6, 22, 29

42 U.S.C. § 1320a-7b(b)(2)(A) ...............................................................................7

42 U.S.C. § 1320a-7b(g) ......................................................................................... 6

42 U.S.C. § 1320a-7b(h) ...........................................................................................7

42 U.S.C. § 13955nn(e)(6)(A) ............................................................................15

42 U.S.C. § 1395nn(a)(1) ...................................................................................... 6

TEX. HUM. RES. CODE § 32.039 ...................................................................... 30

TEX. HUM. RES. CODE § 36.006 ...................................................................... 30

TEX. HUM. RES. CODE § 36.052(a)(1) ......................................................... 30

TEX. HUM. RES. CODE §§ 36.002(1),(2) ...................................................... 29

TEX. REV. CIV. STAT. ANN. ART. 581-33(D) ....................................................................8, 16

**OTHER AUTHORITIES**

S. REP. NO. 99–345 (1986), as reprinted in 1986 U.S.C.C.A.N. 5266 ................................... 20

**RULES**

FED. R. CIV. P. 11(b) .....................................................................................................14

FED. R. CIV. P. 12(b)(6) ......................................................................................... passim

FED. R. CIV. P. 15(a) .....................................................................................................33

FED. R. CIV. P. 9(b) ............................................................................................... passim

**REGULATIONS**

42 C.F.R. § 411.357(f) ....................................................................................................15

42 C.F.R. § 411.357(f)(1) ...............................................................................................16

42 C.F.R. § 411.357(f)(1)(i) ...........................................................................................15

Preliminary Statement

**I.      Introduction and Summary of Argument.**

The Complaint asserts six claims under the Federal False Claims Act (the "FCA") and the Texas Medicaid Fraud Prevention Act (the "TMFPA") arising from two fraudulent schemes. In Counts I and II, Relators assert FCA claims arising from a fraudulent scheme centered on a set of rescission transactions in 2011 engineered by Defendants St. Luke's Health System Corporation (the "System"), St. Luke's Community Development Corporation – Sugar Land ("SLCDC-SL") and their senior leaders Fine, Pickett, and Koontz. The rescissions were used to buy-out the almost 100 physician partners in nonparty St. Luke's Sugar Land Partnership, L.L.P. (the "Partnership"), the owner and operator of the St. Luke's Sugar Land Hospital (the "Hospital"). Relators assert that the rescission transactions were illegal kickbacks under the Anti-Kickback Statute (the "AKS") and improper financial relationships under the Stark Law, and here, Relators sue under the FCA based on claims resulting from the rescissions.

In Counts III – VI, Relators assert FCA and TMFPA claims arising from Defendants' fraudulent scheme to illegally transfer the Hospital from the Partnership to SLCDC-SL to deprive the last four physician partners – who each had declined rescission – of their ownership interests in the Hospital, along with their statutory, common law, and contractual partnership rights. To achieve their goal, Defendants made several material misrepresentations to Medicare and Texas Medicaid officials about the effectiveness of the supposed transfer of the Hospital. But the ownership of the Hospital never transferred to SLCDC-SL from the Partnership under Texas law, and yet still Defendants continue to submit false claims listing SLCDC-SL as the hospital provider for services performed at the Hospital.

To support their claims, Relators have alleged particular details of these two schemes as well as reliable indicia to lead to a strong inference that false claims have been submitted and that liability under the TMFPA attaches to Defendants' conduct. Over the course of more than 100 paragraphs of detailed factual allegations, the Complaint identifies with particularity: 33 emails, 9 phone calls or discussions, and 18 written communications or presentations through which Defendants' two fraudulent schemes were carried out. The Complaint discloses the contents of these communications and how they relate to the fraudulent schemes. And the Complaint identifies 20 individuals by name who played key roles in Defendants' schemes.

Yet Defendants' memorandum supporting their motion to dismiss does not even acknowledge these factual allegations, much less explain why they are deficient under the Rules. And against the portions of the Complaint Defendants choose to address, Defendants base their arguments on the wrong Rule 9(b) standard.

And then Defendants get really off-track, claiming, for example, that Relators asked a jury to award them $60 million in damages against Defendants in their separate state court litigation. The trial transcript shows that Relators' counsel asked the jury during opening statements "to award as damages 3.4 to 4.2 million." Such an obvious misrepresentation to this Court for what appears to be nothing more than an attempt to paint Relators as greedy and disgruntled hardly seems worth it. Likewise, more than once Defendants subtly ask the Court to evaluate the Complaint – not on its merits – but on the fact that neither the United States nor Texas has intervened. Congress did not authorize private citizens to sue under the FCA only to have their claims be denied simply because the government declined to intervene.

Defendants' refusal to address the extensive, detailed factual allegations in the Complaint coupled with their willingness to malign Relators and to pitch reasons to dismiss the Complaint wholly unrelated to the merits of Defendants' Rule 12(b)(6) and Rule 9(b) challenges should give the Court a strong indication of how this motion should be decided. Relators, below, explain how the Complaint satisfies the pleading standards under Rule 12(b)(6) and Rule 9(b) and why Defendants' generalized, non-specific arguments offer no basis for dismissal.

## II.   Nature and Stage of the Proceeding.

On June 11, 2017, Relators filed the Complaint under seal. On August 14, 2017, the United States and the State of Texas filed a notice of election to decline intervention. On August 15, 2017, the Court ordered the Complaint to be unsealed. Relators served Defendants on September 12, 2017. Now before the Court is Defendants' Motion to Dismiss the Complaint under Rule 12(b)(6) and Rule 9(b), filed October 31, 2017. Relators file this memorandum to support their opposition to Defendants' pending motion to dismiss, which has automatically been set for submission for November 21, 2017.

## III.   Issues Presented.

Should the Court dismiss any of the claims asserted in the Complaint for failure to state a claim under Rule 12(b)(6) or for failure to satisfy Rule 9(b)'s heightened pleading requirements?

If the Court finds that dismissal is warranted as to one or more claims asserted in the Complaint, should the Court dismiss with prejudice or instead grant Relators leave to amend?

**ARGUMENT**

1.      **Standard of Review.**

   1.1.      **Rule 12(b)(6): Defendants overlook a key portion of the applicable standard.**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard is not a probability test, but it does require more than the sheer possibility that a defendant acted unlawfully. *Id.* Although a complaint must set forth more than labels, conclusions, and formulaic recitations of the elements of a claim, detailed factual allegations are not required. *Twombly*, 550 U.S. at 555 (citation omitted).

In evaluating a Rule 12(b)(6) motion, courts "accept[] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (quoting *Jones v. Greninger*, 188 F.3d 322 (5th Cir. 1999)). And importantly, courts should not assess the merits of the allegations, but decide only if the plaintiff has adequately pled a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).

Notably, in their statement of the applicable standard, Defendants do not appear to acknowledge that a complaint "does not need detailed factual allegations" to survive a Rule 12(b)(6) motion. *Twombly*, 550 U.S. at 555. Factual allegations need only be enough "to raise a right to relief above the speculative level," assuming that all factual allegations are true "even if doubtful in fact." *Id.* at 555-56 (citations omitted).

**1.2.    Rule 9(b): Defendants apply the wrong standard.**

Rule 9(b) requires that a party "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). But "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.*

FCA claims fall within the scope of Rule 9(b). *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009). A complaint asserting FCA claims, "if it cannot allege the details of an actually submitted false claim," may nevertheless satisfy Rule 9(b)'s heightened pleading standard "by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190. *See also United States ex rel. Ruscher v. Omnicare*, No. 4:08-cv-3396, 2014 WL 2618158, at *5 (S.D. Tex. June 12, 2014) (applying *Grubbs* to Rule 9(b) review of FCA complaint).

Despite the holding in *Grubbs*, Defendants incorrectly state that Rule 9(b) requires a complaint asserting FCA claims to "plead at least one false claim with requisite specificity." (Dkt. 19, p. 15, citing *United States ex rel. Hebert v. Dizney*, No. 07-31053, 2008 WL 4538308, at *4 (5th Cir. Oct. 10, 2008).) Although Defendants cite *Grubbs* once in their memorandum (Dkt. 19, p. 28), Defendants argue much more than once that Rule 9(b) demands the particulars of at least one submitted false claim. (*See* Dkt. 19, pp. 25, 26, 28, 29, 33, 40.) Defendants appear to use the pre-*Grubbs* standard to avoid having to acknowledge or address the Complaint's more than 100 paragraphs of detailed factual allegations setting forth two separate schemes to submit false claims and reliable indicia leading to a strong inference that false claims were actually submitted.

The Court should evaluate the Complaint under the standard set forth in *Grubbs*.

2. **The Complaint's FCA claims arising from the 2011 rescission transactions meet the requirements of Rule 12(b)(6) and Rule 9(b).**

In Counts I and II, the Complaint asserts two FCA claims arising from the 2011 rescission transactions. (Dkt. 1, ¶¶ 141-171.) Count I alleges that the 2011 rescission transactions violated the AKS and the Stark Law, and thus, claims for payment including items or services resulting from the 2011 rescission transactions constitute false or fraudulent claims under 31 U.S.C. § 3729(a)(1)(A). *See* 42 U.S.C. § 1320a-7b(g) ("a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31"); 42 U.S.C. § 1395nn(a)(1) (barring an entity from presenting a claim for payment or bill for designated health services furnished pursuant to a referral from a physician with a financial relationship with such entity).

Count II alleges that because the 2011 rescission transactions violated the AKS and the Stark Law, Defendants are liable for false certifications of compliance with the AKS and the Stark Law when submitting SLCDC-SL's Medicare enrollment form 855A, annual Medicare cost reports, and claims for covered services. 31 U.S.C. § 3729(a)(1)(B) (establishing liability for a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim").

Defendants attack Counts I and II on the grounds that (1) no plausible violation of the AKS has been alleged, (2) no plausible Stark Law violation has been alleged, and (3) no knowingly submitted false claims have been alleged.

2.1. **The Complaint plausibly alleges violations of the AKS arising from the 2011 rescission transactions.**

Defendants assert that the Complaint fails to "plausibly allege a violation of the AKS." (Dkt. 19, p. 18.) A violation of the AKS occurs when, among other things, a person "knowingly

and willfully offers or pays remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person" to "refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program…." 42 U.S.C. § 1320a-7b(b)(2)(A). To violate the AKS, a person need not have actual knowledge of or a specific intent to violate the AKS. 42 U.S.C. § 1320a-7b(h).

An offer to pay or a payment of remuneration violates the AKS if one purpose of the offer or payment was to induce referrals. *Waldmann v. Fulp*, ___ F.Supp.3d ___, 2016 WL 9711525, at *27 (S.D. Tex. Oct. 12, 2016). *See also United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998) (rejecting claim that the AKS requires showing that remuneration made "for no other purpose" than "inducing the referral of Medicare patients"). Moreover, the AKS does not require that inducement of referrals "was the primary purpose of the remuneration." *Waldmann*, 2016 WL 9711525, at *27.

Defendants seek dismissal of the AKS-related FCA claims on three grounds: (1) the rescission transactions were not kickbacks; (2) the Complaint fails to allege the requisite intent to break the law; and (3) the Complaint fails to identify any referrals for services covered by Medicare or Medicaid. (Dkt. 19, pp. 19-26.) The Court should reject all three.

### 2.1.1.   The Complaint plausibly alleges that the 2011 rescission transactions constitute illegal kickbacks under the AKS.

To convince the Court that the 2011 rescission transactions were not kickbacks for referrals, Defendants offer several unpersuasive arguments. First, Defendants simply assert that the rescission transactions "were bona fide remuneration designed not to induce or reward referrals, but instead to eliminate the very real risk" of a lawsuit against the Partnership under

the Texas Securities Act ("TSA") "based on the accuracy and reliability of … the Partnership's projected financial performance." (Dkt. 19, pp. 19-20.) This argument fails for three reasons.

- Defendants' assertions of fact should be disregarded. Instead, the factual allegations in the Complaint must be deemed true, even if Defendants cast doubt on them with unsupported assertions, implications, or conjectures. *See Twombly*, 550 U.S. at 555-56.

- The Complaint presents several detailed allegations showing that an important part of Defendants' fraudulent scheme was creating a false pretext for invoking the TSA. (*See* Dkt. 1, ¶¶ 50, 51, 55, 58-71.) These allegations identify with particularity 10 emails, two phone calls, one meeting agenda, and seven different named individuals playing a role in fabricating support for the (non-existent) risk to the Partnership of lawsuits asserting TSA securities claims. (Dkt. 1, ¶¶ 50, 51, 55, 61-71.)

- And contrary to Defendants' suggestion, Relator Dr. Patel's filing of the State Court Action does not evince a "not hypothetical" risk to the Partnership of TSA securities lawsuits." (Dkt. 19, p. 20 n. 5.) Relator Dr. Patel filed suit in response to the System's attempt to use the TSA's rescission process to supposedly mitigate a non-existent risk. (Dkt. 1, ¶ 67.)

Second, Defendants argue that the rescission transactions cannot be kickbacks because the payment amounts were set by the TSA without regard to referral volume, and thus, were "fair-market-value." (Dkt. 19, p. 20, n. 6.) This argument fails for the following reasons.

- The TSA itself differentiates the payment amount mandated through the statutory rescission process from the value of the underlying securities. TEX. REV. CIV. STAT. ANN. ART. 581-33(D) (the "value of the security" affects damages calculation, but payments "[o]n rescission determined without considering the "value of the security").

- The Complaint alleges with particularity that the System commissioned HCAI in November 2010 to appraise the physician partnership units, that HCAI appraised the units at $5,000 each, as detailed in HCAI's report dated April 19, 2011. (Dkt. 1, ¶¶ 51, 72, 73.)

- Finally, it makes no difference that the TSA naturally ignores referral volume in setting the payment amount of a statutory rescission. The AKS is not limited just to cases where payments were made based on referral volume.

Third, Defendants argue that the allegations about the expiration of the TSA's limitations period should be disregarded because Defendants "could not have known at the time whether a Court would ultimately agree that the investors' claims were time barred." (Dkt. 19, p. 21.) The Court should reject this argument for the following reasons.

- The Complaint alleges with particularity (1) that the System knew that expiration of the TSA's limitations period would crater even the false justification the System had concocted to invoke the TSA in the first place, and (2) that the System's strong-arm tactics to convince physicians to accept their rescission offers prior to the date the System believed the TSA limitations period would run out underscores how certain the System was about the importance of the TSA's limitations period. (Dkt. 1, ¶¶ 66, 74, 75, 79-81.) These allegations identify with particularity at least eight emails and seven named individuals.

- The uncertainty of how a court might read the limitations provisions of the TSA is beside the point. No physician partner had ever directly or indirectly threatened a Texas Securities Act lawsuit. (Dkt. 1, ¶¶ 66-67.)

Fourth, Defendants argue that the Complaint fails to establish that the rescission transactions "were designed or intended to induce new Medicare or Medicaid business." (Dkt.

19, p. 22.) To bolster this argument, Defendants broadly claim that every allegation about intent to induce referrals is conclusory. (Dkt. 19, p. 23.) This argument fails for the following reasons.

Initially, Rule 9(b) expressly permits *mens rea* elements – such as intent to induce referrals – to be alleged generally. FED. R. CIV. P. 9(b). Thus, "with respect to inducement," a relator need only plead that the defendant acted with "'intent to induce referrals of federal health care program business.'" *Ruscher*, 2014 WL 2618158, at *12 (citations omitted).

Moreover, the Complaint does allege intent to induce referrals for covered services. (Dkt. 1, ¶¶ 144-49.) The following supporting allegations meet the plausibility test of Rule 12(b)(6).

- By November 2010, the System wanted to eliminate the physician owners of the Hospital, but in a way that would induce the most active referral sources to continue growing their relationship with the Hospital and St. Luke's and to continue increasing referrals despite losing their status as part-owners of the Hospital. (Dkt. 1, ¶ 50, 51, 58-59.)

- The System had already identified 30 of the physician owners who regularly used and referred services to the Hospital. (Dkt. 1, ¶ 51.) These 30 referral sources remained a central focus of the System's plans when discussing options to eliminate the physician owners with the System's outside counsel Baker Donelson. (Dkt. 1, ¶¶ 51, 54.)

- Two physician partners – Vanderzyl and Korfin – assisted the System in accomplishing its goals of eliminating the physician owners, with Korfin actively advising the System that it needed to find a way to buy out the physician partners at a value significantly greater than the System's $5,000 per partnership unit valuation. (Dkt. 1, ¶¶ 58-60.)

- The System had always known that its competitiveness in the Sugar Land market required providing the proper incentives to induce local physicians to refer patients and services to the

Hospital instead of to St. Luke's well-established competitors. (Dkt. 1, ¶¶ 27-30.) After being told by Korfin and Vanderzyl that the System had to buy out the physician partners at a value substantially greater than $5,000 per unit (Dkt. 1, ¶¶ 58-60), the System concluded that to induce the 30 best referral sources to maintain and grow their referral relationship despite losing their ownership interest in the Hospital, the System had to buy the physician's units for substantially more than $5,000 per unit value. The System was even willing to create an entire sham lawsuit to facilitate paying the physician partners substantially more than $5,000 per unit. (Dkt. 1, ¶¶ 61-62.)

In sum, Defendants' attempts to argue that the 2011 rescission transactions were not kickbacks fail. The well-pleaded facts in the Complaint and the reasonable inferences drawn from them are more than sufficient to meet the plausibility standard of Rule 12(b)(6). Moreover, the Complaint sufficiently alleges the details of Defendants' fraudulent scheme, with several allegations identifying specific emails and phone calls and the people involved. The Court should conclude that the Complaint plausibly alleges that the 2011 rescission transactions constitute illegal kickbacks under the AKS.

### 2.1.2.   The Complaint plausibly alleges the required level of intent for the AKS-related allegations.

Defendants contend that the Complaint fails to allege that Defendants knowingly and willfully violated the AKS with the 2011 rescission transactions because (1) Defendants sought outside legal and consulting advice and (2) Defendants had non-referral-based business reasons for the 2011 rescission transactions. (Dkt. 19, pp. 23-24.) Neither argument passes muster.

First, while the Complaint does allege that Defendants used outside lawyers and consultants, the Complaint makes it clear that Defendants did so to advance their fraudulent scheme. (Dkt. 1, ¶¶ 61-73.)

Second, while the Complaint does allege that Defendants wanted to eliminate the physician partners from the Partnership by 2010, this does not negate the intent elements of the AKS. The TSA rescission process was not the only mechanism available to buy-out the physician partners. Instead of pursuing a legally permissible buy-out based on the System's appraised value of the physician partner's units, the System chose a questionable, arcane method as a ploy to pay illegal kickbacks without being caught. (Dkt. 1, ¶¶ 61-73.) The Complaint also details the measures Defendants took to fabricate supporting evidence to bolster the plausibility of the rescission process and Defendants' decision to proceed with rescission even after being advised by outside counsel that the window of opportunity had closed for the TSA to sanitize Defendants' payments from the AKS. (Dkt. 1, ¶¶ 68-71, 74, 75.)

Moreover, even if Defendants had other purposes for the rescission transactions, the AKS only requires that one purpose be to referrals. *Waldmann*, 2016 WL 9711525, at *27. For these reasons, the Court should reject Defendants' arguments that the Complaint fails to allege the requisite intent level for the AKS violations at issue.

### 2.1.3.   The Complaint plausibly and with sufficient particularity alleges the existence of referrals for covered services underlying Relators' FCA claims.

Defendants finally attack the Complaint's AKS allegations for failure to identify any specific referrals covered by Medicare or Medicaid. Defendants contend that (1) the Complaint does not plausibly allege that any rescinded physicians ever referred covered services to the Hospital or to a St. Luke's-affiliated entity and (2) the Complaint does not specifically identify a

single referral with information such as the patient's name, the services provided to that patient, and other similar referral-specific information. Neither argument warrants dismissal.

First, the Complaint meets the plausibility test for its allegations that several rescinded physicians actually made referrals for covered services to the Hospital and to other St. Luke's entities. The Complaint, for example, names 15 physicians currently holding active medical staff privileges at Hospital who could not possibly have had any claims under the Texas Securities Act at the time their investments were rescinded, and the Complaint expressly alleges that these 15 physicians continue to refer patients and designated health services to the Hospital (Dkt. 1, ¶¶ 85, 86.) The Complaint also alleges the following supporting facts.

- The Hospital is a 100-bed acute care regional hospital and became a Medicare provider in conjunction with commencing operations in October 2008. (Dkt. 1, ¶¶ 43, 45.)

- Maintaining the right to receive Medicare and Medicaid payments was important enough to cause Defendants to abandon the physician-owned structure to ensure the Hospital could expand without risking its Medicare enrollment. (Dkt. 1, ¶¶ 48-49.)

Taken together, these facts show that Medicare and Medicaid business constitutes a sizable portion of the Hospital's overall operations. The 15 named physicians in paragraph 85 of the Complaint are active staff members, and it is reasonable to infer that maintaining active staff privileges requires a minimum level of physician engagement in the Hospital, including referrals. Thus, since Medicare and Medicaid business represents a significant percentage of the Hospital's operations, it is reasonable to infer that referrals from active staff members will include at least some referrals for designated health services. *See Iqbal*, 556 U.S. at 678 (courts may draw reasonable inferences in favor of the plaintiff based on alleged facts).

Moreover, it would be remarkable if Defendants' reply brief affirmatively asserts that no referrals for designated health services were made by any of the 15 physicians named in paragraph 43 at any time since the rescission transactions. *See* Fed. R. Civ. P. 11(b).

Second, the Complaint satisfies Rule 9(b) without having to identify a single specific referral for designated health services. *Grubbs*, 565 F.3d at 190. The Complaint alleges the particular details of Defendants' scheme to submit false claims and reliable indicia leading to a strong inference that claims were actually submitted. *Id*. As extensively discussed in Section 2.1.1 of this memorandum, above, the Complaint alleges particular details of Defendants' scheme to use the Texas Securities Act rescission process as a false pretext to pay the physician partners more than the System's appraised value of the physician's partnership units.

And as discussed in Section 2.1.2 of this memorandum, above, reliable indicia here indicate that false claims were actually submitted. The false claims at issue consist of claims seeking payment for designated health services referred to the Hospital by rescinded physician partners, and in particular, the 15 physicians named paragraph 85 of in the Complaint. These indicia are more than sufficient to lead to a strong inference that false claims were submitted.

Further, the two cases cited by Defendants do not support the notion that the particular details of a specific referral must be alleged. *See United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 895 (5th Cir. 2013) (acknowledging *Grubbs* and requiring the details of a specific actual referral only because the complaint failed to allege a fraudulent scheme); *United States v. Caris Life Scis., Inc.*, No. 3:10-CV-02237-P, 2013 WL 11579021, at *4 (N.D. Tex. Oct. 23, 2013) (applying *Grubbs* to deny motion to dismiss even though FCA complaint "does not cite specific bills submitted"). Accordingly, the Court should reject

Defendants' argument that the Complaint should be dismissed for failing to identify a specific actual referral.

### 2.2. The Complaint plausibly alleges violations of the Stark Law arising from Defendants' rescission transactions.

Defendants ask the Court to dismiss the FCA claims arising from Defendants violation of the Stark Law on the same grounds Defendants used to justify dismissal of the AKS-related FCA claims. (Dkt. 19, p. 26.) For the reasons addressed in Section 2.1 of this memorandum, above, the Court should also deny Defendants' request for dismissal of the Stark-related FCA claims.

Defendants also offer one independent basis for dismissal of the Stark-related FCA claims: that the rescission transactions constitute isolated transactions permitted under the Stark Law and its related regulations. *See* 42 U.S.C. § 13955nn(e)(6)(A); 42 C.F.R. § 411.357(f). (Dkt. 19, p. 27.) But the Complaint's factual allegations establish that the rescission transactions were not permissible isolated transactions because the remuneration paid was not "[c]onsistent with the fair market value of the transaction." 42 C.F.R. § 411.357(f)(1)(i). Specifically:

- Defendants' appraisal valued the physician partner units at $5,000 each. (Dkt. 1, ¶ 72.)

- Defendants had no basis to invoke the TSA's rescission process, and only as a means to pay the physician partners more than $5,000 per unit did Defendants direct HCAI to conjure up a false basis to justify using the rescission process. (Dkt. 1, ¶¶ 68-71.)

- But ultimately, the expiration of the limitations period for Texas Securities Act claims meant that even Defendants' false pretext offer no valid basis to use the statutory rescission process. Yet Defendants did so anyway. (Dkt. 1, ¶¶ 74-75.)

Defendants entirely ignore the well-pleaded factual allegations in the Complaint and instead try to support their fair market value argument in other ways. First, Defendants claim

that the rescission payments were "implicitly" consistent with fair market value because the payment amounts were set by statute and because Defendants obtained outside legal and consulting advice. (Dkt. 19, p. 27.) But this argument fails because the Texas Securities Act on its face differentiates the rescission payment amount from what is the "value" of the underlying security. Tex. Rev. Civ. Stat. Ann. art. 581-33(D). And the Complaint alleges with particularity that Defendants used their outside lawyers and consultants to further their fraudulent scheme by creating a false justification for invoking the Texas Securities Act. (Dkt. 1, ¶¶ 61-73.)

Second, Defendants argue that the rescission payments did not take into account referral volume. But to be an isolated transaction, the rescission payments had to (1) be consistent with fair market value and (2) be independent of any referral volume. 42 C.F.R. § 411.357(f)(1). Thus, the fact that referral volume was not taken into account to determine the payment amounts does not, on its own, show that the rescission transactions constitute isolated transactions.

Finally, Defendants claim that the rescission payments were commercially reasonable because they were used to eliminate "the very real risk of lawsuits." (Dkt. 19, p. 27.) Once again Defendants point to Relator Dr. Patel's initiation of the State Court Action as evidence of this supposed risk of lawsuits. (Dkt. 19, p. 27.) But multiple well-pleaded allegations in the Complaint establish that Defendants knew that no real risk of a TSA lawsuit existed and that Defendants then fabricated a basis to invoke the TSA. (Dkt. 19, p. 27.) And as stated multiple times, Relator Dr. Patel filed suit in response to and because of Defendants' Texas Securities Act ploy, and so Defendants have no basis to use the State Court Action as evidence that a risk of lawsuits existed prior to Defendants' actions to pursue statutory rescission. (Dkt. 1, ¶ 67.) The Court should

therefore reject Defendant's contention that the rescissions were isolated transactions permissible under the Stark Law.

### 2.3. The Complaint sufficiently alleges that Defendants knowingly submitted or caused to be submitted false claims arising from the 2011 rescission transactions.

Defendants challenge the FCA claims arising from the 2011 rescission transactions by asserting again that the Complaint fails to satisfy Rule 9(b) because Relators have not alleged at least one submitted false claim with the traditional "who, what, where, when, and why" degree of specificity. (Dkt. 19, p. 28.) But as stated above, an FCA complaint may alternatively satisfy Rule 9(b) "by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Grubbs*, 565 F.3d at 190. The one time Defendants acknowledge *Grubbs* in their memorandum, Defendants merely assert, without explanation, that the Complaint has failed to allege the particular details of a fraudulent scheme and reliable indicia that false claims were actually submitted. (Dkt. 19, p. 28.) The Court should not dismiss any part of the Complaint on these grounds given Defendants' failure to present any argument about the *Grubbs* standard and the extensive discussion in Section 2.1 of this memorandum, above, showing how the Complaint satisfies Rule 9(b).

Defendants conclude their discussion of the 2011 rescission transactions by briefly repeating that the Complaint cannot sufficiently plead that Defendants' "knowingly" submitted false claims because Defendants were "guided by advice received from" legal counsel and external consultants. (Dkt. 19, p. 29.) To the contrary, the Complaint's detailed factual allegations show that Defendants' used their outside counsel and consultants to further their fraudulent scheme. (Dkt. 19, p. 28.)

In sum, Defendants numerous challenges – often repetitive – to the Complaint's FCA claims arising from the 2011 rescission transactions fail to justify dismissing the Complaint.

3.    **The Complaint's FCA claims arising from the purported change of ownership of the Hospital meet the requirements of Rule 12(b)(6) and Rule 9(b).**

In Counts III and IV, the Complaint asserts two FCA claims arising from Defendants' attempted transfer of the Hospital from the Partnership to SLCDC-SL. (Dkt. 1, ¶¶ 172-194.) In Counts V and VI, the Complaint states two TMFPA claims from the purported Hospital transfer. (Dkt. 1, ¶¶ 195-213.) Defendants have elected to group these four claims together, treating the FCA and the TMFPA as essentially the same. (Dkt. 19, p. 29 n. 9.) But Relators address the FCA and the TMFPA claims separately, due to material differences between the two statutes, as explained further in Section 4, below.

Defendants attack the sufficiency of the Complaint as to the Hospital transfer claims on the grounds that the Complaint fails to plead (1) the existence of factually false claims, (2) the existence of legally false claims, and (3) that Defendants knowingly submitted false claims. Relators address each point, in turn.

3.1.    **The Complaint plausibly alleges the existence of factually false claims.**

Factually false claims involve "an incorrect description of goods or services or a request for reimbursement for goods or services never provided." *United States ex rel. Bennett v. Medtronic*, 747 F.Supp.2d 745, 765 (S.D. Tex. 2010). For example, a claim that represents that a specific provider performed the services billed when, in fact, the services were delivered by a different provider would constitute a factually false claim. *Waldmann*, 2016 WL 9711525, at *6 (citing *Riley*, 355 F.3d at 370).

The Complaint alleges that SLCDC-SL has, in fact, submitted claims for payment to Medicare in the years 2012 to the present and that every claim submitted by SLCDC-SL required certification that the information contained therein was true and correct. (Dkt. 1, ¶¶ 133-34.) Among other things, the required information to be submitted as part of each claim includes the identity of the correct owner of the Hospital where the billed services were performed. (Dkt. 1, ¶ 133.) And the Complaint alleges that SLCDC-SL has since 2012 continually misrepresented the Hospital's owner on each and every submitted claim for payment, despite the requirement to certify that all information on each submitted claim is true and correct. (Dkt. 1, ¶ 185.)

Defendants argue that false statements about the owner of the Hospital where billed services were provided are insufficient to render a claim factually false because information identifying the hospital provider by name and by its National Provider ID "have nothing to do with the goods and services" for which reimbursement is sought. (Dkt. 19, p. 32.) But Defendants' argument fails for the following two reasons.

First, this Court recently held that listing the wrong provider on a Medicare claim form renders the claim factually false. *Waldmann*, 2016 WL 9711525, at *9-10. The Court in *Waldmann* decided that a hospital submitted factually false claims by listing a physician provider on several CMS-1450 claim forms even when that provider did not actually perform the services billed. *Id*. The hospital had argued that the name of the physician provider listed on the hospital's claims had nothing to do with the services billed on those claims, which were limited to services of a hospital – such as nursing care – and not for services billed by the physician. *Id*. at *9.

But this Court in *Waldmann* was not persuaded because the certification contained in claim form CMS-1450 required "the hospital to ensure that *all* billing information is true,

accurate and complete and that the biller not conceal material facts." *Id.* Had the hospital "provided the NPI of a physician who did not exist, or of a physician who was not the Attending Provider or the Operating Provider," the claim would necessarily contain "an incorrect description of goods and services." *Id*. Although the issue in *Waldmann* centered on the wrong physician provider listed on a claim, the same reasoning holds here, where SLCDC-SL has been submitting claims since 2012 using form CMS-1450 (inclusive of its electronic version) listing the wrong hospital provider for the goods and services billed.

Second, the legislative history of the FCA supports the *Waldmann* holding and the basis for Relators' FCA claims related to the purported transfer of the Hospital. In conjunction with passing the 1986 amendments to the FCA, the Senate Judiciary committee issued a report confirming the legislative intent that an actionable "false claim may take many forms" and that "such claims may be false even though the services are provided as claimed...." S. Rep. No. 99–345, at 9 (1986), as reprinted in 1986 U.S.C.C.A.N. 5266, 5274. Both the persuasive reasoning in *Waldmann* and the legislative history of the FCA dispel Defendants' theory that claims cannot be factually false if a provider seeks reimbursement for the specific goods and services provided. Accordingly, the Complaint more than meets the plausibility standard of Rule 12(b)(6) as to alleging factually false claims, having alleged that each and every claim submitted by SLCDC-SL since 2012 identifying the wrong hospital provider constitutes a factually false claim due to the certification required with each CMS-1450 claim submitted. (Dkt. 1, ¶ 132.)

Having addressed the plausibility of the Complaint's allegations of factually false claims, Relators respond to Defendants' Rule 9(b) challenge, where Defendants once again ignore *Grubbs* and demand dismissal because the Complaint does not allege the particular details of any

actually submitted claims. (Dkt. 19, pp. 33-34.) Like before, Defendants offer no argument or analysis on whether the Complaint alleges the particular details of a scheme to submit false claims with reliable indicia leading to a strong inference that claims were actually submitted. Instead Defendants undercut their own position by directly referencing the hospital claim form CMS-1450. (Dkt. 19, p. 33.) While the Complaint does not specifically name this form, it is the only form (inclusive of its electronic version) used for hospital submitted claims. And given that Defendants had no trouble identifying it based on the descriptions in the Complaint, the Court should not dismiss the Complaint solely because the name of form CMS-1450 is missing.

Furthermore, even though Defendants offer no substantive discussion on the sufficiency of the Complaint's allegations of the particular details of Defendants' fraudulent scheme, the Court should be satisfied that the Complaint meets the Rule 9(b) standard set forth in *Grubbs*. Here, the Complaint presents an array of detailed factual allegations: (1) explaining Defendants' goal of taking the Hospital from the Partnership without having to comply with applicable statutory, common law, and contractual duties; (2) detailing the bad acts Defendants committed to achieve their goal, despite being informed by outside and internal counsel that Defendants' planned actions failed to comply with several legal duties and requirements; (3) exposing Defendants' strategy of concealing their fraudulent acts behind the cloak of their outside counsel; and (4) detailing the multitude of material misrepresentations Defendants made to federal and state healthcare officials hoping to overcome Medicare's objections to Defendants' claim that ownership of the Hospital had transferred. (Dkt. 1, ¶¶ 90-128.)

The factual allegations setting forth Defendants' fraudulent scheme related to the purported transfer of the Hospital include identifying with particular detail at least six emails, six

phone calls or discussions, and four notices, memos, or presentations. (Dkt. 1, ¶¶ 91, 102, 110, 112-15, 117-21, 124, 125, 128.) In addition, the Complaint identifies 15 specific individuals not party to this suit who either played a role in advancing the scheme or were adversely affected by it. (Dkt. 1, ¶¶ 104, 105, 112-20, 124-26, 128.) Accordingly, the Court should determine that the Complaint's allegations supporting the Hospital-ownership-related FCA claims comply with Rule 12(b)(6) and Rule 9(b).

### 3.2. Defendants have no basis to challenge Counts III – VI for failing to allege false certification theories with sufficient particularity.

Defendants next attempt to convince the Court to dismiss the FCA claims arising from the purported transfer of the Hospital by improperly mixing in the Complaint's separate allegations related to the 2011 rescission transactions. Defendants tip off their bait and switch when they pause to point out that paragraphs 172-213 of the Complaint do not contain one "variant of the word 'certify.'" (Dkt. 19, p. 34.) Paragraphs 172-213 constitute Counts III – VI, which set forth Relators' FCA and TMFPA claims arising from the purported transfer of the Hospital. Defendants are correct – no variant of "certify" appears in those paragraphs. (Dkt. 1, ¶¶ 172-213.) But the word "certifications" appears 35 times in the Complaint, with 34 instances between paragraphs 161-171, setting forth Count II, Relators' rescission-related FCA claim under 31 U.S.C. § 3729(a)(1)(B). (Dkt. 1, ¶¶ 161-171.)

Count II – regarding the rescission transactions – expressly and extensively alleges that Defendants made false certifications of compliance with the AKS and the Stark Law on Medicare enrollment forms, annual cost reports, and electronically submitted claims. (Dkt. 1, ¶¶ 161-171.) Yet Defendants ask the Court to dismiss Counts III – VI – regarding the purported Hospital transfer – on the grounds that Relators fail to properly allege the express or implied certification

theories to support FCA liability. (Dkt. 19, pp. 26-30.) But Counts III – VI are not predicated on the express or implied certification theories. (Dkt. 1, ¶¶ 172-213.)

Defendants have essentially conjured up theories that are not part of Counts III – VI to then ask the Court to dismiss Counts III – VI because the Complaint does not sufficiently plead the theories fabricated by Defendants. Moreover, Defendants do not attempt to challenge the one claim Relators have asserted based on the express or implied certification theories. Thus, Defendants' lengthy discussion about the express or implied certification theories establishes no basis to dismiss the FCA and TMFPA claims arising from the purported transfer of the Hospital.

To help filter the muddy waters, Relators draw the Court's attention to three important points about Count II's certification theories and the scope of the claims set forth in Counts III – VI. First, Defendants' certification arguments would have failed against Relators' rescission-related FCA claim set forth in Count II, even if Defendants had challenged Count II on those grounds. Defendants essentially argue that the Complaint (1) fails to identify the specific statutes or regulations that Defendants had falsely certified compliance with, (2) fails to show how Defendants violated those statutes, regulations, or duties, and (3) fails to establish that Defendants' false certification was a material condition of payment. (Dkt. 19, pp. 34-38.)

But "numerous courts" have already held that "allegations referring to just such forms" as annual cost reports and Medicare form 855A "are sufficient to plead certification as required for FCA liability" stemming from violations of the AKS or the Stark Law. *United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 664 (S.D. Tex. 2013) (citing *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997); *Riley*, 355 F.3d 370 at 376 n. 6). Here, the certification theories alleged in Count II and its predicate factual

allegations in the Complaint are expressly focused on false certification of compliance with the AKS and the Stark Law. (Dkt. 1, ¶¶ 161-171.) And because the Complaint expressly alleges false certification in annual cost reports, enrollment agreements, and claims submissions, the false certification allegations in the Complaint satisfy Rule 12(b)(6) and Rule 9(b). (Dkt. 1, ¶¶ 132-34.) So Defendants' arguments would have failed against Relators' FCA claim set forth in Count II.

Second, the claims set forth in Counts III and IV are not based on false certifications of compliance with healthcare laws in general (Counts V and VI are address in Section 4, below). But these claims are, in part, predicated on the requirement found in CMS-1450 claim forms, enrollment agreements, and annual cost reports that a submitting party certify that the information contained in those forms is true, accurate, and complete and that no material facts have been concealed. As explained above, this Court in *Waldmann* cited such a certification requirement in CMS-1450 to conclude that any false information – including the incorrect identification of the provider of the services – would render the claim factually false. But these certifications about the truthfulness of the information contained in specific forms are not the same as the types of broad false certification theories and allegations Defendants tried to ascribe to the claims set forth in Counts III – VI.

Third, in the midst of challenging the non-existent false certification theories underlying Counts III – VI, Defendants contend that any false claims or misrepresentations related to the purported transfer of the Hospital cannot be considered material because the government continues to pay SLCDC-SL for services performed at the Hospital, even though it is owned by the Partnership. But this argument fails for the following reasons.

- The detailed allegations in the Complaint show that the government did consider it material that Defendants could not produce the necessary proof to establish an actual transfer of ownership of the Hospital from the Partnership to SLCDC-SL. It was only due to Defendants' misrepresentations and machinations that the government, after a substantial delay, recognized a change in ownership for Medicare purposes. (Dkt. 1, ¶¶ 120-28.)

- The government's interests extend to matters of public health and safety. And so it is entirely reasonable for the government to wait for remedies authorized by the FCA and the TMFPA in lieu of trying to disrupt an on-going hospital operation.

Ultimately, whether the government considers Defendants' false claims to be material is not something that can be decided at the pleading stage, based on pure conjecture by Defendants about the governments interests, motives, and most importantly, competing demands.

### 3.3. The Complaint plausibly alleges that Defendants knowingly submitted false claims.

Defendants claim that the Complaint fails to allege specific facts sufficient to plead that Defendants' knowingly submitted false claims after Defendants' attempted transfer of the Hospital to SLCDC-SL. (Dkt. 19, pp. 39-41.) Against Defendants' unsupported assertion that every allegation about Defendants' intent is "conclusory," the Court should consider the detailed factual allegations in paragraphs 90-131 of the Complaint, which are more than sufficient to support a strong inference of the requisite level of intent. (These allegations are discussed in more detail in Sections 3.1 and 3.2 of this memorandum, above.)

Defendants further argue that no intent can be inferred from allegations bearing any connection to the *Patel* opinion from the Texas First Court of Appeals, a decision that Defendants contend merely shows "[c]onfusion regarding the treatment of the Partnership"

under Texas law. (Dkt. 19, pp. 40-41.) *See generally Patel v. St. Luke's Sugar Land Partnership, L.L.P.*, 445 S.W.3d 413 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). Defendants further suggest that since the Complaint offers no "allegations of how the *Patel* decision caused the Defendants to knowingly violate general 'healthcare laws' or 'CMS's requirements,'" the Complaint has not sufficiently alleged scienter. (Dkt. 19, p. 41.) The Court should reject this line of argument for the following four reasons.

First, the Complaint alleges scienter with sufficient particularity based not on the *Patel* decision, but on several emails identified by date, recipient, sender, and subject matter, tracing the genesis of Defendants' frivolous theory that upon termination of the last four physician partners of the Partnership, the Partnership's assets automatically transferred by operation of law to SLCDC-SL. (Dkt. 1, ¶¶ 115-19.) These emails prompted the System's most senior in-house lawyer Thielke to send an October 26, 2011 email to key System personnel Koontz, Dunham, and Geire as well as outside advisor Grady that their conceived theory that the Hospital would automatically transfer to SLCDC-SL upon terminating the physician partnership interests was incorrect. (Dkt. ¶ 119.) Thielke included with her email the relevant Texas statutes governing the winding up and termination procedures for partnerships and flatly told the others that "there is no 'automatic' action" to transfer assets without compliance with windup procedures. (Dkt. 1, ¶ 119.) And in a December 5, 2011 memo, the System's outside counsel Haynes and Boone confirmed that the Hospital would not simply be inherited by SLCDC-SL if the physician partners' interests were effectively terminated. (Dkt. 1, ¶ 122.)

Despite being told by its most senior in-house lawyer and its outside counsel at the time that absolutely no basis existed to support the position that ownership of the Hospital would

automatically transfer to SLCDC-SL if Defendants could, with legal effect, terminate the last four physician partners, Defendants started fraudulently misrepresenting to various government officials that under Texas law, title to and ownership of the assets comprising the Hospital transferred to SLCDC-SL in late 2011. (Dkt. 1, ¶¶ 120, 121, 124.) And in 2012, SLCDC-SL started presenting factually false claims for payment by listing itself as the hospital provider, even though Defendants knew that such representations were false and that the Hospital had not been transferred from the Partnership to any other entity. (Dkt. 1, ¶ 132-134.) None of these allegations depend in any way on the *Patel* decision.

Second, in light of the detailed and particular allegations establishing scienter (which Defendants entirely ignore in their memorandum), the Court can now put the *Patel* decision in the proper context. Although Relators sufficiently allege that Defendants knowingly made fraudulent statements about the Hospital's ownership starting in late 2011 and knowingly presented false claims from 2012 forward, the *Patel* decision establishes a date after which Defendants have no plausible basis to deny knowing that the Partnership has continuously owned the Hospital since it opened in 2008 through today. While Relators believe the evidence will establish at trial that Defendants (other than CHI, which entered the picture in 2013) knowingly submitted false claims from 2012 forward, the date *Patel* became final sets an alternative temporal scope for Relators' FCA claim.

Third, the Court should reject Defendants' implication that, as an interlocutory appeal, *Patel* could not actually and finally decide the Hospital ownership issue. (Dkt. 19, p. 40.) Under review in the *Patel* appeal was a trial court order denying a temporary injunction solely on the grounds of mootness, a subject matter jurisdiction issue. (Dkt. 1, ¶¶ 105, 108.) Under Texas law,

appellate courts are "obliged" to conduct *de novo* review of trial court rulings based on subject matter jurisdiction. *In re United Services Auto. Ass'n*, 307 S.W.3d 299, 306 (Tex. 2010). In doing so, the reviewing courts must reach all necessary issues to resolve the subject matter jurisdiction dispute. *Id*. It makes no difference if subject matter jurisdiction issues are intertwined with the underlying merits. *Texas Dept. of Parks and Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004). The appellate court had to decide if a transfer of the Hospital to SLCDC-SL had occurred under Texas law to resolve the subject matter jurisdiction question. Accordingly, on the issue of the proper ownership of the Hospital, the *Patel* decision is final.

Fourth, and finally, the Court should give no weight to Defendants' unsupported assertions that they were simply confused about the ownership of the Hospital. The detailed allegations in the Complaint, inclusive of several specifically identified emails, show that Defendants knew that the Hospital had not been transferred to SLCDC-SL. (Dkt. 1, ¶¶ 90-128.)

In sum, none of Defendants' varied challenges to the FCA claims arising from the purported transfer of the Hospital pass muster.

## 4. The Complaint's TMFPA claims arising from the purported change of ownership of the Hospital meet the requirements of Rule 12(b)(6) and Rule 9(b).

Defendants offer no basis to justify dismissing the Complaint's TMFPA claims other than a single footnote claiming that the "analysis under the TMFPA mirrors the analysis under the FCA…." (Dkt. 19, p. 29 n. 9.) Defendants cite two cases for support, but neither court actually decided that TMFPA claims are essentially equivalent to FCA claims. *See United States ex rel. Williams v. McKesson Corp.*, No. 3:12-CV-371-B, 2014 WL 3353247, at *4 (N.D. Tex. Jul. 9, 2014) (recognizing that "the language of the FCA and the TMFPA differ," but based on the parties' agreement, evaluating TMFPA claims under the FCA's legal requirements); *United*

*States v. Planned Parenthood Gulf Coast, Inc.*, 21 F. Supp. 3d 825, 832 n. 24 (S.D. Tex. 2014) (addressing FCA and TMFPA claims together because the "parties focus primarily on the FCA in their briefing and have not argued that a different standard applies" for TMFPA claims).

As discussed above, the Complaint satisfies the requirements of Rule 12(b)(6) and Rule 9(b) for its FCA claims. But even if the Court were to dismiss the FCA claims with prejudice and without giving Relators a single opportunity to amend, the Court should not dismiss the TMFPA claims for two reasons: (1) the FCA and the TMFPA materially differ in several ways, of which two key differences are relevant here and (2) the Complaint sufficiently alleges TMFPA claims under Rule 12(b)(6) and Rule 9(b) considering the TMFPA's actual elements.

### 4.1. The FCA and the TMFPA materially differ in two key respects relevant here.

First, unlike the FCA, the TMFPA is not a false claims statute, and thus, the presentment of a false claim for payment is not an essential element under the TMFPA. Specifically:

- Both 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(B) require "a false or fraudulent claim" for liability to attach.

- But a person commits an unlawful act under the TMFPA by knowingly making or causing to be made false statements or misrepresentations of material facts or by knowingly concealing or failing to disclose information that "permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized." TEX. HUM. RES. CODE §§ 36.002(1),(2).

Because the TMFPA does not require a false claim for payment, Defendants' contentions about the Complaint's allegations of false claims for payment do not affect the TMFPA claims.

Moreover, the extensive discussion above about factually false claims, legally false claims, and the express or implied certification theories are irrelevant to the TMFPA claims.

Second, unlike the FCA, the TMFPA allows the recovery of the "amount of any payment or the value of any monetary or in-kind benefit under the Medicaid program," in addition to interest and civil penalties. TEX. HUM. RES. CODE § 36.052(a)(1). *Cf.* 31 U.S.C. § 3729(a)(1) (FCA liability includes civil penalties "plus 3 times the amount of damages" sustained by the government). The Texas Third Court of Appeals recently explained that the TMFPA "does not limit the recovery to any type of overpayment," instead permitting "the full recovery of the payment as well as an additional double recovery of the payment plus other potential penalties." *Nazari v. State*, 497 S.W.3d 169, 179 (Tex. App.—Austin 2016, pet. filed). A separate provision of the TMFPA also distinguishes between civil remedies authorized by the TMFPA and civil damages. TEX. HUM. RES. CODE § 36.006 (barring recovery of both civil remedies under the TMFPA and civil damages under TEX. HUM. RES. CODE § 32.039 for the same underlying act). Because the TMFPA allows recovery for the unauthorized Medicaid payments made to SLCDC-SL, Defendants' argument that the government has sustained no damages from paying SLCDC-SL for covered services rendered at the Hospital bears no relevance to the TMFPA claims. (Dkt. 19, p. 24.)

These two key differences between the FCA and the TMFPA are apparent from the plain text of the statutes. The Texas Supreme Court recently reaffirmed (1) that under Texas law, unambiguous statutory language must be interpreted according to its plain meaning and (2) that words in a statute were included "for a purpose and that words not included were purposefully omitted." *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015). *See also LaSalle Bank Nat.*

*Ass'n v. Sleutel*, 289 F.3d 837, 839 (5th Cir. 2002) (federal courts apply Texas rules of construction when interpreting a Texas statute). Accordingly, the Court should recognize that the TMFPA should be construed differently from the FCA and that, as a result, Defendants' arguments about pleading false claims with particularity and about the government's damages are irrelevant to the TMFPA claims.

**4.2.    The Complaint satisfies Rule 12(b)(6) and Rule 9(b) with respect to the actual elements of the TMFPA claims asserted.**

As discussed above, Relators have alleged plausible FCA claims with particular allegations showing two separate fraudulent schemes. As Defendants have offered no independent grounds to dismiss the TMFPA claims, if the Court agrees with Relators, then the motion to dismiss should also be denied as to the TMFPA claims. But if the Court dismisses the FCA claims with prejudice and without even one chance to amend, the Court should not also dismiss the TMFPA claims with prejudice, as the Complaint meets the plausibility and particularity requirements of Rule 12(b)(6) and Rule 9(b) for the TMFPA claims asserted.

The extensive discussion above sets forth numerous detailed factual allegations plausibly showing that Defendants knowingly made false statements and misrepresentations of material fact that permitted SLCDC-SL to receive benefits and payments under Medicaid that SLCDC-SL was never authorized or entitled to receive. Similarly, the Complaint alleges facts plausibly showing that Defendants knowingly concealed or failed to disclose material information that permitted SLCDC-SL to receive benefits and payments under Medicaid. These allegations exceed the minimum requirements of Rule 12(b)(6).

Regarding Rule 9(b), the Complaint's detailed allegations of the fraudulent scheme to transfer the Hospital to an entirely different entity and to misrepresent the nature,

circumstances, and permissibility of the transfer are sufficient. *Grubbs*, 565 F.3d at 190. But the Complaint also complies with Rule 9(b) as to the TMFPA claims by alleging the details of actionable fraudulent misrepresentations.

Specifically, in paragraphs 124, 125, and 126, the Complaint details three different fraudulent emails dated February 10, 2012, March 1, 2012, and March 14, 2012 sent from System employees Lauzon-Vallone and Thielke to Texas Department of State Health Services (TDSHS) employees Robbins, Nieman, and Vallejo. (Dkt. 1, ¶¶ 124-126.) The Complaint's allegations about these three emails meet the traditional Rule 9(b) particularity requirements for the false statements and misrepresentations permitting SLCDC-SL to receive unauthorized Medicaid payments. *See Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997) (under Rule 9(b), complaint must specify statements alleged to be fraudulent, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent).

For these reasons, the Complaint's TMFPA claims meet federal pleading requirements and should not be dismissed. Even if the Court were to dismiss the FCA claims with prejudice and without giving Relators a single opportunity to amend, the Court should, at most, dismiss the TMFPA claims without prejudice, so that Relators may pursue them in state court. *Bass v. Parkwood Hosp.*, 180 F.3d 234, 246 (5th Cir. 1999) (if all federal claims are dismissed before trial, the general rule is to dismiss pendent state claims "*without* prejudice so that the plaintiff may refile" in state court) (emphasis in original).

**5.**   **The Complaint sufficiently pleads FCA and TMFPA claims against the individual Defendants Fine, Pickett, and Koontz under Rule 12(b)(6) and Rule 9(b).**

Without any explanation or reasoning, Defendants assert that the Complaint fails to meet the pleading standards of Rule 12(b)(6) and Rule 9(b) as to the individual Defendants Fine,

Pickett, and Koontz. (Dkt. 19, pp. 42, 43.) These three individuals were the masterminds behind the two fraudulent schemes detailed in the Complaint, and so it is reasonable that several allegations against them would be similar or overlapping. But Relators also present detailed and particular factual allegations specific to each individual and based on each individual's actual conduct. (*See* Dkt. 1, ¶¶ 27, 29, 46, 51, 53, 58, 61, 62, 77, 110, 115 (Defendant Fine); Dkt. 1, ¶¶ 45, 47, 49- 52, 58, 59, 77, 81, 102-04, 114, 115, 118, 119, 128, 130 (Defendant Koontz); Dkt. 1, ¶¶ 45, 63, 77, 115 (Defendant Pickett).)

These supporting factual allegations satisfy the plausibility standard of Rule 12(b)(6) and the requirements of Rule 9(b) as set forth in *Grubbs*. Based on these allegations and because Defendants have offered no argument or analysis to support dismissal of any claims against the individual Defendants, the Court should also deny the motion to dismiss as to them.

**6.      If the Court finds the Complaint insufficient under either Rule 12(b)(6) or Rule 9(b) with respect to one or more claims asserted, the Court should grant leave to amend.**

If the Court decides that the Complaint fails to satisfy the pleading requirements of Rule 12(b)(6) or Rule 9(b) as to one or more of the claims asserted, the Court should grant leave to amend instead of dismissing the Complaint or any claims with prejudice, as Defendants have requested. (Dkt. 19, p. 43.) A "plaintiff's failure to meet the specific pleading requirements should not automatically or inflexibly result in dismissal of the complaint with prejudice to re-filing." *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n. 6 (5th Cir. 2000). Rule 15(a) also directs district courts to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a). Rule 15(a) "evinces a bias in favor of granting leave to amend." *Lyn–Lea Travel Corp. v. Am. Airlines*, 283 F.3d 282, 286 (5th Cir. 2002) (citation omitted). District courts must have a "substantial" reason to deny a request for leave to amend. *Id.*

Defendants ask the Court to dismiss the Complaint with prejudice based on Defendants' claim that any possible amendment would be futile because Relators have had access to substantial discovery in the State Court Action. (Dkt. 19, p. 43.) But Defendants make no attempt to explain how Relators' access to discovery in the State Court Action relates in any way to any pleading deficiencies raised in Defendants' motion to dismiss. Moreover, access to discovery should not be the basis to deny leave to amend given the extensive discovery abuse committed by Defendants in the State Court Action. As the Complaint alleges, some of this discovery abuse was even part of the fraudulent scheme to illegally transfer the Hospital to SLCDC-SL and trick the government into believing the transfer complied with state law. (Dkt. 1, ¶¶ 109, 130.) But Defendants' discovery abuse went well-beyond the specific instances alleged in the Complaint.

In addition, Relators offer the following four independent reasons for the Court to grant leave to amend if the Court were to find the Complaint deficient as to one or more claims. First, as the extensive discussion throughout this memorandum shows, Relators have a good faith basis to contend that the Complaint does meet the applicable pleading requirements of Rule 12(b)(6) and Rule 9(b). If the Court disagrees, Relators should at least be given the chance to address what the Court considers to be pleading deficiencies, which will remain unknown to Relators until the Court issues an order on this motion.

Second, Rule 9(b) "is context specific and flexible," further underscoring that the Court's application of Rule 9(b) to the facts here may result in the Court reaching conclusions about the pleading requirements specific to this case that Relators – despite their good faith efforts – could not have anticipated. *Grubbs*, 565 F.3d at 190. It would be unjust to deny Relators the chance to address any such deficiencies given the flexibility of Rule 9(b). *Id.*

Third, denying Relators even one chance to amend would be inconsistent with Fifth Circuit cases addressing similar pleading deficiencies. *See, e.g., United States ex rel. Gage v. Davis S.R. Aviation, L.L.C.*, 623 Fed. Appx. 622, 628 (5th Cir. 2015) (fourth amendment request to address pleading deficiencies denied); *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 387 (5th Cir. 2003) (third amendment request to address Rule 9(b) denied).

Finally, while Relators contend that the Complaint satisfies Rule 12(b)(6) and Rule 9(b), Relators do have access to substantial volumes of evidence – including testimony from a three-week jury trial – to address any pleading deficiencies the Court might find.

## Conclusion & Prayer for Relief

The factual allegations in the Complaint satisfy the pleading requirements of Rule 12(b)(6) and Rule 9(b). The Complaint plausibly alleges particular details of two schemes to submit false claims as well as reliable indicia that lead to a strong inference that claims were actually submitted. In total, the Complaint identifies with particularity: 33 emails, 9 phone calls or discussions, and 18 written communications or presentations through which Defendants' two fraudulent schemes were carried out. In doing so, the Complaint identifies 20 individuals with key roles in Defendants' schemes. Thus, the Court should deny Defendants' Motion to Dismiss.

Alternatively, if the Court dismisses one or more claims, the Court should grant Relators leave to amend, as this motion is the first time the Complaint has been challenged.

Dated: November 21, 2017

Respectfully submitted,

/s/ Hiren P. Patel
Hiren P. Patel
Southern District ID No. 608956
Texas Bar No. 24056098
1113 Vine Street, Suite 230
Houston, Texas 77002
Telephone: (713) 579-9700
Facsimile: (832) 460-6530
Email:  hpatel@patelervin.com

**Attorney-in-Charge for Relators**

## CERTIFICATE OF SERVICE

I certify that on November 21, 2017, a true and correct copy of this document was electronically served via the Court's CM/ECF system to counsel for all parties properly registered with the Court's CM/ECF system.

/s/ Hiren P. Patel
Hiren P. Patel