**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA and STATE OF TEXAS, ex rel. SHATISH PATEL, M.D., HEMALATHA VIJAYNA, M.D., and WOLLEY OLADUT, M.D.,** | § § § § § | |
| *Plaintiffs*, | § § § | |
| | § | **CIVIL ACTION NO. 4:17-CV-01817** |
| **V.** | § § | |
| **CATHOLIC HEALTH INITIATIVES, ST. LUKE'S HEALTH SYSTEM CORPORATION, ST. LUKE'S COMMUNITY DEVELOPMENT CORPORATION – SUGAR LAND, DAVID FINE, DAVID KOONTZ, and STEPHEN PICKETT,** | § § § § § § § § | |
| *Defendants*. | § | |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS RELATORS' ORIGINAL COMPLAINT**

## TABLE OF CONTENTS

I.  ARGUMENT ........................................................................................... 1

  A.  The Rescission Transactions Did Not Violate the Anti-Kickback Statute.................. 1

    1.  The rescission transactions were not illegal remuneration. ........................................... 2

    2.  Relators have not established Defendants' intent to break the law. ............................. 5

    3.  The Complaint fails to plead any facts about referrals of federal healthcare
        program business. ........................................................................................ 7

  B.  Relators Change of Ownership ("CHOW") Claims Should be Dismissed.................. 8

    1.  Relators abandoned their legal falsity claim and failed to plead factual falsity. ............ 8

    2.  Defendants did not make knowingly false statements to government payors............. 11

  C.  Relators' TMFPA Claims Are Not Materially Different From Their FCA
      Claims And Should Be Dismissed.............................................................................. 13

II.  CONCLUSION ........................................................................................... 15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).............................................................................................7

*Bank One, Texas, N.A. v. Taylor,*
    970 F.2d 16 (5th Cir. 1992) ...............................................................................4

*U.S. ex rel. Bennett v. Boston Sci. Corp.,*
    No. CIV.A. H-07-2467, 2011 WL 1231577 (S.D. Tex. Mar. 31, 2011) ...............10

*Dorsey v. Portfolio Equities, Inc.,*
    540 F.3d 333 (5th Cir. 2008) .....................................................................5, 6, 7

*In Interest of J.A.L.,*
    No. 14-16-00614-CV, 2017 WL 4128947 (Tex. App. Sept. 19, 2017)..................13

*Maher v. Zapata Corp.,*
    714 F.2d 436 (5th Cir. 1983) ...............................................................................4

*Middleton v. Life Ins. Co. of North America,*
    H–09–CV–3270, 2010 WL 582552 (S.D.Tex. Feb.12, 2010)................................10

*Moore v. United Servs. Auto Ass'n,*
    808 F. 2d 1147 (5th Cir. 1987) ...........................................................................5

*United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.,*
    519 F. App'x 890 (5th Cir. 2013)........................................................................8

*U.S. ex rel. Parikh v. Citizens Medical Ctr.,*
    977 F. Supp. 2d 654 (S.D. Tex. 2013) ..................................................................6

*Patel v. St. Luke's Sugar Land Partnership, LLP,*
    445 S.W.3d 413 (Texas App. – Houston [1st Dist.] 2013)..........................11, 12, 13

*U.S., ex rel. Ramadoss v. Caremark Inc.,*
    No. SA-99-CA-00914-WRF, 2008 WL 3978101 (W.D. Tex. Aug. 27, 2008) .....................15

*United States v. Ellis,*
    No. H-10-416-S, 2011 WL 3793679 (S.D. Tex. Aug. 25, 2011) .............................6

*United States v. Planned Parenthood Gulf Coast, Inc.,*
    21 F. Supp. 3d 825, 830-31 (S.D. Tex. 2014).......................................................14

*United States v. Solvay*
    S.A., No. H-06-2662, 2015 WL 8480148 (S.D. Tex. Dec. 10, 2015) ......................................8

*United States v. TEVA Pharm. USA, Inc.*,
    No. 13 CIV. 3702 (CM), 2016 WL 750720 (S.D.N.Y. Feb. 22, 2016) ................................6

*United States v. Vista Hospice Care, Inc.*,
    No. 3:07-CV-00604-M, 2016 WL 3449833 (N.D. Tex. June 20, 2016) ..................................7

*Universal Health Servs., Inc. v. United States*,
    136 S. Ct. 1989 (2016) .................................................................................................10, 11

*Waldmann v. Fulp*,
    259 F.Supp.3d 579, 2016 WL 9711525 (S.D. Tex. Oct. 12, 2016) ....................8, 9, 10, 14, 15

*United States ex rel. Wall v. Vista Hospice Care, Inc.*,
    No. 3:07-CV-0604-M, 2017 WL 5483747 (N.D. Tex. Nov. 14, 2017).................................7

*United States ex rel. Williams v. McKesson Corp.*,
    No. 3:12-CV-371-B, 2014 WL 3353247 (N.D. Tex. Jul. 9, 2014).........................................14

**Statutes**

31 U.S.C. § 3729(a)(1)(A) ..........................................................................................................14

Tex. Hum. Res. Code §§ 36.002(1) ...........................................................................................14

Tex. Hum. Res. Code §§ 36.002(1) and (2)................................................................................14

Defendants Catholic Health Initiatives, St. Luke's Health System Corporation, St. Luke's Community Development Corporation – Sugar Land, David Fine, David Koontz, and Stephen Pickett (collectively "Defendants") respectfully submit this Reply in Support of their Motion to Dismiss the Original Complaint (the "Complaint") filed by Relators Shatish Patel, M.D., Hemalatha Vijayna, M.D., and Wolley Oladut, M.D.'s (collectively "Relators").

## I.    ARGUMENT

### A.    The Rescission Transactions Did Not Violate the Anti-Kickback Statute.

The Complaint and Relators' Response have raised a novel, untested theory of liability under the Anti-Kickback Statute ("AKS").[1]  Namely, Relators claim that Defendants violated the AKS by paying physician investors prohibited remuneration disguised as valid rescission transactions.[2]  Relators essentially ask this Court to supplant Defendant's subjective business decision to settle a host of known or unknown claims that were or could have been asserted by nearly 100 physician owners in the Partnership. It should be immediately clear why second guessing a party's business decision to settle a lawsuit or potential lawsuit – under threat of False Claims Act ("FCA") liability if a third party later disagrees with that decision – is fraught with peril.

Beyond the problematic nature of what they ask this Court to do, Relators' claims are also deficient under Rules 12(b)(6) and 9(b), as the Complaint fails to allege facts establishing that the rescission payments represented anything other than valuable consideration intended to compensate the physicians for their ownership interest in the Hospital *and* their willingness to

---

[1] While Defendants' Reply focuses on the AKS, the primary question which applies to both Relators' AKS and the Stark Law theories is whether or not the rescission payments were reasonable and consistent with fair market value ("FMV").  *See* Dkt. 22 p. 15.  In this respect, Defendant's arguments about FMV and the *bona fide* nature of the rescission payments when addressing the AKS apply with equal force to the Stark Law, and merit dismissal of the Complaint.

[2] The Response has not identified a single case discussing the viability of Relators' proposed theory of AKS liability (e.g. where a relator alleged that consideration for a settlement and release functioned as prohibited remuneration intended to induce or reward the referral of federal program business.)

1

release Defendants from any and all potential claims, including – but certainly not limited to – lawsuits brought pursuant to the Texas Securities Act ("TSA").  Relators cannot point to the essential factual allegations necessary to refute Defendants' arguments that: (1) the rescission transactions and settlement payments were valid consideration and *not* prohibited remuneration under the AKS; (2) the Complaint failed to establish the requisite intent to induce or reward referrals; and; (3) Relators failed to identify referrals for services covered by Medicare or Medicaid.[3]

1.      The rescission transactions were not illegal remuneration.

Even if payments made pursuant to a settlement and release could constitute a viable theory of liability under the AKS, Relators have not sufficiently alleged – beyond mere conclusory allegations – that the rescission payments were anything other than a good faith effort to mitigate the risk of costly and time consuming litigation, including potential lawsuits brought pursuant to the TSA.  The Complaint itself alleges that "for the statutory rescission process under the [TSA] to allow the system to refund the physician partners their entire original investment amounts … there must be some known or identified colorable claim that ***could be*** asserted under the [TSA]." Dkt. 1 ¶ 18 (emphasis added). In its April 8, 2011 report, Healthcare Appraisers, Inc. ("HCAI") concluded that the original financial projections for the Hospital shared with prospective physician investors overestimated revenues and underestimated salary expenses and, according to HCAI, "there [was] some basis for the position that the assumptions underlying the original projections were unreasonable." Dkt. 19 p. 20, citing Dkt. 1 ¶ 68.

---

[3] When it comes to understanding their burden to plead well-pled claims, Relators seem to mistake quantity for quality, repeatedly asserting that "the Complaint identifies with particularity: 33 emails, 9 phone calls or discussions, and 18 written communications or presentations through which Defendants' two fraudulent schemes were carried out." *Dkt.* 22 p. 8. No matter how many times Relators restate their position, the Complaint fails to present sufficient factual allegations necessary to satisfy Rule 9(b) or 12(b)(6).

2

While Relators have alleged that Defendants used the report to "fabricate a basis for statutory rescission," the Complaint fails to establish why or how it would have been unreasonable for Defendants to rely on HCAI's advice when assessing the risk posed by the inaccurate financial projections and determining whether there "could be" potential liability under the TSA, or any other common law theory. *See* Dkt. 1 ¶ 75; Dkt. 22 p. 14. Relators have not alleged, for example, that Defendants altered the report, or colluded with or exercised undue influence on HCAI in order to fabricate or falsify the conclusions contained in the report.

Relators also argue that there was not a credible risk of litigation because "even if possible claims existed, those claims would be extinguished upon the expiration of the statute of limitations set forth in [TSA]." *See* Dkt. 1 ¶ 66. Relators' argument is flawed for a number of reasons. First, Relators discount the possibility that the physician investors might bring claims unrelated to the TSA. At the time of the rescission offer, Defendants were acknowledging potential missteps in their initial offering of securities and were taking steps that would fundamentally alter the Partnership's ownership structure. It was certainly foreseeable that physician owners might pursue litigation under any number of potentially available legal theories.  In fact, as Defendants explained in their Motion to Dismiss, at the time the rescission payments were offered, the risk of a lawsuit shifted from hypothetical to actual when Dr. Patel initiated his lawsuit against the Partnership, alleging common law claims of fraud and misrepresentation, not TSA claims, regarding the initial securities offering.  *See* Dkt. 19 p. 12 fn 5.[4]   Defendants sought to avoid the risk of litigation by offering physicians valuable

---

[4]   Setting aside Relator's mischaracterization of the initial claims in the State Court Action (which expressly sought damages for fraud and misrepresentation in the original securities offering), Dr. Oladut, a relator here, and Dr. Sonwalkar, joined Dr. Patel's lawsuit after the rescission and sought damages on those same fraud and misrepresentations claims.   Had those physicians accepted the rescission, the claims they brought against Defendants would have been released.

3

consideration in exchange for their release of liability and their promise not to file *any* claims against them.

This same rationale defeats Relators' misguided argument that the rescission payments exceeded fair market value because the payments were greater than HCAI's $5,000 per unit appraisal value for the physician investors' Class A units. *See* Dkt. 22 p. 15.  As just explained, the rescission payments not only constituted compensation for the participating physicians' Class A units, but also as consideration for the release of claims and covenant not to sue.  The rescission payments were therefore justified both by the TSA[5] and fundamental principles of contract law. *See Bank One, Texas, N.A. v. Taylor*, 970 F.2d 16, 22 (5th Cir. 1992) (a release of claims is treated as a contract, which *must* be supported by valuable consideration) (emphasis added).

Relators' argument also ignores the fact that the statute of limitations is an affirmative defense, but cannot prevent a plaintiff from filing a lawsuit in the first place. Despite Relators' effort to assert themselves as the final arbiters of a hypothetical legal battle, the success of a statute of limitations defense is rarely a foregone conclusion. Even short-lived litigation can expose defendants to considerable financial burden and damage to reputation. Accordingly, the Complaint fails to establish that it was unreasonable for Defendants to pursue a broad release of claims to avoid litigation altogether, even if defendants may have had an available statute of limitations defense.  *See Maher v. Zapata Corp.*, 714 F.2d 436 (5th Cir. 1983) ("it is plain that one of the principal purposes of the settlement was to terminate the litigation to avoid any further

---

[5] Relators are correct that the "TSA itself differentiates the payment amount mandated through the statutory rescission process from the value of the underlying securities."  *See* Dkt. 22 p. 8.  But the rescission offers were consistent with FMV because they did more than simply act as a means to re-purchase the physician owners' Class A Units.

4

legal expense…"); *Moore v. United Servs. Auto Ass'n*, 808 F. 2d 1147, 1153 n.6 (5th Cir. 1987) ("the purpose of settlements is, in fact, to avoid litigation").

2.    <u>Relators have not established Defendants' intent to break the law.</u>

Relators seek to lower the pleading standard with respect to the intent element, arguing that to satisfy Rule 9(b) a relator need only plead that the defendant acted with the "intent to induce referrals of federal health care program business." *See* Dkt. 22 p. 16 (internal citations omitted). Although Rule 9(b) expressly allows intent to be alleged generally, simple conclusory allegations that Defendants possessed fraudulent intent will not satisfy the rule. *Dorsey v. Portfolio Equities, Inc*., 540 F.3d 333, 339 (5th Cir. 2008) (internal citations omitted). Instead, "plaintiffs must set forth *specific facts* supporting an inference of fraud." *Id.* (emphasis added).

Relators cite only to a series of conclusory assertions in the Complaint that are wholly insufficient to establish that Defendants intended to induce or reward referrals. *See* Dkt. 22 p. 16-17, citing Dkt. 1 ¶¶ 27-30, 50, 51, 54, 58-62.  In fact, none of the eleven allegations Relators cite in support of their intent argument even mention Defendants' purported goal of using the rescission payments to induce referrals. These allegations instead suggest that the rescission payments were intended to facilitate Defendants' alleged business objective of removing the physician investors from the partnership. *Id.* Specifically, Relators cite to an allegation in the Complaint asserting, in part, that "the physician partners would not sell Class A Units voluntarily at HCAI's stated value," and that "Koontz and HCAI had explored whether redemption payments to the Class A Unit holders could substantially exceed HCAI's stated value if those payments were represented to be some sort of settlement payment." *See* Dkt. 1 ¶ 51.  Nothing in this allegation – or any other Relators cite – establishes any intent to induce referrals.  The closest these allegations come to even referencing referrals is the statement that "30 of the 96

5

physician partners regularly used the Hospital." *Id.* It is not at all reasonable, however, to assume from this allegation that the physicians referred items or services that were covered by Medicare or Medicaid. Nor can the Court infer that Defendants intended to induce or reward referrals from those 30 physicians by offering the same statutorily authorized rescission payments to all 96 physicians, including the other 66 who apparently did *not* "regularly use" the Hospital.

Relators fail to explain how the rescission payments could have possibly constituted prohibited remuneration intended to induce or reward referrals, when each physician was offered the *same statutorily authorized payment* regardless of referral history. Relators spend precious little time on this issue, asserting only in passing that "[t]he AKS is not limited just to cases where payments were made based on referral volume." *See* Dkt. 22 p. 15.[6] It is axiomatic that the purpose of the AKS is to prohibit the offering of remuneration to reward or incentivize referrals. Relators have not sufficiently alleged how the rescission payments – which were derived in the exact same manner for all the physicians (whether they referred 100 patients or none at all) – could have been intended to incentivize the referral of federal health care program business.

Finally, Relators mischaracterize and manipulate Defendants' decision to seek advice from its outside legal counsel, Baker Donelson, and healthcare consulting company, HCAI. *See* Dkt. 22 p. 18. Relators state that "[w]hile the Complaint does allege that Defendants used outside lawyers and consultants, the Complaint makes it clear that Defendants did so to advance their

---

[6] Courts have consistently looked to the correlation between referral volume and the amount of remuneration as a hallmark of an AKS violation, which is conspicuously absent from the Complaint. *See U.S. ex rel. Parikh v. Citizens Medical Ctr.*, 977 F. Supp. 2d 654, 666-672 (S.D. Tex. 2013) (bonuses and salary increases of physicians strongly correlated with an uptick in referral volume to hospital are evidence of kickbacks); *See also United States v. Ellis*, No. H-10-416-S, 2011 WL 3793679 at *3 (S.D. Tex. Aug. 25, 2011) (where home health provider paid nurse recruiter using checks, court found that a strong correlation between the amount paid and the number of referrals – as noted on the checks – was direct evidence of a kickback under the AKS) ; *See also United States v. TEVA Pharm. USA, Inc.*, No. 13 CIV. 3702 (CM), 2016 WL 750720, at *3 (S.D.N.Y. Feb. 22, 2016) (pharmaceutical company violated the AKS by disproportionately offering speaking engagements and honoraria to physicians with higher prescription volume).

fraudulent scheme." *Id.* citing Dkt. 1 ¶¶ 61-73.  Relators' outlandish allegations are nothing more than legal conclusions that spuriously accuse these third parties of fraud.  However, the Complaint and Response do not explain why a large, well-regarded healthcare law firm and a nationally-recognized consulting firm would fabricate their conclusions and falsify reports for Defendants' benefit. The Court should disregard Plaintiffs' bald, unsubstantiated (and unbelievable) allegations of fraud. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). Relators' vague innuendo of a conspiracy between Defendants and their outside lawyers and consultants falls well short of the requirements of Rule 9(b).

3.     The Complaint fails to plead any facts about referrals of federal healthcare program business.

Defendants' Motion to Dismiss notes that the Complaint does not establish that any of the physicians who received rescission payments actually referred federal health care program business to the Hospital. *See* Dkt. 19 p. 25. In response, Relators argue that 15 physicians remained on active staff at the Hospital and "it is reasonable to infer that maintaining active staff privileges requires a minimum level of physician engagement in the Hospital, including referrals." *See* Dkt. 22 p. 19. Relators further postulate that "since Medicare and Medicaid business represents a significant percentage of the Hospital's operations, it is reasonable to infer "that those 15 physicians referred Medicare and Medicaid business to the Hospital." *Id.*

Courts in the Fifth Circuit have denied this line of reasoning and regularly reject FCA claims which rely on probability arguments like Relators'. *See e.g. United States v. Vista Hospice Care, Inc*., No. 3:07-CV-00604-M, 2016 WL 3449833, at *25 (N.D. Tex. June 20, 2016), reconsideration denied sub nom. *United States ex rel. Wall v. Vista Hospice Care, Inc*., No. 3:07-CV-0604-M, 2017 WL 5483747 (N.D. Tex. Nov. 14, 2017) ("[t]he mere fact that 93% of

Defendants' patients are Medicare patients is not sufficient to show Defendants submitted claims that falsely certified compliance with the AKS"). Aside from Relators' insufficient "it sure seems likely" arguments, the Complaint provides no indicia whatsoever that referrals were made for Medicare or Medicare services for which Defendants submitted claims. *United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 894 (5th Cir. 2013) (dismissing relators claims which "fail[ed] to allege any particular details of any actual referral by a physician" to the defendant).

### B.      Relators Change of Ownership ("CHOW") Claims Should be Dismissed

1.      Relators abandoned their legal falsity claim and failed to plead factual falsity.

Realtors have affirmatively stated that their CHOW claims under the FCA are *not* based on a theory of legal falsity. *See* Dkt. 22 p. 29. ("Counts III – VI are not predicated on the express or implied certification theories" of legal falsity). As a result, Relators are barred from raising a legal falsity theory of liability in connection with Counts III through VI. *See United States v. Solvay* S.A., No. H-06-2662, 2015 WL 8480148, at *3 (S.D. Tex. Dec. 10, 2015) (where Relators did not address one of the Defendant's arguments, the argument is unopposed).

Relators now exclusively allege that Defendants submitted *factually* false claims because the Defendants listed the wrong provider on claims for payment to CMS and Texas Medicaid. *See* Dkt. 22 p. 25. Relators are wrong as a matter of law that identifying the incorrect owner of the hospital on a claim (as opposed to providing an inaccurate description of the actual services provided) can serve as a basis for a factual falsity theory.  Relator's reliance on *Waldmann v. Fulp*, 259 F.Supp.3d 579, 2016 WL 9711525 (S.D. Tex. Oct. 12, 2016) is misplaced, as that case does not support their theory of liability.  In *Waldmann*, the Court opined that "[a] claim may also be factually false where, for example, the claim represents that a certain provider performed

the billed-for procedures *when in fact those services were delivered by an unlicensed provider*."
*Waldmann*, 2016 WL 9711525 at *6 (citing *United States ex rel. Riley v. St. Luke's Episcopal
Hospital*, 355 F.3d 370 (5th Cir. 2004) (emphasis added)).[7]  On its face, *Waldmann* is inapposite,
as the relators specifically alleged that the defendants "engaged in a pattern and practice of
submitting claims that falsely certify that Dr. Fulp [a surgeon] performed medical procedures on
patients, while in reality they were performed in whole or in part by [surgical scrub technicians]
neither of whom [were] licensed to practice medicine in any state." *Id.* at *1. In other words, the
complaint in *Waldmann* alleged that the defendants identified the wrong (unlicensed) individuals
who actually treated and laid hands on patients, and thus *directly* related to the goods or services
provided by defendants. *Id.* In stark contrast here, Relators have at best alleged that Defendants
misidentified the corporate ownership structure of the Hospital, and say absolutely nothing about
the specific goods or services provided to patients.  As Defendants explained in their Motion to
Dismiss, claims were submitted for medical necessary acute care hospital services, which is
precisely what the government paid for and received.  *See* Dkt. 19 p. 24.

Even if identifying the wrong owner of the hospital could serve as the basis for a
factually false claim, Relators' allegations are grossly insufficient when measured against what
Rule 12(b)(6) and Rule 9(b) require. Although the Complaint broadly asserts that Defendants
"misrepresented the Hospital's owner on each and every claim for payment," Relators fail to (1)
describe the purportedly false claims with any level of detail whatsoever, (2) identify the specific
information allegedly made by Defendants on those claims, or (3) discuss the section of the
forms requiring information about the owner of the Hospital or the National Provider Identifier

---

[7] Relators failed to properly quote this portion of the *Waldmann* holding, stating instead that "a claim that
represents that a specific provider performed the services billed when, in fact, the services were delivered
by a different provider would constitute a factually false claim." Dkt. 22 p. 24.

("NPI"), and why the information included by Defendants was factually false. *See* Dkt. 1 ¶163.[8] Stated differently, Relators do not plead any specific facts whatsoever about the actual claims allegedly submitted by the Defendants.   *U.S. ex rel. Bennett v. Boston Sci. Corp.*, No. CIV.A. H-07-2467, 2011 WL 1231577, at *2 (S.D. Tex. Mar. 31, 2011) citing *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.,* 290 F.3d 1301, 1311 (11th Cir.2002) ("Evidence of an actual false claim is the *sine qua non* of a False Claims Act violation").

The Complaint's failure to identify even the most straightforward information about the claim forms or the information included by the Defendants on those forms serves to distinguish Relators' allegations from those in Relators' chief authority. In *Waldmann,* the relators alleged that the hospital defendant made false certifications on claim forms CMS-1500 and CMS-1450. *Waldmann*, 2016 WL 9711525 at *10. In contrast to the Complaint in this case, relators in *Waldmann* identified the precise information contained on the forms which they asserted was false, as well as a description of the section relating to the provider's NPI information and its importance. *Id.* These shortcomings subject Relators' CHOW claims to dismissal under Rules 12(b)(6) and 9(b).

Finally, even if Relators had pled that Defendants identified the wrong owner of the Hospital or included the wrong NPI number on claims for payment, the Complaint does not allege and the Response does not support, that this represented a knowing violation of a requirement that was materiality to the Government's payment decision. *See Universal Health*

---

[8] The Response wrongly asserts that Relators have demonstrated Defendant's submission of factually false claims by  alleging that "SLCDC-SL has been submitting claims since 2012 using form CMS-1450 (inclusive of its electronic version) listing the wrong hospital provider for the goods and services billed." Dkt. 22 at 26. This statement appears to be a product of revisionist history, as the Complaint does not contain any mention whatsoever of claim form CMS-1450.  The Court should therefore ignore this assertion, as Relators' Response is not the appropriate time to raise brand new allegations not previously contained in the Complaint. *Middleton v. Life Ins. Co. of North America*, H–09–CV–3270, 2010 WL 582552, *5 (S.D.Tex. Feb.12, 2010) (claim raised for first time in response to motion to dismiss was not properly before the Court) citing *Fisher v. Metro. Life Ins. Co*., 895 F.2d 1073, 1078 (5th Cir.1990).

*Servs., Inc. v. United States*, 136 S. Ct. 1989, 1994 (2016).  Because the FCA is not an "all-purpose fraud statute" which should be used as a "vehicle for punishing garden-variety breaches of contract or regulatory violations," Relators must specifically plead how and why the inclusion of incorrect ownership information, or the Hospital's NPI would rise to the level of materially required under the FCA. *Id*. at 2003.  For these reasons, Relators' CHOW allegations fail to pass muster under Rules 12(b)(6) and 9(b).

        2.     <u>Defendants did not make knowingly false statements to government payors.</u>

Relators' implausible allegation that Defendants have, since 2012, "misrepresented the Hospital's owner on each and every claim for payment" is based on nothing more than an incorrect opinion about the legal impact of the decision in *Patel v. St. Luke's Sugar Land Partnership, LLP*, 445 S.W.3d 413, 417 (Texas App. – Houston [1st Dist.] 2013, *review denied*), and a misapplication of factual falsity under the FCA.  The Complaint acknowledges that after Relators failed to meet the capital call, the Partnership took several steps to transition the Hospital to a wholly-owned, not-for-profit subsidiary of the System.   The complaint acknowledges, for example, that after Relators failed to meet the capital call in 2011, the System and SLCDC-SL: 1) withdrew the LLP registration of the Partnership; 2) transferred the "St. Luke's Sugar Land Hospital" business name to SLCDC-SL; 3) filed a final sales tax return for the Partnership; 4) transferred the Partnership's Medicare provider number; 5) assigned the Partnership's equipment leases; 6) informed government agencies that SLCDC-SL was the new registered provider of medical services through the Hospital; and 7) obtained new accreditation. Dkt 1, ¶ 99; *see also Patel*, 445 S.W.3d at 417.  And there is no dispute that the Hospital has been operated in all respects since January 1, 2012 as though it is owned by SLCDC-SL.

11

Relators attempt to support their claims of factual falsity by pointing to statements purportedly made to federal and Texas payors in late 2011 and early 2012. Dkt 1, ¶¶ 120-21, 124-26. But Defendants' statements were made based on their good faith belief that SLCDC-SL, as the sole remaining partner in the Partnership, was the *de facto* owner of the Hospital. Defendants explained to CMS and others that although the Partnership still existed for purposes of winding up activities, SLCDC-SL was the only remaining partner and therefore it effectively owned (or entirely controlled) the operations of the Hospital. Only much later, after the Texas Court of Appeals' *Patel* decision, did any arguable question arise regarding the ownership of the Hospital. But even those potential ownership questions remained subject to legal challenge through the appellate process until January 2015, and are still not fully and finally resolved given the ongoing proceedings in the State Court Action.[9]

Given the state of play at the time, Relators have not pled that the statements and representations made by Defendants' during the CHOW process or when submitting claims for reimbursement to CMS and Texas Medicaid were false or misleading on the issue of the Hospital's ownership. No matter how loudly the Relators protest that they were (at least in their own minds) *true* owners of the Hospital, Defendants did in fact believe they had removed Relators from the Partnership and transferred the Partnership's interest in the Hospital precisely as they told CMS and Texas Medicaid. *See e.g.* Dkt. 1 ¶ 90-93. While Relators claim that both their ouster from the Partnership and the transfer of ownership were improper – claims for which they have already sought damages in the State Court Action on contract, tort, and equitable

---

[9] In addition, a temporary injunction currently prohibits SLCDC-SL from using its super-majority ownership position, acquired through the rescission and confirmed as a matter of law in the State Court Action, to terminate the Partnership altogether. Under the Partnership Agreement, SLCDC-SL's super-majority ownership position gives it the present and immediate ability to terminate the Partnership. SLCDC-SL has been precluded from exercising that right as a result of the appeals and injunctions. A final judgment in the State Court Action will allow SLCDC-SL to exercise those rights to resolve any potentially lingering questions about ownership.

theories – alleged non-compliance with corporate law or contractual provisions does not constitute a violation of the FCA or render Defendants' statements about the Hospital's ownership actionable false claims.

Relators attempt to manufacture the appearance of falsity by portraying their own subjective views and legal theories (as advanced in the State Court Action) as the Defendants' state of mind at the time they communicated with CMS and Texas Medicaid.  *See* Dkt. 19 p. 32-33. But when Defendants communicated with CMS and Texas Medicaid in late 2011 and early 2012, Defendants had a good faith belief that they owned the Hospital, and the *Patel* opinion, which was issued in November 2013 (and remained subject to further appellate review until January 2015), did not yet exist. Dkt. 1 ¶¶ 124-126; Dkt. 19 p. 32-33.  A disputed legal issue (such as the owner of the Hospital as a matter of corporate law) is wholly insufficient to establish the level of objective falsity required under the FCA.  Because the Complaint fails to establish that Defendants submitted a single knowingly false claim to CMS or Texas Medicaid,  Counts III through VI, based as they are exclusively on a theory of factual falsity, should be dismissed.

### C.    Relators' TMFPA Claims Are Not Materially Different From Their FCA Claims And Should Be Dismissed

Relators' spend considerable time in their Response trying to distinguish the legal and factual basis for the Counts in the Complaint brought under the Texas Medicaid Fraud Prevention Act ("TMFPA")[10] from those based on the FCA.  While Relators are correct that

---

[10] Relators' effort to cast their TMFPA claims as distinct creatures of state law reveals a separate basis for dismissal. Under Texas law, the doctrine of *res judicata* "bars a second action by parties on matters that were actually litigated in a previous suit, as well as claims *which, through the exercise of diligence, could have been litigated in a prior suit*."  *In Interest of J.A.L.*, No. 14-16-00614-CV, 2017 WL 4128947, at *2 (Tex. App. Sept. 19, 2017) (emphasis added) (quoting *Hallco Tex., Inc. v. McMullen Cty.*, 221 S.W.3d 50, 58 (Tex. 2006)).  "[R]es judicata bars the litigation of a claim if the claim bears a close factual and logical relationship to claims raised in an earlier proceeding."  *Id.* at *2.  Here, the allegations supporting Relators' TMFPA claims are virtually identical to the allegations raised in support of Relators' State Court Action claims.

TMFPA liability does not *per se* hinge on the submission of false claims,[11] they are wrong that Defendants' arguments challenging Relators' FCA claims "do not affect the TMFPA claims." *See* Dkt. 22 p. 29.  Numerous decisions from courts within the Fifth Circuit have specifically noted the overlap between language of the FCA and TMFPA, the similar nature of the conduct that would violate both statues, and have analyzed defendants' liability under the TMFPA and FCA in tandem, not in isolation as Relators suggest.  *See Waldmann,* 2016 WL 9711525, at *38; *United States ex rel. Williams v. McKesson Corp.*, No. 3:12-CV-371-B, 2014 WL 3353247, at *4 (N.D. Tex. Jul. 9, 2014);  *United States v. Planned Parenthood Gulf Coast, Inc.*, 21 F. Supp. 3d 825, 830-31 (S.D. Tex. 2014).

Along these lines, the TMFPA and FCA both premise liability on a party having the same requisite level of scienter ("knowingly") and address conduct involving falsity, either based on the submission of a false claim (31 U.S.C. § 3729(a)(1)(A)) or through making a misleading or false statement to a government agency in connection with the payment for a claim (Tex. Hum. Res. Code §§ 36.002(1)).  For these reasons, Defendants' arguments as described in Section B.2 above that Relators have failed to identify the presence of any knowingly made false claims, also directly bears on Counts V and IV which are premised on the TMFPA, and subject them to dismissal under Rules 12(b)(6) and Rule 9(b).

Even if Relators had sufficiently pled that Defendants' "knowingly" made false statements or misrepresentations to Texas Medicaid in connection with the CHOW process, this would still fail to state a viable claim under Tex. Hum. Res. Code §§ 36.002(1) and (2). The

---

[11] Despite Relators' insistence that they need not plead information about false claims in connection with their Counts under the TMFPA, the Complaint seemingly predicates Defendants' liability (at least in part) on "false statements about the Hospital's owner *with every single electronic claim submitted by SLCDC-SL* for services rendered at the Hospital." *See* Dkt. 1 ¶ 198.  To the extent Relators are looking to purportedly false claims to cement their TMFPA Counts, such a theory fails for the same reasons as Relators' claims under the FCA. *See* Dkt. 19 p. 21-24, 31-34; Section B.2, supra.

provision of the TMFPA cited by Relators in Counts V and VI make it illegal to "knowingly make or cause to be made a false statement or misrepresentation of a material fact" or "knowingly conceal or fail to disclose information that" "permit[s] a person to receive a *benefit[12] or payment* under the Medicaid program *that is not authorized or that is greater than the benefit or payment that is authorized*." *Id*. [emphasis added]. The plain language of the TMFPA makes clear that the false statements or concealment of information must be directly related to or in the course of, the submission of a claim which yields an unauthorized or excessive payment. *See Waldmann,* 2016 WL 9711525, at \*38 ("Like the FCA, the TMFPA is aimed at fraudulent *statements made in connection with claims* made to government payors") [emphasis added]. Given the attenuated nature of any statements made by Defendants' during the CHOW process, their wholesale disconnect from Defendant's submission of claims to Texas Medicaid, and Relators failure to link the purportedly false representations with unauthorized or excessive reimbursement, the TMFPA claims should be dismissed.

## II.      CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Relators' Complaint with prejudice.

---

[12] The term "benefit" under the TMFPA has been interpreted to mean "health care benefits received by individuals" and efforts to more broadly construe "benefit" to include includes "advantage, privilege, profit or gain" have been expressly rejected. *See U.S., ex. rel. Ramadoss v. Caremark Inc., No. SA-99-CA-00914-WRF, 2008 WL 3978101, at \*2 (W.D. Tex. Aug. 27, 2008), aff'd sub nom. United States v. Caremark, Inc., 634 F.3d 808 (5th Cir. 2011).*

Dated:  December 1, 2017.                    Respectfully submitted,

                                             **POLSINELLI PC**

                                             By:  */s/ P. John Brady* _____
                                                   P. John Brady (Attorney-In-Charge)
                                                   Missouri State Bar No. 30183
                                                   Federal ID No. 2818866
                                                   Andrew J. Ennis
                                                   Missouri State Bar No.57713
                                                   Federal ID No. 3137530
                                                   900 W. 48th Place, Suite 900
                                                   Kansas City,  MO 64112
                                                   (816) 374-0515 (Direct)
                                                   (816) 817-0108 (Fax)
                                                   JBrady@polsinelli.com

                                                   Mark S. Armstrong
                                                   Texas State Bar No. 01321900
                                                   Federal ID No. 219390
                                                   1000 Louisiana Street
                                                   Fifty-Third Floor
                                                   Houston, Texas 77002
                                                   (713) 374-1660 (Direct)
                                                   (713) 374-1601 (Fax)
                                                   MArmstrong@polsinelli.com

                                                   Asher D. Funk
                                                   Illinois State Bar No. 6295022
                                                   Federal ID No. 3138175
                                                   150 N. Riverside Plaza, Suite 3000
                                                   (312) 873-3635 (Direct)
                                                   (312) 602-3919 (Fax)
                                                   Afunk@polsinelli.com

                                             **ATTORNEYS FOR DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 1st day of December, 2017, a true and correct copy of the foregoing was electronically served on counsel for all parties properly registered to receive notice via the Court's CM/ECF system.

*/s/ Andrew J. Ennis*