**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA and STATE OF TEXAS,** *ex rel.* **SHATISH PATEL,** *et al.,* | § § § § § | |
| **Plaintiffs,** | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:17-CV-1817** |
| | § | |
| **CATHOLIC HEALTH INITIATIVES,** *et al.,* | § § § | |
| **Defendants.** | § § § | |

**MEMORANDUM & ORDER**

This *qui tam* action under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, alleges two unlawful schemes by St. Luke's Health System ("System") in connection with its hospital in Sugar Land, Texas. The System launched the hospital with partial physician ownership. In 2011, after several years of poor performance and an intervening change in the law, the System decided to buy out the physician–investors and change the hospital's ownership structure. Relators are three physicians who were among the earliest investors and resisted the System's attempt to buy them out. Defendants are various St. Luke's entities, St. Luke's executives from the relevant period, and Catholic Health Initiatives, which bought the St. Luke's Health System in 2013.

The first alleged scheme concerns the process by which the physician investors were bought out. St. Luke's used a statutory rescission process under the Texas Securities Act. Relators allege that it resulted in payments to the physician investors substantially above the market value of their stakes in the hospital. According to Relators, St. Luke's made these high

1

payments with the intent of maintaining referral relationships with the physicians. This discrepancy in value is alleged to violate the Anti-Kickback Statute, the Stark Law, and by extension, the False Claims Act.

The second alleged scheme concerns St. Luke's representations to federal and state health care programs about the true ownership of the hospital. Before the investors were bought out, they were part of a limited liability partnership that existed for the purpose of owning the hospital. After the buyout, St. Luke's began representing to the government that the partnership was defunct and so a different entity owned the hospital. Relators allege that St. Luke's knew this to be false at the time they made these various representations. Relators rely on their own litigation against St. Luke's in Texas courts from 2011 to 2016, which established that Relators retained partnership interests and that the partnership remained the owner of the hospital. According to Relators, this rendered St. Luke's representations factually false, leading to violations of both the False Claims Act and the Texas Medicaid Fraud Prevention Act.

Relators' complaint has an abundance of detail, but it does not add up to liability under the False Claims Act. Relators might well have had legitimate grievances; their litigation in state court against some of the Defendants suggests as much. But the False Claims Act "is not an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Univ. Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016). More is needed to establish that false or fraudulent claims have been made on the government.

Accordingly, based on careful consideration of the parties' filings and the applicable law, the Court must dismiss with prejudice Relators' claims for violations of the False Claims Act.

Dismissal of those claims leaves only claims under state law in the suit. The Court dismisses those claims without prejudice to refiling in state court.

## I.  BACKGROUND

Relators begin their story in the mid-2000's. St. Luke's was trying to catch up to competitors that had moved more quickly into markets in the suburbs of Houston like Sugar Land. (Doc. No. 1 at 7–8.) To stay competitive, St. Luke's needed to form good relationships with physicians in the area who would make referrals. Its approach was conferring ownership stakes in its new hospital. In 2006, the System formed a new partnership, the St. Luke's Sugar Land Partnership, L.L.P. ("Partnership"), a non-party. (*Id.* at 8.) Class A shares would comprise 49% of the Partnership, while Class B shares would comprise 51%. (*Id.* at 9.) Physician investors could buy Class A units for $40,000 per unit, while only the System or an affiliated entity would own the Class B shares. (*Id.*) Later, Defendant St. Luke's Community Development Corporation–Sugar Land ("SLCDC–SL") came to be the owner of these Class B shares. (*Id.* at 11.) Despite the 49–51 split, the physician investors had an important role in the Partnership's governance, because the partnership agreement imposed supermajority thresholds for votes by the Partnership's governing board on important matters. (*Id.* at 23.) Relators Shatish Patel, Hemalatha Vijayan, and Wolley Oladut were among the first physician investors, with Patel and Vijayan buying four Class A units each and Oladut buying two. (*Id.* at 10.)

### a.  New Limits on Hospital Expansion Lead to Rescission

The hospital opened for business in October 2008, and it evidently was a Medicare provider from the outset. (Doc. No. 1 at 12.) The next year, Congress began consideration of the Affordable Care Act (ACA), and the ACA's passage in 2010 had major significance for the

hospital. Based on long-standing apprehensions about the conflicts of interest inherent in physician-owned hospitals,[1] the ACA added a provision to the Stark Law, 42 U.S.C. § 1395nn(i)(1)(B), that limited the expansion of operating rooms, procedure rooms, and beds in physician-owned hospitals to the number they had as of March 2010. The effect of this provision, according to one commentator, was to "prohibit[] future physician investment and cap[] existing physician investment in hospitals." Craig A. Conway, *Physician Ownership of Hospitals Significantly Impacted by Health Care Reform Legislation*, UNIV. HOUSTON L. CTR., HEALTH L. PERSPECTIVES 2 (Apr. 2010). Another observed that the provision "rais[ed] questions about [physician-owned hospitals'] future status and viability." Cristie M. Cole, *Physician-Owned Hospitals and Self-Referral*, 15 AM. MED. ASSOC. J. ETHICS 150, 150 (2013).

Relators say that the ACA hampered the System's plans for expanding the hospital from a 100-bed to a 200-bed facility. (Doc. No. 1 at 12–13.) The System had been planning this expansion for some time, viewing it as a necessity for the hospital to become reliably profitable. (*Id.* at 13–14.) The System also had intended to open an additional operating room at the

---

[1] In the late 1980's, the U.S. Department of Health and Human Services conducted an investigation of self-referral practices in the health care industry. The investigation, conducted by the Department's Inspector General, found that self-referrals were common, even though anti-kickback laws already existed. Cristie M. Cole, *Physician-Owned Hospitals and Self-Referral*, 15 AM. MED. ASSOC. J. ETHICS 150, 150–51 (2013). That investigation led to the passage of the Stark Law, 42 U.S.C. § 1395nn, in 1990. The Stark Law generally prohibits a physician who has a financial relationship with an entity from referring patients in federal health care programs to that entity, subject to certain exceptions. It was meant to reduce self-referrals on the thinking that "if physicians were allowed to make self-referrals they would refer more than is actually medically necessary, resulting in over-utilization and compromising the physician's ethical standards." Craig A. Conway, *Physician Ownership of Hospitals Significantly Impacted by Health Care Reform Legislation*, UNIV. HOUSTON L. CTR., HEALTH L. PERSPECTIVES 2 (Apr. 2010). In the intervening years, Congress has revisited the issue of self-referrals several times in order to combat mutations in business forms that have enabled conflicts of interest to continue. *Id.* at 3–4.

hospital, but the new law prevented that. Relators quote emails from System executives saying that the new law "is killing us." (*Id.* at 14.)

With the ACA's limits on physician-owned hospitals impeding business, System executives—like Defendants David Fine, David Koontz, and Stephen Pickett—began planning to move away from physician ownership. (Doc. No. 1 at 14–17.) The System worked with outside counsel from Baker Donelson and a health care consultant, HCAI, to devise a plan. By March 2011, the System had chosen to use the Texas Security Act's rescission process, which permits sellers of securities to rescind a sale at a statutorily determined price in exchange for the release of the buyer's legal claims against the seller. *See* Tex. Rev. Civ. Stat. art. 581-33. In April 2011, HCAI produced a report that appraised the Class A ownership units, originally sold for $40,000, at only $5,000. (*Id.* at 19–21.) In May, the Partnership took a $10 million loan from the System to fund rescission offers, and then it made the offers in June, giving the physician investors thirty days to decide. (*Id.* at 23.)

Relators devote a lengthy portion of their complaint to the argument that the System and Partnership faced no risk of lawsuits from their physician investors. (Doc. No. 1 at 18–29.) The inference is that the System used the Texas Securities Act's rescission process under false pretenses. Relators assert that "no formal or informal claims of any kind had been made by any of the physician investors in the Partnership." (*Id.* at 19.) Relators also assert that the statute of limitations for claims under the Texas Securities Act was, right at that time, foreclosing the possibility of litigation by most or all of the original physician investors. (*Id.* at 25–26.)

These rescission offers are the core of the first scheme that the Relators allege. As to the plausibility of Relators' allegations, it must be noted that Patel sued the Partnership in state court in April 2011, shortly before the rescission offers went out. The other Relators later joined the

suit. Whether Relators can plausibly contend that the Partnership faced no litigation risk at the very time they were suing the Partnership is a question the Court takes up below.

### b. Relators' Conflict with St. Luke's Intensifies

All but four of the physician investors accepted the System's rescission offers: Relators and Subodh Sonwalkar, their co-plaintiff in the state court litigation. (Doc. No. 1 at 29.) At this point, the four physicians were the last hold-outs blocking the System's plans. A complex dispute over the hospital's ownership then unfolded, playing out partly in Texas courts. The significance, in Relators' view, is that this dispute allegedly led the System to knowingly misrepresent SLCDC–SL, its subsidiary, as the hospital's owner to the government.

Relators took the position that the rescission of all other Class A units left them and Sonwalkar in sole control of the Class A units' 49% voting interest in the Partnership that owned the hospital. (Doc. No. 1 at 29.) The System seems to have taken the view that the rescission process resulted in Relators and Sonwalkar possessing only a small stake in the Partnership— under 5%—while its subsidiary, SLCDC–SL, controlled the rest. As the System saw it, the four physician investors were therefore incapable of blocking decisions by the Partnership's governing board.

Faced with these four physician investors' resistance, the System initiated a capital call, demanding they produce nearly a quarter of a million (in the case of Oladut and Sonwalkar) or half a million dollars (in the case of Patel and Vijayan). (Doc. No. 1 at 29.) Relators say the capital call was *ultra vires*, because the Partnership's board did not properly approve it. (*Id.* at 30.) By this time, they had already tried and failed twice to obtain an injunction blocking the Partnership's actions. (*Id.*) After the capital call went unanswered, the Partnership moved to terminate the Relators' and Sonwalkar's ownership interests. A third request for injunctive relief

at this point was unsuccessful in the trial court but more successful in the First Court of Appeals, which ruled that the physicians had demonstrated a probable right to relief against the unlawful deprivation of their voting interest in the Partnership. *Sonwalkar v. St. Luke's Sugar Land P'ship, L.L.P.*, 394 S.W.3d 186 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

On remand, two days before the injunction hearing, St. Luke's apparently surprised Relators and Sonwalkar with a new argument: the Partnership had terminated their interests; the elimination of Class A units rendered the Partnership a defunct entity; SLCDC–SL was now the owner; and so the suit was moot. (Doc. No. 1 at 31–33.) The trial court accepted this argument and denied relief, prompting another trip to the First Court of Appeals. The appellate court again sided with Relators and Sonwalkar, ruling that their lawsuit was not moot. *Patel v. St. Luke's Sugar Land P'ship, L.L.P.*, 445 S.W.3d 413, 424 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). It ruled that the Partnership had not ceased to exist, because Relators' and Sonwalkar's ownership interests had not been validly eliminated. *Id.* at 422. The court also rejected St. Luke's theory that elimination of the physicians' interests would cause ownership of the hospital to automatically revert to SLCDC–SL by operation of Texas law. Even if their interests had been eliminated, numerous steps were necessary to wind up the Partnership; it would not happen automatically. *Id.* at 422–23. The failure of St. Luke's to take all these steps was another reason the suit was not yet moot. *Id.* at 423. In sum, "there is no evidence whatsoever," the court said, that "ownership of the hospital was actually transferred away from the Partnership." *Id.*

This was a split decision. One justice would have affirmed the trial court's ruling that the case was moot and the physicians' interests in the hospital had been terminated. *Patel*, 445 S.W.3d at 424 (Keyes, J., dissenting). St. Luke's also repeatedly sought review of the decision afterwards. It sought rehearing (denied in January 2014), review in the Supreme Court of Texas

(denied in October 2014), and reconsideration of its petition for review (denied in January 2015). *See* Docket, *St. Luke's Sugar Land P'ship L.L.P. v. Patel*, Case No. 14-0183 (Tex. 2014).

Relators believe that the First Court of Appeals' ruling on the mootness of their suit, issued on November 7, 2013, has significance under the False Claims Act. In Relators' view, any representations to the government after that date that SLCDC–SL, not the Partnership, owned the hospital must be factually false. (Doc. No. 1 at 44.)

### c.  Misleading Texas and CMS

Relators also assert that the First Court of Appeals' ruling should have come as no surprise to St. Luke's. They allege that the System's senior in-house counsel, Ann Thielke, wrote an email on October 26, 2011—after the purported termination of Relators' partnership interests—saying "that the Partnership was still in existence and in the winding up phase." (Doc. No. 1 at 38.) As Relators see it, this "directly contradict[s] the self-serving … theory that the Hospital had automatically transferred to SLCDC–SL" that St. Luke's was advancing in court. (*Id.*) In another email to System executives the same day, Thielke carefully explained that "the idea … of the Hospital automatically transferring to SLCDC–SL was not correct." (*Id.* at 39.)

The Thielke emails are important to Relators' story because St. Luke's would soon represent to Texas and to the federal government that SLCDC–SL was the sole owner of the hospital. On December 2, 2011, the System submitted a form to the Centers for Medicare & Medicaid Services (CMS), Form 855A, giving notice of the change in the hospital's ownership. (Doc. No. 1 at 40.) According to Relators, CMS requires a "bill of sale" to corroborate such changes, but the System did not have one. In lieu of the required documentation, the System advanced the automatic-transfer theory that, by this time, its own senior counsel had debunked.

(*Id.*) Moreover, three days later, its outside counsel, Haynes and Boone, confirmed to the System that Thielke's analysis was right. (*Id.*)

Despite its attorneys' guidance, the System allegedly continued to misrepresent the hospital's ownership. In February and March 2012, it made three misrepresentations to the state of Texas: an email to the Texas Department of State Health Services (TDSHS), the administrator of Medicaid in Texas, on February 10; an attempt to pass off an unrelated document as a bill of sale on March 1; and another attempt to do so on March 14. (Doc. No. 1 at 40–42.) Relators also allege that the System never corrected its misrepresentations to CMS, which had approved the change of ownership in May 2012. (*Id.* at 42–43.) Consequently, the System based its change of ownership form and its annual cost reports ever since on information that it knew to be false.

Two further developments warrant mention. First, in 2013, Defendant Catholic Health Initiatives (CHI) bought the System from the Episcopal Diocese of Texas, after the First Court of Appeals' decision in *Sonwalkar* but before its decision in *Patel*. (Doc. No. 1 at 45.) Relators allege that CHI knows all this history but still "decided to continue the System's ongoing misrepresentations to CMS and [Texas] about the ownership of the Hospital." (*Id.* at 46.)

Second, Relators' lawsuit in state court went to trial. A jury evidently returned a $3 million verdict for Relators, the plaintiffs in that suit, in June 2015. (Doc. No. 19 at 1.) The parties' filings do not reveal what further litigation unfolded in the state courts since then.

## II. APPLICABLE LAW

### a. False Claims Act

The False Claims Act (FCA) is the federal government's "primary litigation tool for recovering losses resulting from fraud." *U.S. ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d

262, 267 (5th Cir. 2010). Passed in 1863 to combat fraud by private suppliers of the Union Army during the Civil War, it was "intended to protect the Treasury against the hungry and unscrupulous host that encompasses it on every side." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) (quoting S. Rep. No. 99-345 at 11).

The FCA authorizes actions by the United States or by a relator in a *qui tam* capacity on behalf of the government.[2] 31 U.S.C. § 3730(a), (b). Through those actions, it imposes civil penalties and treble damages on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the federal government. *Id.* § 3729(a)(1)(A). It imposes the same liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* § 3729(a)(1)(B). The FCA defines "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information," but proof of the person's "specific intent to defraud" is not required. *Id.* § 3729(b)(1)(A)–(B). The FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4). The Fifth Circuit has summarized the FCA inquiry as follows: "(1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *U.S. ex rel. Harman v. Trinity Industries, Inc.*, 872 F.3d 645, 653–54 (5th Cir. 2017) (quoting *U.S. ex rel. Longhi v. Lithium Power Tech. Inc.*, 575 F.3d 458, 467 (5th Cir. 2009)).

---

[2] *Qui tam* is short for *qui tam pro domino rege quam pro se ipso in hac parte sequitur* ("who pursues this action on our Lord the King's behalf as well as his own"), a formulation that dates at least to Blackstone. *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 768 n.1 (2000).

Defendants can incur liability under the FCA by submitting claims for services rendered in violation of the Anti-Kickback Statute (AKS) or the Stark Law. *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997). Those statutes are explained in separate sections below.

### b. Dismissal

A court may dismiss a complaint for a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "[A] complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor,* 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, (2007)). That is, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). The plausibility standard "is not akin to a 'probability requirement,'" though it does require more than simply a "sheer possibility" that a defendant has acted unlawfully. *Id.*

"[A] complaint filed under the False Claims Act must meet the heightened pleading standard of Rule 9(b)." *Grubbs*, 565 F.3d at 185. The rule provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," though it permits "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally." Fed. R. Civ. P. 9(b). The rule plays a "screening function, standing as a gatekeeper to discovery, a tool to weed out meritless fraud claims sooner than later." *Grubbs*, 565 F.3d at 185. The Fifth Circuit has given Rule 9(b) a "flexible" interpretation in the FCA context in order "to achieve [the FCA's] remedial purpose." *Id.* at 190. A complaint can survive

either by alleging "the details of an actually submitted false claim" or by "alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.*

## III.    ANALYSIS

Relators' first and second claims for relief concern the rescission offers and are based on both the AKS and Stark Law. The Court treats each statutory basis for the first two claims separately. Relators' third and fourth claims for relief concern the issue of hospital ownership and are based on the FCA. Relators' fifth and sixth claims also concern the issue of hospital ownership but are based on the Texas Medicaid Fraud Prevention Act (TMFPA).

### a.  Claims I and II: Rescission and the AKS

Relators allege that the rescission payments by St. Luke's to the physician investors violated the AKS and thus gave rise to violations of the FCA. Claim I states a claim under Subsection (a)(1)(A) of the FCA (presenting a false or fraudulent claim), while Claim II states a claim under Subsection (a)(1)(B) (making or using a false record or statement material to a false claim). (Doc. No. 1 at 47–55, 55–59.)

The AKS imposes liability on anyone who "knowingly and willfully offers or pays any remuneration … to any person to induce such person to refer an individual to a person for the furnishing … of any item or service" paid by a federal health care program. 42 U.S.C. § 1320a-7b(b)(2). In the context of a criminal prosecution under the AKS, the Fifth Circuit has approved jury instructions that define "knowingly" as "mean[ing] that the act was done voluntarily and intentionally, not because of mistake or accident," and "willfully" as "mean[ing] that the act was committed voluntarily and purposely with the specific intent to do something the law forbids;

that is to say, with bad purpose either to disobey or disregard the law." *U.S. v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998). Due to an amendment in the ACA, liability under the FCA for AKS violations does not require the defendants to have expressly certified their compliance with the AKS. 42 U.S.C. § 1320a-7b(g); *U.S. ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 664 n.3 (S.D. Tex. 2013).

No court appears to have considered whether a rescission under the Texas Securities Act (TSA) might lead to liability under the FCA or AKS. The question nevertheless seems to have a clear answer here. FCA liability should not be imposed in these circumstances.

Consider the sequence of events. The System started a partially physician-owned hospital, which was and is permitted by federal law. Congress then placed limits on the expansion of physician-owned hospitals, encouraging hospital systems to pursue different ownership arrangements. The System responded to that encouragement, deciding to move away from physician ownership. It did so by using the process set out in Texas law for compensating the buyers of under-performing securities. If the AKS and FCA are interpreted to sanction this conduct, it is not clear what the System could have done to respond to Congress's new discouragement of physician ownership while complying with health care fraud statutes.

The TSA, a so-called "blue sky law,"[3] regulates the sale of securities in Texas. Section 33 is the TSA's remedial scheme. Tex. Rev. Civ. Stat. art. 581-33. Section 33I provides a standard rescission process for sellers of unsatisfactory securities to compensate buyers and thereby to limit the risk of litigation from the buyers. "A frequently encountered provision in state securities law," the rescission process "provides that a potential defendant exposed to

_____

[3] So called because such state laws "originated from concerns that fraudulent securities offerings were so brazen and commonplace that issuers would sell building lots in the blue sky." David Hess, *Blue sky law*, Encyclopedia Britannica (last visited May 16, 2018), https://www.britannica.com/topic/blue-sky-law.

liability, or possible liability, may make a rescission offer to the potential plaintiffs with the statutory assurance that the effect of a valid rescission offer will be to curtail the exposure to liability, whether the offer is accepted or rejected, unless the potential plaintiff in rejecting the offer expressly reserves the right to sue." Hal M. Bateman, *Securities Litigation: The 1977 Modernization of Section 33 of the Texas Securities Act*, 15 HOUSTON L. REV. 839, 856 (1978) ("*Modernization of Section 33*").

The TSA provides a formula for the rescission offer: "a buyer shall recover (a) the consideration he paid for the security plus interest thereon at the legal rate from the date of payment by him, less (b) the amount of any income he received on the security, upon tender of the security." TEX. REV. CIV. STAT. ART. 581-33D(1). Once the rescission offer is made, the buyer cannot sue the seller unless the buyer expressly rejects the rescission offer within 30 days. *Id.* ART. 581-33I(5)(d).

Defendants' use of the TSA rescission process makes it difficult for Relators to plausibly allege two elements of their AKS-based FCA claim: first, that Defendants paid improper remuneration "willfully"; and second, the Defendants paid improper remuneration with the intent to induce referrals. Willfulness, as noted, entails a "specific intent to do something the law forbids; that is to say, [a] bad purpose either to disobey or disregard the law." *Davis*, 132 F.3d at 1094. Relators' complaint presents Defendants' use of rescission in nefarious terms to insinuate Defendants were motivated by bad purposes. They note that the System's outside counsel, Baker Donelson, had prepared memos on the use of rescission early in the hospital's history but never disclosed this to the physician investors. (Doc. No. 1 at 16.) They describe the rescission process as Defendants' "weapon of choice" for pushing out the physician investors. (*Id.* at 18.) They call into question the low valuation given to the Class A units by the System's consultant, HCAI,

because Baker Donelson worked with HCAI on the analysis. (*Id.* at 21.) They accuse Defendants of using "strong-arm tactics" to persuade the physician investors to accept the rescission offers within the 30-day timeline. (*Id.* at 24.)

But, as Defendants point out, Relators' allegations are consistent with an alternate narrative of reasonable, lawful business decision-making. (Doc. No. 19 at 15–16.) Relators' complaint acknowledges the hospital's difficult business position, which the ACA's limits on physician-owned hospitals exacerbated. (Doc. No. 1 at 12–14.) It should therefore come as no surprise that the Class A units were given a low valuation. Appraising the value of such interests is difficult as a general matter,[4] and the hospital's poor business position compounded the difficulty. It also should be unsurprising that a low valuation preceded the use of the TSA's rescission process. That is precisely the situation for which statutory rescission exists. If the Class A units' value exceeded the original purchase price, there would be no reason for the System to fear litigation from its investors. Moreover, the use of outside counsel and consultants is conduct at least as consistent with law-abiding behavior as it is with intentional scheming to skirt the law. Taking all these assertions together, I do not believe that they plausibly allege Defendants' specific intent to do something the law forbids.

Concerning referrals, Relators must plausibly allege that Defendants paid the remuneration to induce referrals from the physician investors. "[T]he AKS's inducement element

---

[4] "[T]he valuation of an interest in a closely held business … is, at best, an imprecise art." Edwin T. Hood et al., *Valuation of Closely Held Business Interests*, 65 UMKC L. Rev. 399, 401 (1997). The problem stems in part from the lack of a regular market, which means there is little or no information on sale prices. *Id.* The lack of a market also makes minority interests in close corporations less desirable. Those interests are less easily sold than shares in a publicly traded corporation. Douglas K. Moll, *Shareholder Oppression and 'Fair Value': Of Discounts, Dates, and Dastardly Deeds in the Close Corporation*, 54 Duke L. Rev. 293, 296 (2004). Such minority interests tend to be less desirable for the additional reason that they entail less control over the business's operations. *Id.* at 315.

[is] an intent requirement." *Parikh*, 977 F. Supp. 2d at 665. Relators need not allege that the improper payments actually resulted in referrals, only that the payments were intended to induce them. Inducement of referrals also "need not be the sole reason for the payment." *U.S. ex rel. Ruscher v. Omnicare*, 2015 WL 5178074, at *13 (S.D. Tex. Sept. 3, 2015). "The presence of a legitimate business purpose for the arrangement or a fair market value payment will not legitimize a payment if there is *also* an illegal purpose." *Id.*

The allegations noted above in connection with willfulness are all also relevant to the issue of inducement. The System's rational response to poor business performance and the passage of the ACA indicate the existence of a legitimate business purpose for making payments to the investors. That alone does not cause Relators' claims to fail; an illegal purpose may have existed alongside that purpose. In Relators view, that illegal purpose was to "build[] goodwill with those specific physician partners the System considered to be valuable referral sources." (Doc. No. 1 at 24–25.) The System used rescission as a "means to pay the physician partners more than what the System deemed to be fair market value for the Class A Units." (*Id.* at 25.) Relators note that numerous physicians bought out through rescission remain "active staff members and referral sources at the Hospital," listing fifteen names. (*Id.* at 27.)

Defendants have several responses. One is that the use of rescission negates the inference that payments were meant to induce referrals, because the statutory formula meant all physicians were compensated at the same rate regardless of their referral volume. (Doc. No. 19 at 12–13.) Another is that it is legitimate to maintain goodwill with one's business partners. (*Id.* at 14.) Defendants point to the distinction this Court has previously drawn between the improper intent to induce referrals prohibited by the AKS and "an honest, if business-minded, desire to maintain good customer relationships." *Omnicare*, 2015 WL 5178074, at *23. The investors in the

hospital were local physicians who would continue to practice in the area after the buyout. It is not unreasonable—nor should it be illegal—for the System to avoid ending their partnership on poor terms.[5]

This raises a more complicated point. Defendants contend that their rescission payments were partly intended "to mitigate the risk of future lawsuits" by the investors. (Doc. No. 19 at 12.) They offer this as a legitimate purpose of the payments, in answer to Relators' allegations of improper inducement of referrals. (*Id.*) They cite it also as a reason for the discrepancy between the rescission payment amounts and the appraised value of the Class A units. The payments were meant as "consideration for the release of claims and covenant not to sue." (Doc. No. 29 at 4.)

How real, then, was the risk of lawsuits that Defendants faced? Relators insist that there was no risk of lawsuits. They rely substantially on an argument that the TSA's statute of limitations was, right at that time, cutting off the possibility of claims against St. Luke's for the under-performance of the hospital. (Doc. No. 1 at 23–24.) Relators allege that the System's internal analysis showed June 21, 2011 to be the date after which claims could no longer be brought under the TSA. (*Id.* at 24.) In Relators' view, this "expose[s]" the System's rescission offers as a "sham." (*Id.* at 23.) The rescission offers were issued on June 10. Because the TSA gave buyers 30 days to expressly refuse the rescission offers and retain their rights to sue, the

---

[5] This argument from Defendants echoes the distinction that the Supreme Court drew in *Bell Atlantic Corp. v. Twombly*. There, a putative class of telephone and internet consumers alleged an illegal agreement among regional service providers to avoid competing in one another's areas. 550 U.S. at 549–51. Dismissing the complaint, the Court distinguished allegations of "parallel conduct" among the service providers from allegations indicating an actual illegal agreement. *Id.* at 556–57. "[W]hen allegations of parallel conduct are set out in order to make [a claim under the Sherman Act], they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557. Something like that distinction is present here. Relators' complaint tells a story of ordinary and rational business behavior, and it lacks the credible allegations of intentionally unlawful behavior required for it to survive Defendants' motion to dismiss.

System knew the offers were invalid at the time they made them. (*Id.* at 23–24.) Relators further allege, based on their analysis of the TSA's statute of limitations, that the limitations period had actually expired on June 10 for roughly half the physician investors. (*Id.* at 26.)

Relators' allegations are inadequate even if they are accepted as true. Supposing the limitations period had run for half the investors, the other half still had the potential to sue. As to the latter half, Relators are essentially making a legal argument—if the statute of limitations falls midway through the 30-day period buyers are given to respond to rescission offers, the offers themselves must somehow be invalid. They cite no legal authority that supports this.

Further, it is not clear that the statute of limitations even resolves the matter. Section 33 of the TSA was based on Section 410 of the Uniform Securities Act. Bateman, *Modernization of Section 33*, at 844. A treatise on that Act says that "blue sky laws expressly contemplate an investor mixing and matching remedies from one cause of action to another to maximize recovery." Joseph C. Long et al., 12A Blue Sky Law § 9:108 (2017). The treatise goes on:

> There are two major advantages to mixing and matching remedies from one cause of action to another. First, other causes of action are governed by their own limitations periods, which may be longer than the limitations periods applicable to securities claims. In fact, as a general matter, the limitations periods for common-law causes of action are often longer than the limitations periods under the blue sky laws. Second, pursuing duplicative and supplemental remedies often allows investors to receive a larger recovery than would be received under the securities acts alone.

*Id.* Given that, the availability of claims under the TSA itself was not the only source of litigation risk for Defendants. It was also possible they would face common-law causes of action.

Finally, and most importantly, Relators acknowledge that they had already sued by this point, bringing numerous common-law claims for relief. (Doc. No. 1 at 19.) Their suit is a clear manifestation of the risk that Defendants were facing. Relators insist that they had brought the suit "in large part to ensure that the System was providing the physician partners with full and

complete disclosure of what the System's plans really were." (*Id.*) But that was not all the suit involved. As summarized by the First Court of Appeals: "Patel sued the Partnership, alleging that when he purchased his Class A units he was promised healthy returns, but instead the Partnership was operating at a net loss." *Sonwalkar*, 394 S.W.3d at 191. Though the First Court of Appeals' opinion supports Relators' assertion that Patel was seeking more information from St. Luke's about the buyout, the opinion establishes that Defendants faced a real risk of litigation due to the under-performance of the hospital.[6]

To summarize this chain of inferences, Relators' lawsuit in state court alone establishes that Defendants faced a real risk of litigation. This risk legitimates Defendants' decision to use the TSA's rescission process. It also justifies the apparently large discrepancy between the appraised value of Class A units and the rescission payments as consideration for the release of claims. Because the use of rescission was legitimate, it renders implausible Relators' assertions that Defendants "knowingly and willfully" paid kickbacks and that Defendants did so for the improper purpose of inducing referrals.

In addition to those weaknesses in Relators' AKS-based claim, there is another deficiency. Defendants note the complaint's lack of specific allegations about particular claims that may have arisen from the improper inducement of the physician investors. (Doc. No. 19 at 16–18.) The Fifth Circuit has said that "a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that

---

[6] One might ask whether reference to the First Court of Appeals' opinion is legitimate in ruling on a Rule 12(b)(6) dismissal. Relators' allegations make frequent reference to the First Court of Appeals' decisions in *Sonwalkar* and *Patel* in support of various arguments. Though the Court must take Relators' allegations as true, it is not bound to read only those portions of the opinions to which Relators refer or to read them only in the ways that Relators want.

claims were actually submitted." *Grubbs*, 565 F.3d at 190. But note what is required in the alternative: "particular details of a scheme to submit false claims." For the foregoing reasons, the Court finds that Relators have not supplied such details here. In the absence of such details, the failure to identify "an actually submitted false claim" is fatal to Relators' claims.

A few case comparisons suffice to demonstrate how far off Relators are from a validly pled AKS-based FCA claim. *See, e.g.*, *Waldmann v. Fulp*, 259 F. Supp. 3d 579 (S.D. Tex. 2016) (Crane, J.); *U.S. ex rel. Ruscher v. Omnicare, Inc.*, 2014 WL 2618158 (S.D. Tex. June 12, 2014); *Parikh*, 977 F. Supp. 2d 654. In *Waldmann*, a physician's assistant allegedly aided the physician in surgeries and worked as a sales representative for medical devices simultaneously. 259 F. Supp. 3d at 585–87. The physician's assistant was paid commissions for devices used in the surgeries, persuaded the physician to use devices excessively, and did all this with the physician's and their hospital's knowledge. *Id.* at 616–18. In *Omnicare*, this Court denied dismissal of a complaint specifically alleging that a pharmaceutical company forgave certain debts from its nursing-facility customers in order to induce referrals of other, more profitable patients. 2014 WL 2618158 at *1–4. Though the defendants eventually obtained summary judgment, the complaint contained adequately clear allegations of improper remuneration and resulting referrals to withstand dismissal. In *Parikh*, the relators detailed numerous schemes in which particular practice groups at a hospital were paid cash bonuses or other remuneration for referrals: ER doctors for referrals to the hospital's chest pain center; gastroenterologists for participation in the hospital's colonoscopy screening program; and others. 259 F. Supp. 3d at 667–73. In each of these alleged schemes, the improper remuneration clearly relates to the inducement of referrals, making it plausible that the defendants specifically intended to do

something the law forbids. Considering validly pled schemes like these three makes it all the more clear that one has not been pled here.

### b. Claims I and II: Rescission Offers and the Stark Law

Relators also allege that the rescission payments violated the Stark Law and thereby gave rise to violations of the FCA. As with the AKS theory, Claim I states a claim under Subsection (a)(1)(A) of the FCA (presenting a false or fraudulent claim), while Claim II states a claim under Subsection (a)(1)(B) (making or using a false record or statement material to a false claim). (Doc. No. 1 at 47–55, 55–59.)

Under the Stark Law, a physician may not refer an individual for health services to an entity with which the physician has a financial relationship. 42 U.S.C. § 1395nn(a)(1)(A). Likewise, the entity may not present a claim to a federal health care program pursuant to a referral from a physician with whom it has a financial relationship. *Id.* § 1395nn(a)(1)(B). A "financial relationship" is "an ownership or investment interest in the entity" or "a compensation arrangement," subject to certain exceptions. *Id.* § 1395nn(a)(2). The Stark Law does not prohibit hospital ownership by a physician, provided that the ownership is in "the hospital itself (and not merely in a subdivision of the hospital)," the physician is authorized to perform services there, and the hospital is not a specialty hospital. *Id.* § 1395nn(d)(3). The Stark Law also does not prohibit "an isolated financial transaction" between a physician and an entity, "such as a one-time sale of property or practice," subject to certain regulations. *Id.* § 1395nn(e)(6). Regulations permit isolated transactions under the following conditions:

(1) The amount of remuneration under the isolated transaction is—

(i) Consistent with the fair market value of the transaction; and

(ii) Not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician or other business generated between the parties.

> (2) The remuneration is provided under an arrangement that would be commercially reasonable even if the physician made no referrals to the entity.
>
> (3) There are no additional transactions between the parties for 6 months after the isolated transaction…

42 C.F.R. § 411.357(f). Little case law sheds light on the application of the isolated-transaction exception. Two courts have found that the purchase of a doctor's practice is an isolated transaction, provided that a fair market price is paid. *See U.S. ex rel. Perales v. St. Margaret's Hosp.*, 243 F. Supp. 2d 843, 849–52 (C.D. Ill. 2003); *U.S. ex rel. Obert-Hong v. Advocate Health Care*, 211 F. Supp. 2d 1045, 1050 (N.D. Ill. 2002). One court found that certain payments were not isolated transactions, because they turned out to be only the first in their respective streams of payments from a hospital to a practice group of doctors. *U.S. ex rel. Emanuele v. Medicor Assoc.*, 242 F. Supp. 3d 409, 425–26 (W.D. Pa. 2017).

Defendants contend that Relators' Stark-based claims fail because the allegations detail only an isolated transaction between Defendants and the physician investors. (Doc. No. 19 at 18–19.) Relators respond that the payments to the physician investors were not "[c]onsistent with the fair market value of the transaction," the first element of the isolated-transaction exception. (Doc. No. 22 at 15.) Neither Relators' response to Defendants' motion nor the allegations in Relators' complaint put any of the exception's other elements in question. As noted, the statute excepts "a one-time sale of property or practice." Relators do not allege any payments from Defendants to the physician investors aside from the rescission payments. Fair market value is the lone leg on which Relators' claims stand.

Relators' view is that the $5,000 valuation of the Class A units by HCAI in April 2011 is the fair market value of the Class A units, and so Defendants' payment of $40,000 plus interest clearly is inconsistent with fair market value. (Doc. No. 22 at 15.) In making this argument, Relators implicate the dispute, already discussed, about the reasonableness of Defendants' use of

the rescission process. If Defendants faced no risk of litigation, then the use of rescission perhaps was unjustifiable. The conclusion that Defendants vastly overpaid for the Class A units would follow. If, by contrast, Relators' own allegations defeat their argument, then the use of rescission was justified and the rescission payments were appropriate.

Put differently, the parties take differing views of the "transaction" at issue for the purposes of the isolated-transaction exception. Relators think the transaction is just the buy-back of the Class A units. Defendants think the transaction is the buy-back as well as the elimination of litigation risk. On the former view, the TSA's rescission formula produces a wildly excessive payment. On the latter, it produces an appropriate one.

For reasons already explained, Relators' own allegations indicate the existence of real litigation risk. Those allegations do not make it plausible that Defendants paid an amount in excess of fair market value. Therefore, Relators have alleged a transaction that can be plausibly characterized only as an isolated financial transaction outside the scope of the Stark Law. Consequently, the Stark Law fails as a basis for Claims I and II, which warrant dismissal.

### c. Claims III & IV: Hospital Change of Ownership

Relators' remaining claims center on the issue of the hospital's ownership. Claims III and IV present it as a matter of liability under the FCA. Relators' theory, in short, is that Defendants misrepresented the hospital's ownership to the government and so all claims submitted after that misrepresentation were false or fraudulent.

Relators' allegations concerning Defendants' scienter and the falsity of their claims are dubious. Relators also fail to allege that the hospital ownership issue was material to the government's decision to pay for medical care provided by the hospital. These weaknesses are fatal to these claims.

Relators allege that the System began working on transferring ownership of the hospital from the Partnership to SLCDC–SL in August 2011, shortly before the capital call intended to drive Relators out of the Partnership. (Doc. No. 1 at 36.) Relators describe emails from a System employee, Niquole Dunham, in August and September 2011 listing the steps required to transfer the ownership of the hospital. (*Id.* at 36–37.) On October 24, 2011, an in-house attorney for the System, Asha Geire, sent an email "pitching the System's theory that, due to the termination of the physician partners from the Partnership, the Hospital automatically transferred to SLCDC–SL." (*Id.* at 38.)

Relators place great weight on what happened next. On October 26, two days later, Ann Thielke, "the System's most senior in-house counsel," wrote two emails that rebutted Geire's automatic-transfer theory. (Doc. No. 1 at 38.) The emails, which went to senior System leadership, explained that the hospital would not automatically transfer to SLCDC–SL; rather, numerous steps were required under Texas law to wind up the Partnership, which remained in existence until those steps were taken. (*Id.* at 38–39.) In Relators' view, the Thielke emails "debunk[ed]" the automatic-transfer theory and caused Defendants to make a series of knowing misrepresentations. (*Id.* at 39.) Relators add that the System's outside counsel, Haynes and Boone, confirmed Thielke's analysis in a memo on December 5, 2011. (*Id.* at 40.)

At the System's direction, the CEO of the hospital notified the Center for Medicare and Medicaid Services (CMS) on December 1, 2011—shortly before the Haynes and Boone memo—that the ownership of the hospital was changing. (Doc. No. 1 at 39.) The notice to CMS apparently relied on the automatic-transfer theory. (*Id.*) Relators say that Medicare requires changes of ownership to be indicated via Form 855A, accompanied by a bill of sale. (*Id.* at 40.)

No bill of sale existed, and so the automatic-transfer theory, allegedly known to be false, was concocted to defeat Medicare's requirements. (*Id.*) Medicare then approved the change of hospital ownership on May 24, 2012. (*Id.* at 42–43.) This prompted a celebratory email among System officials, one of whom wrote that either CMS understood the situation or that the System "just wore them down!" (*Id.*)

In Relators' view, the Thielke emails and the Haynes and Boone memo are significant for the additional reason that System leadership knowingly took a legally indefensible position in the state court litigation. A preliminary injunction hearing was still to come in December 2012, at which St. Luke's represented to the state district court that Relators' interests in the Partnership had terminated, rendering the litigation moot. The state district court accepted this argument and dismissed the case, but the First Court of Appeals then reversed. *Patel v. St. Luke's Sugar Land Partnership, L.L.P.*, 445 S.W.3d 413, 424 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). It rejected St. Luke's theory that elimination of the physicians' interests would cause ownership of the hospital to revert to the SLCDC–SL automatically by operation of Texas law. Even if their interests had been eliminated, numerous steps were necessary to wind up the Partnership. *Id.* at 423. "[T]here is no evidence whatsoever," the court said, that "ownership of the hospital was actually transferred away from the Partnership." *Id.*

As Relators see it, the First Court of Appeals' ruling drove home what the System already knew in 2011: that the Partnership remained the owner of the hospital; that Relators retained ownership stakes; and that SLCDC–SL was not the proper entity to submit claims for reimbursement to the state and federal governments. Consequently, Relators contend that Defendants made material misrepresentations in the Medicare change of ownership form, Form 855A, and in annual Medicare cost reports for 2012, 2013, 2014, 2015, and 2016. (Doc. No. 1 at

44.) They allege that "[a]s a condition of being entitled to receive payment from Medicare and Medicaid, providers must file change of ownership forms and annual Medicare cost reports without any material misrepresentations." (*Id.*) They also contend that Defendants made false certifications in "the documents completed and submitted to CMS for the purpose of enrolling the Hospital to submit claims electronically through CMS's electronic data interchange." (*Id.* at 44–45.) They add that Defendant CHI, which acquired St. Luke's in 2013, knew about these material misrepresentations and chose to continue them. (*Id.* at 46.)

### ii. Applicable Law

A claim may be false either because it makes a "legally false" certification or because it makes a "factually false" certification.[7] *U.S. ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 765 (S.D. Tex. 2010). A "legally false" certification "includes a certification of compliance with a federal statute, regulation, or contract that is a prerequisite to obtaining the government benefit." *Id.* A "factually false" certification "involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *Id.*

Relators' briefing is somewhat unclear about which theory of liability they are advancing. (Doc. No. 22 at 28–31.) Relators do make it clear that they mean to bring a factual falsity theory

---

[7] It has been said elsewhere that this distinction "can be both blurry and unhelpful." *U.S. ex rel. Ligai v. ETA-Lindgren Inc.*, 2014 WL 4649885, at *9 n.9 (S.D. Tex. Sept. 16, 2014). *See also U.S. ex rel. Hutcheson v. Blackstone Medical, Inc.*, 647 F.3d 377, 385 (1st Cir. 2011) (warning that such "[j]udicially-created categories" can "do more to obscure than clarify the issues"). Suppose a layperson does surgery on a Medicare patient but the hospital bills it as though a surgeon did it. Is the hospital's claim factually false, because it misrepresented who did the surgery, or is it legally false, because regulations require services to be done by qualified practitioners and Medicare would not pay the claim if it knew the truth? False representations of compliance with legal requirements entail the assertion of facts—whether express or implied— that are also false. In some instances, the distinction between the two types of falsity seems to blur on close view. This is nevertheless the distinction that the case law provides.

concerning the change in hospital ownership. The Court takes it up first, before turning to the legal falsity theory that Relators may have also intended to set forth.

### iii. Factual Falsity

Factual falsity is not all that well defined in the case law, but as noted, it either concerns incorrect descriptions of goods or services, or it concerns requests for reimbursement of goods or services that were not actually provided. For example, certifying that a doctor did surgeries, when a layperson actually did them, is considered an instance of factual falsity. *Waldmann*, 259 F. Supp. 3d at 590–97. Seeking reimbursement for lab work that falsified test results is an instance of factual falsity, because the services actually rendered were "medically worthless." *U.S. ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001). Similarly, seeking reimbursement for approved drugs, when "unapproved knock-offs" were actually used, is also an instance of factual falsity. *U.S. ex rel. Campie v. Gilead Sciences, Inc.*, 862 F.3d 890, 899–902 (9th Cir. 2017).

These examples should make it plain that Relators do not have a valid factual falsity theory. Relators' complaint has nothing to say about the services performed and the goods provided at Defendants' hospital in Sugar Land. There is no suggestion that the hospital was having unlicensed people providing services, that it was billing the government for worthless or nonexistent services, or that it otherwise sought reimbursement for services that it misrepresented to the government.

Relators' only case supporting their factual falsity theory is *Waldmann v. Fulp*, 259 F. Supp. 3d 579 (S.D. Tex. 2016), and that case is patently different. *Waldmann* involved a scheme under which a doctor certified that he had performed various surgeries that were actually performed by his assistant. *Id.* at 585. The doctor would start the surgery and then turn it entirely

over to the assistant, leaving the operating room to do other work. *Id.* at 586. Relators want *Waldmann* to stand for the following proposition: "a claim that represents that a specific provider performed the services billed when, in fact, the services were delivered by a different provider would constitute a factually false claim." (Doc. No. 22 at 18.) Relators use the term "provider" here in an attempt to bridge the chasm between the facts of that case and this one. But this case is about which of two business entities was the correct owner of the hospital, not about a doctor putting his name on work done by a non-physician subordinate. The FCA imposes liability for the latter because it is fraudulent. For a host of reasons, the government does not want to pay for medical services done by unqualified and unlicensed persons, and one can get the government to pay for those services only by lying about them.

Here, by contrast, nothing suggests that the St. Luke's hospital in Sugar Land was doing anything other than sound medical care. Consequently, analyzing the System's hospital change of ownership through the lens of factual falsity leads to a dead end for Relators. The hospital's ownership status simply was not false in the sense that prior cases have considered claims for reimbursement to be factually false.

### iv. *Legal Falsity*

With the factual falsity theory failing, Relators' complaint stands or falls on whether it presents a valid theory of legal falsity. As noted, a legal falsity theory requires Relators to allege specifically that Defendants falsely certified compliance with a federal statute, regulation, or contract that is a prerequisite to obtaining the government benefit. Legal falsity can take two forms. It can be express, where the party "affirmatively certifies compliance with a statute, regulation, or contract requirement that is a material condition of payment." *Waldmann*, 259 F. Supp. 3d at 597 (citing *Bennett*, 747 F. Supp. 2d at 765–66). Alternatively, it can be implied,

where "a party submits a claim to the government and fails to disclose a violation of relevant statutes, regulations, or contract requirements that are material conditions of payment." *Id.* (citing *Escobar*, 136 S. Ct. at 1993).

In their complaint, Relators identify the following federal condition of payment: "providers must file change of ownership forms and annual Medicare cost reports without any material misrepresentations." (Doc. No. 1 at 44.) The former is evidently Form 855A, which the System submitted in 2011. Defendants allegedly misrepresented the true ownership of the hospital in that form, in annual cost reports submitted since then, and in CMS's "electronic data interchange" system, used for the submission of claims. (*Id.* at 44–45.) Because Relators do not identify a specific government rule on the ownership of hospitals, this is best read as an implied-certification theory. Relators' theory would seem to be that the government implicitly requires that claims for reimbursement come from the correct business entity, and the government would not pay claims if it knew the wrong entity were submitting them.

Recall the fundamental FCA inquiry: "(1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *Harman*, 872 F.3d at 653–54. As noted above, Relators have not made allegations going to the fourth element. They have not identified any specific claims submitted to the government for reimbursement. Relators can survive dismissal at this stage by "alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Grubbs*, 565 F.3d at 190.

Relators' allegations do not adequately mark out legal falsehoods in Defendants' statements to the federal government, so they fail to plead the first element of FCA liability

successfully. Relators also fail to plead scienter on the part of Defendants and the materiality of Defendants' allegedly false statements adequately. Materiality is the most significant problem for Relators, but no step in this theory is sure-footed.

Relators have not identified any condition in federal or Texas statute or regulation with which Defendants falsely certified compliance. It is fair enough to say that the government would condition reimbursement for medical care on the claimant being the correct legal owner of the hospital that provided the care. Suppose there were a billing fraud scheme under which an intruder engaged in an identity theft and tried to steal a stream of payments intended for a legitimate medical practice. Presumably the government would stop the payments once it learned they were ending up in the wrong hands. Perhaps this is so obvious a condition of payment that it was unnecessary for the government to spell it out.

But were Defendants' certifications actually false in the same sense as the billing fraud just hypothesized? Relators' theory is that SLCDC–SL was the intruder, while the Partnership was the legitimate owner, and they stake their case on the internal emails of System officials and on the First Court of Appeals' ruling in *Patel* in 2013. The Court finds from Relators' allegations that the true ownership of the hospital was not conclusively resolved as a legal matter during the relevant period. Four judges were presented with the issue from 2011 to 2013, the trial judge and the three justices of the appellate court, and they split on the issue. The trial judge thought the Partnership had been extinguished, and a dissenting justice on the appellate court agreed. The panel majority, as described above, did indeed find that the Partnership had not been terminated, but it did not render that ruling after a trial or even a summary judgment. The trial court had dismissed on mootness grounds, and the panel had to consider the status of the Partnership in order to resolve that issue of subject-matter jurisdiction. That ruling is best understood as

contingent, because litigation of the case was still to come and because the possibility of appeal to the Supreme Court of Texas still existed.

Even if one takes the First Court's ruling as a conclusive resolution of the ownership issue, the foregoing is not an adequate pleading of Defendants' scienter. The ostensibly conclusive *Patel* decision did not come down until November 2013, nearly two years after the change of ownership form was submitted to CMS. Relators' allegations indicate that the automatic-transfer theory was persuasive to a state district judge in 2012, so it is implausible to say that Defendants knew it to be false at that time or earlier. Moreover, the System's choice to advance the theory in court complicates Relators' idea that the Thielke emails and the Haynes and Boone memo reflect Defendants' state of mind in 2011 and 2012.

Even if one assumes a condition of payment and Defendants' scienter in violating it, there is still the problem of materiality. The term "material" means "having a natural tendency to influence, or be capable of influencing, the payment of money or property." *Escobar*, 136 S. Ct. at 2002 (quoting 31 U.S.C. § 3729(b)(4)). "The materiality standard is demanding," because the FCA "is not an all-purpose antifraud statute or a vehicle or punishing garden-variety breaches of contract or regulatory violations." *Id.* at 2003.

Crucially, the Supreme Court understands materiality to turn on whether the government would pay the claim or not if it knew of the claimant's violation. Discussing appropriate proof of materiality, the Court suggests it can include evidence "that the Government consistently refuses to pay claims" based on noncompliance with a given requirement. *Escobar*, 136 S. Ct. at 2003. It also suggests it can include evidence that "the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated." *Id.* at 2003–04. To illustrate, the allegations in *Escobar* were that a mental health facility in Massachusetts was

billing Medicaid for services provided by unlicensed, unqualified staff in systematic violation of state regulations and that the government would have ceased reimbursement if it knew the truth. *Id.* at 1997–98.

In this case, by contrast, no doubt has been raised that the government would continue to reimburse the St. Luke's hospital in Sugar Land for the care it provides. This dispute is entirely and only about which business entity is the proper recipient of those reimbursements. Nothing in Relators' filings suggests that the government would stop the flow of funds to this hospital if it knew the truth of its ownership; Relators' allegations concern only the direction in which they think the funds should flow. In view of the materiality requirement, Relators' FCA claims appear as little more than a continuation of their long-running business dispute with St. Luke's. Their allegations do not plausibly indicate violations of the FCA, and so Claims III and IV warrant dismissal.

### d. Claims V & VI: Hospital Change of Ownership under the TMFPA

The claims under the TMFPA are before this Court based on supplemental jurisdiction. A district court can decline to exercise that jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "When a court dismisses all federal claims before trial, the general rule is to dismiss any pendent claims. However, the dismissal of the pendent claims should expressly be *without* prejudice so that the plaintiff may refile his claims in the appropriate state court." *Bass v. Parkwood Hosp.*, 180 F.3d 234, 246 (5th Cir. 1999). That would be the prudent choice even if precedent did not direct it.

Relators contend that Defendants' handling of the hospital ownership change also gives rise to liability under the Texas Medicaid Fraud Prevention Act (TMFPA). In addition to the foregoing allegations, Relators assert that Defendants made three specific misrepresentations to

the Texas Department of State Health Services (TDSHS), which administers Medicaid in Texas. The first was on February 10, 2012, when a System employee, Claire Lauzone-Vallone, emailed TDSHS with a resolution purportedly approved by the Partnership's governing board as evidence of a sale of the Hospital from the Partnership to SLCDC-SL. (Doc. No. 1 at 41.) Relators allege that "the attached resolution did not reflect any attempt to document a sale of assets," and so this constituted a misrepresentation to Texas officials. (*Id.*)

> The second:
>
> On March 1, 2012, Thielke sent TDSHS attorney Lisa Nieman a bill of sale documenting the sale of the real property where the Hospital was located, asking if that would be sufficient to meet the necessary change of ownership requirements. The Partnership has leased the real property, and the bill of sale Thielke sent to Nieman was clearly an agreement between Medistar Sugar Land Medical Center, Ltd. and St. Luke's Sugar Land Properties Corporation – not the Partnership and SLCDC-SL. Thielke was fully aware that this bill of sale did not document a transfer and sale of the Hospital to SLCDC-SL, but the System directed Thielke to attempt to pass off this bill of sale in the hopes of getting the change of ownership approved.

(Doc. No. 1 at 41–42.) The third was from Lauzon-Vallone to another TDSHS employee, Lisa Vallejo, on March 14, again attaching the same document that Thielke had sent to Nieman. (*Id.* at 42.) Presumably the state eventually approved the change; Relators' complaint does not say.

The TMFPA imposes penalties on a person who "knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized." Tex. Hum. Res. Code § 36.002(1). It also penalizes a person who "knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized." *Id.* § 36.002(2). Claim V is predicated on the former provision, Claim VI on the latter.

The TMFPA case law is limited, particularly in the state courts. Federal courts analyzing TMFPA claims alongside FCA claims have pinned their analysis of the former to their analysis of the latter. *See, e.g.*, *Waldmann*, 259 F. Supp. 3d at 632–33; *United States ex rel. Williams v. McKesson Corp.*, 2014 WL 3353247, at *4 (N.D. Tex. Jul. 9, 2014) (acknowledging the two statutes differ textually, but describing them as "analogous" and "depend[ent] on the same operative facts and legal requirements"); *U.S. ex rel. Carroll v. Planned Parenthood Gulf Coast, Inc.*, 21 F. Supp. 3d 825, 831–32 (S.D. Tex. 2014) (characterizing the TMFPA as "contain[ing] analogous provisions prohibiting substantially the same conduct in the context of the State's Medicaid program").

Defendants want this Court to do the same here. (Doc. No. 19 at 21–22 n.9.) They argue that their criticisms of Relators' FCA claims "apply with equal force" to Relators' TMFPA claims. (*Id.*) Defendants also make the point that the TMFPA has been deemed compliant with 42 U.S.C. § 1396h. (Doc. No. 32 at 1 n.2.) That statute entitles states to a greater share of the proceeds of actions they bring under their own fraud prevention statutes, provided those statutes establish liability for conduct that would violate the FCA. In Defendants' view, this means the TMFPA mirrors the FCA. (*Id.*) Relators respond that the statutory text of the TMFPA differs from the FCA in important ways. Most notably, they argue that "the presentment of a false claim for payment is not an essential element under the TMFPA." (Doc. No. 22 at 29.)

Significantly, Texas has filed a Statement of Interest, calling for the TMFPA to be interpreted separately from the FCA in light of the textual differences.[8] (Doc. No. 31.) Texas

---

[8] Defendants point out that Texas has filed its Statement "[w]ithout seeking leave of the Court, or citing any statutory authority to do so." (Doc. No. 32.) Defendants are right. Nevertheless, Texas is not entirely uninvolved in the litigation. It has the continuing option to intervene in cases under the TMFPA and a statutory entitlement to be served all pleadings and deposition transcripts. Tex. Hum. Res. Code § 36.104. The Court will accept the state's Statement.

concurs with Relators that the presentation of a false claim is not required for liability under the TMFPA. (*Id.* at 5.) Texas also contends that the "false certification" doctrines developed by federal courts under the FCA are inapplicable to the TMFPA, as is the materiality requirement that the Supreme Court expounded in *Escobar*. (*Id.* at 6–7.)

The Court is inclined to accept the reasoning of Relators and Texas over that of Defendants. The TMPFA's scope can be broader than the FCA's scope. As Texas sees it, the TMFPA prohibits false or misrepresentative statements made to obtain payments under the Medicaid program, but it does not require the presentment of a particular false claim to be identified. On this reading, the law would penalize all conduct that violates the FCA while also reaching a broader range of false or fraudulent conduct less closely tied to the Medicaid claim submission process. Texas courts could reasonably interpret the TMFPA in this manner. Under the circumstances, it is appropriate for those courts, and not this one, to decide whether it should be so interpreted.

## IV.    CONCLUSION

Relators' claims under the False Claims Act concerning the System's rescission offers to its physician investors and concerning the change in the hospital's ownership are hereby **DISMISSED WITH PREJUDICE**. The Court declines to permit Relators to amend and refile their federal claims because the problems with those claims are not problems of inadequate specificity. Relators' complaint explains their theories in great detail. Rather, the claims fail because the alleged conduct is not within the scope of the False Claims Act. The Anti-Kickback Statute and the Stark Law do not prohibit buying out physician investors through the rescission processes provided by commonplace state securities laws. Consequently, there is no liability

under the FCA. Likewise, an ownership dispute over a hospital seems to be of no moment to the government if that hospital is otherwise acting in a lawful manner. The ownership dispute is surely of momentous importance to the hospital's owners and investors, as evidenced by their protracted litigation, but more is required for liability under the FCA.

Relators' claims under the Texas Medicaid Fraud Prevention Act are hereby **DISMISSED WITHOUT PREJUDICE**. It is for Relators to decide whether to refile those claims in Texas state court and, in that event, for those courts to determine that statute's proper application to the present case.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas on the 16th day of May, 2018.


HON. KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE